In re BELLANCA AIRCRAFT
CORPORATION, Debtor.

Edward W. BERGQUIST, Trustee of
the Bankrupt Estate of Bellanca
Aircraft Corporation, Plaintiff,

v.

ANDERSON–GREENWOOD AVIATION
CORP., a Texas corporation; and Anderson Greenwood & Co., a Texas Corporation, Defendants.

Bankruptcy No. 4–81–959.
Adv. No. 4–81–323.

United States Bankruptcy Court,
D. Minnesota.

Dec. 9, 1985.

plaint seeking to avoid certain alleged preferential and postpetition transfers under 11 U.S.C. §§ 547 and 549, and to equitably subordinate Defendants' claims against the bankruptcy estate under 11 U.S.C. § 510(c)(1). Defendants additionally seek a claim for administrative expenses for certain expenditures occurring postpetition. The parties submitted this matter for my determination based upon the trial record, consisting of five days of testimony, certain factual stipulations, approximately 350 exhibits, and upon the parties' post-trial oral and written arguments. This Court has jurisdiction over and the power to hear and finally determine all issues arising hereunder pursuant to 28 U.S.C. §§ 1334 and 157, and the July 27, 1984, Order of Reference from the United States District Court for the district of Minnesota. This is a core proceeding under 28 U.S.C. § 157(b)(2)(F).

## FACTS

### A. *Introduction*

1. *The Parties*

Plaintiff is the bankruptcy trustee for the estate of Bellanca Aircraft Corporation (Bellanca), the Debtor in this matter. Bellanca was incorporated under the laws of the state of Minnesota in 1955 as Northern Aircraft, Inc., and adopted the name Bellanca Aircraft Corporation in 1966. On July 25, 1980, Bellanca filed its voluntary petition under Chapter 11 of the United States Bankruptcy Code. Defendants, Anderson, Greenwood & Co. (AGCO) and Anderson-Greenwood Aviation Corp. (Aviation), are corporations formed under the laws of the state of Texas in 1947 and 1970 respectively. Aviation was created as and remains a wholly-owned subsidiary of AGCO.

Jan Stuurmans, Brian Todd, Stuurmans & Kelly, P.A., Minneapolis, Minn., for plaintiff.

Jerry W. Snider, Faegre & Benson, John R. Stoebner, Richard T. Thomson, Lapp, Lazar, Laurie & Smith, Chartered, Minneapolis, Minn., for defendants.

ORDER

MARGARET A. MAHONEY, Bankruptcy Judge.

The above-entitled action came on for trial on April 15, 1985, on Plaintiff's com-

Throughout its active existence, Bellanca was chiefly engaged in the business of manufacturing and selling single-engine aircraft and their parts and accessories. Prior to the Defendants' involvement with

the corporation in early 1976, Bellanca had concurrently been producing two separate aircraft known as the Viking and the Champion. The Viking line, which was a descendant of the Bellanca Columbia, the second airplane to make a trans-Atlantic crossing, was a low wing aircraft constructed of plywood, fabric, and tubular steel, and was designed principally for business and recreational use. Production of the Viking began in approximately 1964 in Alexandria, Minnesota, and it enjoyed increasingly strong sales until 1974 or 1975, when the fuel crisis, recessionary and interest rate pressures, and approaching obsolescence greatly reduced demand. In 1970, Bellanca added the Champion to its inventory by virtue of the acquisition that year of the Champion Aircraft Co. Produced out of Bellanca's Osceola, Wisconsin, facility, the Champion was a high wing aircraft designed for pleasure and agricultural use. Unlike the Viking, it accounted for a substantial and increasing percentage of Bellanca's overall production and sales.

Defendant AGCO, like Bellanca, shared an interest in aircraft development and production at the time of its formation in 1947. At that time AGCO was formed for the purpose of designing and manufacturing an airplane envisioned by the corporate founders. While five such airplanes were actually produced, supply shortages during the Korean war caused production to cease, and the corporation redirected its efforts toward the manufacturing of instrument and safety relief valves for aeronautical applications. Eventually, AGCO engaged in the manufacture of various valves for use in oil and gas production, the petrochemical, chemical, and refining industries, power generation, pulp and paper production, as well as food, beverage, water, and sewage applications.

While AGCO continued the development and production of valves, its founders persisted in their dream of producing their own airplane. For many years AGCO engaged in the designing of a single-engine aircraft known as the Aries T–250. By the early 1970's it more actively began to pursue the development of the Aries in anticipation of the possibility of receiving a type certificate from the Federal Aviation Administration (FAA) conferring upon the corporation the exclusive right to manufacture and sell the aircraft. On December 30, 1970, Aviation was incorporated by AGCO for the purpose of serving as the corporate repository for the Aries type certificate, as well as for the purpose of manufacturing, designing, developing, and selling the aircraft. On December 12, 1973, AGCO filed its application for the Aries T–250 type certificate, which certificate was then issued on July 28, 1976. While AGCO was the recipient of the type certificate, and no actual transfer of the certificate to Aviation ever occurred, it is clear that AGCO transferred certain rights under the certificate to Aviation. The certificate was in fact recorded in the name of Aviation.

Despite testimony to the effect that Aviation remained inactive up until receipt of the Aries type certificate, and then served as little more than a cost center for future Aries design, development and manufacture, it is evident that at all material times this subsidiary corporation to AGCO maintained a board of directors and officers. Moreover, the evidence indicates that significant engineering, drafting, and production assistance was provided in the name of Aviation during the relevant time period, as well as some manufacturing of parts for the Aries due to particular expertise in either Aviation or AGCO. In conjunction with at least some of these activities, Aviation further maintained its own corporate record book and separate bank accounts. The record also indicates that Aviation possessed contracting capacity independent of AGCO.

Although the evidence clearly demonstrated that a variety of services were rendered in the name of Aviation to Bellanca, it is unclear to what extent these services were actually rendered by persons in the employ of Aviation.[1] Testimony at trial

---

1. Significantly, the proxy statement for the an- nual meeting of Bellanca shareholders to be

established that all such services were provided by persons whose income was paid directly by AGCO. In contrast, it is undisputed that Bellanca was directly billed by Aviation for the receipt of such services from 1978 to early 1980, and, presumably, issued checks in the name of Aviation for those Aviation invoices paid. The record indicates, though, that in the year preceding the commencement of the bankruptcy no such Aviation invoices were paid by Bellanca.

## 2. *Commencement of the Bellanca-AGCO-Aviation Relationship*

In anticipation of certification by the FAA of the Aries T–250, Aviation commenced a study to determine the best means of manufacturing and marketing the aircraft, and concluded that it lacked both the necessary facilities and expertise to do so. Moreover, Aviation's parent company AGCO, intending to devote all of its resources and efforts to its successful and growing specialty valve business, wished to limit its further support and involvement in the Aries enterprise. Consequently, Aviation began a search for a partner experienced in manufacturing and marketing airplanes.

In the spring of 1976, discussions occurred between Aviation and Bellanca with respect to engaging Bellanca in the manufacturing and marketing of the Aries T–250. A respected company in the manufacturing and marketing of airplanes, Bellanca was at the time in financial difficulties and in need of a new product. Negotiations continued through much of 1976 until early November of that year when Bellanca and Aviation entered into a series of agreements which provided in part as follows: (1) Aviation would manage Bellanca's operations for six months; (2) a $250,000 loan would be advanced from Aviation to Bellanca; and (3) Aviation would use its best efforts to raise $3 million of capital from private investors for the Aries project. By

early 1977, Bellanca had apparently expended much of the original Aviation loan, and it became necessary for Aviation to advance Bellanca an additional $250,000.

On April 11, 1977, with the Aries project lacking the capitalization proposed under the November agreements, a new series of agreements were reached between Bellanca, Aviation, the Alexandria Bank & Trust Co., and the Farmers' Home Administration (FmHA). Pursuant to these agreements, Aviation advanced substantial funds to Bellanca during the course of 1977. Evidenced by two promissory notes, these advances included $1.5 million in loans convertible at Aviation's option into 16,113,000 shares of Bellanca common stock, which upon conversion would have represented 82 percent of the outstanding shares of Bellanca. In connection with the advances, Bellanca shareholders collectively owning 68 percent of Bellanca's stock granted to Aviation the right to vote their shares on all matters, thereby enabling five AGCO or Aviation officials to occupy positions on Bellanca's board of directors. Total loans and advances from Aviation to Bellanca through at least 1977 amounted to $2,422,539.

By 1978, Aviation and Bellanca curtailed efforts to capitalize the Aries project by way of private investment. The decision was made in approximately May, 1978, to fund the project by way of conventional bank financing. In December 1978, Bellanca obtained a $2,150,000 secured term bank loan from the Alexandria Bank and Trust Company which loan was 90% guaranteed by the FmHA. As part of the loan arrangement, Aviation pledged a $200,000 certificate of deposit and the Aries T–250 type certificate as collateral, and subordinated its then existing mortgages and security interests in Bellanca's assets to the mortgages of the bank. In addition, Aviation entered into a new licensing agreement with Bellanca whereby Bellanca was grant-

---

held on February 29, 1980, reveals that Aviation had billed Bellanca for aircraft-related engineering and tooling services, and accounting services rendered by Aviation employees to Bellanca apparently in 1978 and 1979.

ed the exclusive right to manufacture and market the Aries T–250 aircraft.

### B. *Bellanca's Reported Pre-petition Financial Condition*

By the mid-1970's, Bellanca began to visibly experience the effects of its deteriorating financial situation. Sales, which had steadily increased through the early 1970's to a high of $12,152,000 in fiscal 1974, had suddenly dropped to $9,003,000 in the following fiscal year. In 1976, roughly concurrent with the commencement and continuation of discussions with AGCO concerning the manufacture and marketing of the Aries T–250, Bellanca was in default on all of its loans, its payables were seriously delinquent, and its production and sales were further declining. The corporation's financial data for fiscal 1976 revealed sales totaling $8,928,000. As of September 30, 1976, the close of the 1976 fiscal year, Viking aircraft production was halted, and production of Bellanca's Champion line had fallen to a rate of 1 per day.

Bellanca's 1977 fiscal year commenced with both its Alexandria, Minnesota, and Osceola, Wisconsin, plants shut down. As a result of the execution of manufacturing and marketing agreements with Aviation and the subsequent and repeated infusions of funds by Aviation into Bellanca, however, production in each facility ultimately resumed. Champion aircraft production commenced on approximately November 13, 1976, after only a brief cessation of operations. Viking production remained at a standstill for about eight months, though, and did not begin start-up phases until May 9, 1977. To compound Bellanca's dismal financial picture at this time, a temporary additional cessation of production occurred in 1977 on both the Viking and Champion lines due to a labor strike experienced by

Lycoming Division of Avco Corp. and Continental Division of Teledyne, Bellanca's principal suppliers of aircraft engines. Due to production problems associated with the shut downs, Viking aircraft production for fiscal 1977 dropped to only 15 units, representing a 79 percent decline over the preceding fiscal year. Champion production fell a more modest 22 percent during this same period with 216 units produced. Due in large part to its production problems during this period, the corporation incurred a total net operating loss of $1,351,970. At the close of the 1977 fiscal year, Bellanca's balance sheet revealed assets totaling $4,743,612, and liabilities totaling $5,237,655, with a total stockholders' deficit of $494,043.

Bellanca entered the next fiscal year with a production posture somewhat improved over fiscal 1977. Production and sales of both the Viking and Champion lines continued uninterrupted and exceeded the previous year's figures, approaching those for fiscal 1976. However, due to a net operating loss incurred in the amount of $1,343,056, as well as those losses incurred in prior years, Bellanca's balance sheet for fiscal 1978 reflected an increased stockholders' deficit. Based upon reported total assets of $4,581,943 and total liabilities of $6,419,052, Bellanca's total reported stockholders' deficit equaled $1,837,109.[2]

This established trend of steady financial deterioration continued for Bellanca from the commencement of its 1979 fiscal year through July 25, 1980, when the corporation's chapter 11 petition was filed. Despite additional cash infusions to Bellanca pursuant to the 1978 term loan agreement with the Alexandria Bank & Trust Co., Bellanca's monthly balance sheets revealed

---

**2.** Indicative of Bellanca's precarious financial condition at this time, the independent auditor for the corporation's annual shareholders' report commented as follows:

> In the opinion of management, the realization of the company's investment in certain raw material inventory, machinery and equipment, and deferred software costs is dependent upon the success of future operations.

> Should the company be required to dispose of its assets, other than in the normal course of business, the amounts realized, particularly for certain of its raw material inventory, machinery and equipment, and deferred software costs, might not be sufficient to recover the carrying amount of these assets.

Bellanca Aircraft Corporation, Annual Report to Shareholders 16 (1978).

an increasing stockholders' deficit due to Bellanca's high interest expenses and continuing operating losses resulting in part from mounting start-up costs for the Aries T–250. Bellanca's available audited and unaudited balance sheet reflected the following financial statistics for fiscal years 1979 through 1980:

TABLE I [3]

Bellanca's Reported Financial Status

Fiscal 1979
(by quarters)

| | 12/31/78 | 3/31/79 | 6/30/79 | 9/30/79 |
|--------------------------|----------------|----------------|----------------|-----------------|
| Total Assets | $5,051,691 | $6,590,610 | $6,534,044 | $6,928,771 |
| Total Liabilities | $7,161,402 | $8,929,065 | $9,046,587 | $10,148,951 |
| Stockholders' Equity/Deficit | ($2,109,711) | ($2,338,455) | ($2,512,543) | ($3,220,180) |

Three Month Period Ending
December 31, 1979 [4]

| | |
|--------------------------|----------------|
| Total Assets | $6,374,463 |
| Total Liabilities | $9,734,642 |
| Stockholders' Equity/Deficit | ($3,360,179) |

Fiscal 1980 [5]

| | 1/31/80 | 2/29/80 | 6/30/80 |
|--------------------------|----------------|----------------|-----------------|
| Total Assets | $6,160,626 | $6,915,325 | $6,226,033 |
| Total Liabilities | $9,985,218 | $10,486,998 | $11,377,642 |
| Stockholders' Equity/Deficit | ($3,824,592) | ($3,571,673) | ($5,151,609) |

As the above table indicates, for the one-year period immediately preceding the filing of its bankruptcy petition Bellanca's reported liabilities exceeded its reported assets by at least $2,512,543 and as much as $5,151,609. *See* Appendix A.

3. The category identified as "Total Assets" in the tables for fiscal 1979 and 1980 includes all cash, accounts receivable, inventories, prepaid expenses, and fixed assets primarily in the form of property, plant, and equipment less depreciation as such are separately identified on Bellanca's various balance sheets. Similarly, the category identified as "Total Liabilities" in the same tables includes all total current liabilities, senior long term debt, and notes and accrued interest payable to Aviation as such are separately identified on Bellanca's various balance sheets. In all instances "Total Liabilities" includes a $1,500,000 long term obligation to Aviation convertible at Aviation's option into approximately 16,113,000 common shares of Bellanca—approximately 82% of the then outstanding common shares of the corporation.

4. Effective December 31, 1979, Bellanca changed its year end for financial reporting purposes to coincide with the calendar year, resulting in a three month financial reporting year ending December 31, 1979.

5. The evidence submitted at trial failed to include a complete monthly accounting by way of corporate balance sheets for Bellanca's continuing financial decline in fiscal 1980. Consequently, balance sheets for January 31 and February 29, 1980, have been referenced to provide some indication of the corporation's status at the close of the first quarter of the fiscal year on March 31, 1980.

## C. Market Valuation of Bellanca's Assets

### 1. Valuation of Tangible Assets

In contrast to the asset values reported by Bellanca on its balance sheets, evidence independent from the balance sheets established market values for such assets that occasionally varied from Bellanca's reported values. While the evidence clearly established that the market values for Bellanca's cash, accounts receivable, and inventory of raw materials, work-in-progress, and demonstrator aircraft during the relevant time period were the same as or no more than those reported in its balance sheets, the corporation's remaining tangible assets possessed market values greater than their reported values.[6] In particular, the evidence established greater market values for Bellanca's finished goods, as well as its real property, plant, and equipment.

The record indicates that for the one year period prior to the filing of Bellanca's petition the market value for the corporation's finished goods ranged from approximately 117 percent to approximately 123 percent of the values reported in its balance sheets. Absent additional evidence, and in light of the parties' apparent agreement on the subject, I am satisfied that during the relevant time period the market value for Bellanca's finished goods equals 123 percent of their value as reported.[7]

As to Bellanca's real property, plant, and equipment, a variety of appraisals were introduced into evidence, including the corporation's own appraisal as reflected in the stated valuation in its final supplemental and amended bankruptcy schedules. In light of the apparent consensus between the parties that Bellanca's bankruptcy schedules accurately reflect the market value of these assets, as well as the fact that the schedules contain the highest available valuation of such, and are in closest proximity to the time period in question, I am satisfied that the market value of the subject real property, plant, and equipment is as stated therein.[8] Therefore, Bellanca's real property, plant, and equipment possessed throughout the relevant time period a market value of $2,231,906.[9]

### 2. Valuation of Intangible Assets

In addition to the tangible assets identified above, the record indicates that Bellanca's financial status during the one year period prior to the filing of the corporation's Chapter 11 petition was further bolstered by the possession of certain intangible assets. Defendants contend that the following intangible assets may increase Bellanca's total asset picture by as much as approximately $8.3 million: (1) development of certain computer software; (2) the Viking aircraft type certificate; (3) the

---

**6.** For the months of June, July, August, and October 1979, Bellanca's balance sheets value the corporation's demonstrator aircraft at amounts ranging from $12,274 to $10,173. As to the market value for such aircraft, the Plaintiff has incorporated their respective balance sheet values as market values in his exhibits, proposed factual findings, and briefs. As the Defendants have failed to dispute in any way these market values propounded by the Plaintiff, I am satisfied that the Defendants have acquiesced in the Plaintiff's valuation of this particular asset.

**7.** Bellanca's balance sheets for the months of December 1979 and January 1980 fail to provide an itemized valuation of the corporation's inventory. Consequently, no accurate determination of the market value for its finished goods for those two months is possible. As such, I am allocating toward reported finished goods for those months an amount equal to the highest value for such goods as is reflected in the corporation's balance sheets during the relevant one year period. Therefore, $529,598 (the amount of finished goods reflected on the June 1980 balance sheet) is allocated as finished goods to each of Bellanca's two balance sheets at issue. Market values for finished goods for the months of December 1979 and January 1980 have also been determined in this manner.

**8.** Plaintiff introduced into evidence appraisals dated 1978 and 1981 valuing Bellanca's various plants at $1,462,000 and $1,405,000 respectively. In addition, appraisals dated 1975, 1978, and 1981 were introduced which valued Bellanca's equipment at $372,143, $524,143, and $608,025 respectively.

**9.** For a comprehensive breakdown of market values for all of Bellanca's tangible assets, see Appendix B.

Champion aircraft type certificate; (4) an exclusive license to manufacture and market the Aries T–250 aircraft; and (5) a cost-plus contract to manufacture an aircraft line for Eagle Aircraft Company and Eagle Aircraft Sales Company (Eagle Aircraft). Plaintiff, however, disputes Defendants' valuation and assigns to these assets a collective market value of no more than $56,000.

Bellanca reported certain deferred computer software development costs on its balance sheets under the category of "Deferred Charges and Other Assets." Of the total value reported under this category, approximately $30,703 was allocable each month through August 1979 to the deferred software costs and approximately $79,331 was so allocable for each month thereafter through May 1980. In connection with the balance sheets for September 30, 1979, the corporation's auditor reported that development was discontinued during reevaluation of the software system. Concerning the balance sheets for December 31, 1979, it subsequently reported, not only that completion of the system was unlikely, but that it had been decided that all such deferred costs would be charged to expense. The record indicates, however, that the deferred software costs were reflected as assets for balance sheet purposes until withdrawn from such on Bellanca's June 1980 balance sheet. Despite the auditor's comments on this matter, therefore, I find that the corporation's software development had a market value equal to the

amount so allocated on the monthly balance sheets.[10]

As to the Viking and Champion aircraft type certificates, the parties submitted substantially contradictory valuations. In correspondence dated October 1, 1979, Gerald Sears, as acting secretary to Bellanca, while simultaneously serving as officer and director of AGCO and officer of Aviation, estimated the market value of the Viking type certificate at about $1.0 million.[11] Testimony at trial established that such valuation was based "on what an investor or purchaser of the right to produce the Viking could realize in terms of cash flow from the production of the Viking and the result in earnings that would accrue to him." Using an analysis identical to that applied in the Viking type certificate valuation,[12] Sears subsequently valued the type certificate for the Champion aircraft. In early 1980, when he conducted his analysis, he valued the Champion type certificate at $1.5 million. As to both valuations, however, the record fails to show what period of time Sears based his cash flow and resulting earnings computations, or whether such computations were reduced to present value as part of his valuation analysis.

In the October 1, 1979, correspondence Sears indicated that Bellanca had no potential buyers for the Viking type certificate and that it had not solicited any. By November 19, 1979, however, subsequent to the Viking type certificate analysis, but prior to that for the Champion type certifi-

---

**10.** Also included in Bellanca's "Deferred Charges and Other Assets" balance sheet category for certain months were approximately $70,000 of deferred debt expense. The record clearly indicates, though, that no market value should be assigned these amounts.

**11.** The October 1, 1979, correspondence from Sears was addressed to Herman Felt of the Alexandria Bank & Trust Co. That letter indicated that Bellanca was at that time in default on a loan agreement between the Bank and Bellanca, and relayed certain strategies of Bellanca's for improving Bellanca's financial condition. One such strategy included the sale of the Viking type certificate.

**12.** At trial, Sears further clarified the basis upon which he arrived at the value of the Champion type certificate:

[I did identically] the same analysis I used on the Viking. I used what I thought at that time would be a reasonable production rate that a purchaser could expect to sustain. I used current selling prices through the various Champion models. I used cost to produce those models. I made various assumptions relating to selling, general administrative expenses. I arrived at a pre-tax income that the owner of those Type Certificates could reasonably expect to earn. I applied a 50 percent tax rate to that, and then I capitalized that amount at a rate of 25 percent before tax, or in effect, 12½ percent after tax.

Transcript, Vol. III–A, at 70.

cate, Sears indicated to Felt and two others by memo that negotiations were pending on the sale of both the Viking and Champion assets, which presumably included the two type certificates. Almost simultaneous with these pending negotiations, Sears decided to wind up Viking production, complete the existing aircraft on the assembly line, and shut down that Alexandria operation. By February 1980, when Viking production finally ceased, efforts to sell both the Viking and Champion lines intensified. In March 1980 the Champion line was shut down. Unlike the Viking line, though, the working process on the Champion production line was left intact to help make that line more saleable to a potential buyer. Prior to the filing of its

bankruptcy petition, however, Bellanca was unable to effectuate a sale of either line.

Subsequent to the commencement of Bellanca's Chapter 11 case, efforts to sell the various assets relating to the Viking and Champion lines resumed without success. On April 27, 1981, the case was converted to a Chapter 7, and the trustee and the Alexandria Bank & Trust Co. continued the search for prospective or potential purchasers of Bellanca's assets. As a result of efforts by the trustee and the bank, firm offers were received on most of the remaining assets excepting in part Bellanca's accounts receivable. These offers, which constituted the only firm offers received, were accepted and approved by this Court as described in the table below.[13]

TABLE II

Chapter 7 Liquidation of Bellanca Assets

| Assets Sold | Date Approved by Court | Sale Price |
|---|---|---|
| Champion line, including WIP, equipment, and type certificates and other intangibles | 3/11/82 | $305,000 |
| Alexandria Manufacturing Plant | 3/11/82 | $420,000 |
| Viking line, including equipment and intangibles | 3/11/82 | $140,000 |
| All rights to manufacture and market the Aries T–250, including inventory, equipment, intangibles, the bank's release of its security interest in the Sales and Production Agreement, the T–250 type certificate pledged by AGCO, and the Agreement Not to Terminate | 1/13/83 | $100,000 |
| Osceola Manufacturing Facility | 5/20/83 | $255,000 |
| | TOTAL | $1,220,000 |

As to the sale of the Viking line, $1,000 of the $140,000 purchase price was allocable to the Viking type certificate. In the case of the sale of the Champion line, the record indicates that $55,000 was allocable to the Champion type certificate. Finally, $50,000

of the total sale price for the Aries T–250 manufacturing and marketing rights was allocable to the release of the bank's security interest, the T–250 type certificate, and the parties' agreement not to terminate.

**13.** Defendants contend that certain notes taken by Herman Felt, an officer of Alexandria Bank & Trust Co., establish that a substantially higher firm offer was made for certain assets, including the Champion type certificate. Felt's notes, dated February 17 of presumably 1980, appear to reflect the substance of a phone conversation between Gerald Sears and Felt in which Sears relayed to Felt that an individual named Tom

Grane "proposed" to buy the "operation" for $3.0 million. Felt's notes, however, fail to adequately clarify whether such a proposal actually consisted of a firm offer. Moreover, contrary to the Defendants' assertions, the notes fail to sufficiently identify the assets contemplated to be sold, or the portion of the sale price to be allocated to each asset.

Based in part upon the extensive and unsuccessful prepetition and postpetition efforts to sell the Viking and Champion lines in other than a liquidation sale as well as the fact that such efforts were apparently common knowledge throughout the industry, the fact that Mr. Sears' involvement and experience in the aircraft manufacturing industry is derived solely through Bellanca, AGCO, and Aviation, the absence of pertinent details concerning the basis for his 1979 and 1980 appraisals of the two type certificates, and the exceedingly low sale prices ultimately paid on liquidation in 1982, I find that Defendants' appraisals for the Viking and Champion type certificates are unrealistically high. Similarly, I find unpersuasive the assertion that the market value for such type certificates equals the amount allocated thereto on liquidation. Taking into account the above considerations, as well as the evidence concerning the economic climate in the aircraft industry during the relevant time period, Bellanca's history of financial deterioration, the approaching obsolescence of the Viking and such related problems as the Viking's cramped interior space, weight, high noise level, and heavy fuel consumption, and the approximately 84 percent decline in value of Bellanca's inventory, property, plant, and equipment at liquidation, I find the following values to more reasonably represent the market values for the type certificates during the one year period prior to the filing of Bellanca's petition: (a) $10,000 for the Viking type certificate; and (b) $390,000 for the Champion type certificate.[14]

Evidence was presented by both parties concerning the exclusive license to manufacture and market the Aries T–250 and the cost-plus contract to manufacture aircraft for Eagle Aircraft. Defendants submitted documentary evidence and testimony seeking to establish valuations for the license and contract in the amounts of $4.0 million and $1.8 to $2.0 million respectively. Plaintiff introduced documentary evidence and testimony tending to contradict Defendants' appraisals.

With respect to Bellanca's license to manufacture and market the Aries T–250, Defendants rely on a 1978 letter from Gerald Sears valuing such license in the context of the cost to create those assets related to the license, such as the Aries tooling, drawings, and prototype. In addition, Sears appraised the license in a manner consistent with his appraisals of the Viking and Champion type certificates.[15] Both valuation approaches yielded appraisals of $4.0 million for Bellanca's license.

Defendants also introduced testimony seeking to establish a value to Bellanca of the Eagle contract. Pursuant to that contract, all costs were to be borne by Eagle Aircraft. In exchange for each aircraft produced, Bellanca was to be paid a percentage of the cost as well as an incentive amount. Based upon revenue projections for the first five years under the contract, as discounted to present value, Juan Gomez testified that the contract had a value to

14. Significantly, the relationship between the $56,000 liquidation and the $400,000 market values for the type certificates roughly corresponds to the relationship between the $1.114 million liquidation value allocable to Bellanca's liquidated tangible assets, see Table II, and the $7.776 million highest total market value for all of Bellanca's tangible assets, see Appendix B. The evidence supports a determination that the market values for the type certificates should, under this analysis, be less than or equal to the selected amounts.

15. Sears, basing his appraisal on an analysis similar to that made with regard to the Viking, testified as follows: "I base my assessment on the number of units of Aries T–250's that would be sold during the relevant time period and the amount of profit that would accrue to Bellanca on an after-tax basis as a result of its beneficial interest in the type certificate." Transcript, Vol. III–A, at 68. It is unclear whether or not the "relevant period" referred to is the one year period of insolvency sought to be established by the Plaintiff. Whatever period of time was relied upon by Sears in reaching his valuation, the record lacks any explanation of how such time period relates to a market valuation. In addition, the record does not suggest whether Sears' income-oriented appraisal was ever reduced to present value. In short, Defendants have failed to establish any understandable basis for this appraisal.

356

Bellanca of approximately $1.8 to $2.0 million.

It is undisputed by the parties that both the Production and Sales Agreement, which gives rise to Bellanca's exclusive license concerning the Aries T–250, and the Eagle contracts contain provisions limiting Bellanca's right to assign. Specifically, the Production and Sales Agreement provides that Bellanca "has no right under this agreement to assign or sub-license or make disclosure of anything herein licensed or disclosed to any other person or organization without the prior written consent of Aviation." Similarly, as to Bellanca's contract to manufacture aircraft for Eagle Aircraft, both the Nonexclusive License and the Aircraft Purchase Agreement between Eagle Aircraft and Bellanca contain the following assignment clause:

[Bellanca] may not assign any of its rights under this Agreement without the express written consent of [Eagle Aircraft]. The purchase of the controlling interest in [Bellanca] by, or a merger with, Anderson, Greenwood & Co. or Anderson-Greenwood Aviation Corp. shall not be considered an assignment for purposes of this [Agreement], provided that in connection with such purchase or merger with Anderson, Greenwood & Co. or Anderson-Greenwood Aviation Corp., as the case may be, assumes the obligations of [Bellanca] under this Agreement.

The record is void of any indication that written consent to assign its rights had ever been given to Bellanca by either Aviation or Eagle Aircraft.

D. *The Alleged Preferential Transfers*

1. *Aircraft Transactions*

As a result of a worsening economy and rising interest rates in 1979, Bellanca's dealers experienced increasing difficulty in taking delivery on or paying for completed airplanes which they had ordered. Consequently, due to a mounting finished aircraft inventory, Bellanca began to sustain critical cash flow problems by fall of 1979 which hindered its ability to address its

seriously delinquent accounts payable picture, edged it close to default on its loan obligations to the Alexandria Bank & Trust Co., and generally threatened its ability to survive. Faced with critical decisions concerning its continuing support for Bellanca, the Defendants began to explore alternatives for providing additional financing to the ailing corporation while minimizing their own risk of sustaining further loss. In this vein, the parties ultimately engaged in a series of aircraft transactions which, in the parties' respective books and records, were treated as aircraft sales.

The first set of aircraft transactions occurred in September, 1979, whereby Bellanca's existing accounts payable to AGCO were reduced. In its sales records, Bellanca reflected three transactions of aircraft carrying work order designations of B–083, E–207, and E–266 as purchases by AGCO for which AGCO was invoiced in the respective amounts of $62,662.75, $20,243.25, and $20,648.75. Rather than advancing funds to Bellanca in exchange for the aircraft, AGCO reduced its existing accounts receivable due from Bellanca by an amount equal to the invoiced amounts. Similarly, corresponding reductions were entered by Bellanca in its accounts payable ledger.

In December, 1979, approximately three months after the original transactions took place, two of the three aircraft were sold by Bellanca to third parties. These airplanes, B–083 and E–266, were invoiced to the purchasers in the amounts of $55,000 and $18,221.63 respectively. Moreover, the amounts paid by the purchasers were reflected in Bellanca's cash receipts journal as received for AGCO aircraft. In both cases the funds deposited by the purchasers with Bellanca were turned over to AGCO. On December 27, 1979, AGCO received payment on Bellanca checks dated December 19, 1979, in amounts of $55,000 and $18,221.63.

With respect to all three of the original September transactions, AGCO filed an aircraft bill of sale with the F.A.A. Registry on only E–207. The filing occurred on December 31, 1979, over three months after

the date of Bellanca's invoice to AGCO. Prior to that aircraft's sale directly from AGCO to a third party on February 11, 1983, it was apparently utilized by an AGCO flying club. At all times, E–207 was listed in AGCO's property account and was not reported on the corporation's books and records as inventory held for resale.

On November 12, 1979, subsequent to the three September aircraft transactions,[16] AGCO granted Gerald Sears, its vice president of finance and secretary-treasurer, authority to commit up to $1.0 million toward the purchase from Bellanca of finished aircraft. Sears was at that time simultaneously serving as an officer of Aviation and Bellanca as well. The primary purpose behind the authorization was basically to infuse Bellanca with sufficient cash to meet its trade accounts payable in a manner that provided some security for AGCO's funding. Despite the simplicity of its intentions, however, AGCO embarked on a financing approach which shared many of the convoluted characteristics of its prior aircraft transactions. Shortly after the November 12 grant of authority to Sears, Bellanca's sales records reflected a second set of aircraft transactions involving transfers of thirteen aircraft to AGCO.

On November 16, 1979, Bellanca invoiced AGCO on seven of the thirteen aircraft. Totaling $476,505.60, these invoices refer to Viking airplanes carrying work order designations of B–118, B–126, B–128, B–129, B–130, B–131, and B–133. Contemporaneous with the invoicing of these aircraft, AGCO caused to be transferred to Bellanca $300,000 which represented loan proceeds borrowed by AGCO from the Alexandria Bank & Trust Co. and which had previously been placed by AGCO in an Aviation account with the bank. The remaining $176,505.60 of the total amount invoiced on the seven Vikings was subse-

quently transferred to Bellanca by an AGCO check dated November 19, 1979.

On November 30, 1979, AGCO wire transferred an additional $223,494.40 to Bellanca thereby raising its November cash transfers to the debtor to a total of $700,000. Subsequently, it was invoiced by Bellanca on six more aircraft—three Vikings and three Champions carrying respective work order designations of B–136, B–137, B–138, E–309, E–317, and E–338. Bearing dates ranging from December 20, 1979, to January 2, 1980, the six invoices totaled $284,814.10, exceeding the November 30 wire transfer by $61,319.70. To account for this difference, AGCO credited its accounts receivable from Bellanca in the amount of $61,319.70. Accordingly, Bellanca's general ledger sheets and other records reflect a corresponding reduction on or before June 30, 1980, to its accounts payable in the same amount.

With respect to three of the thirteen aircraft reflected in Bellanca's records as purchased by AGCO, the evidence indicates that those aircraft were sold shortly thereafter to third parties. Subsequent to the AGCO transactions, Bellanca invoiced third party purchasers on the three Viking aircraft designated as B–129, B–130, and B–138 in the amounts of $69,675.00, $69,528.60, and $71,775.40 respectively. All three invoices were paid in full to Bellanca, the payments were reflected in Bellanca's cash receipts journal as received for AGCO aircraft, and Bellanca paid a portion of the funds over to AGCO. As to B–129, Bellanca transferred to AGCO an amount equal to that received—which amount similarly equaled that on which AGCO was originally invoiced. In contrast, while Bellanca also paid over to AGCO the full amount received on B–138, that amount exceeded the original invoice amount to AGCO of $69,240.40 by $2,535.00. Furthermore, as to B–130, Bellanca paid over to AGCO only

---

**16.** Although not contested by Plaintiff as preferential, two aircraft transactions occurred in both October, 1979, and January, 1980, as well, in which sales recorded in Bellanca's records from Bellanca to AGCO were subsequently "reversed". The aircraft involved in those transactions, designated as E–306, E–329, B–139 and B–140 were later sold by Bellanca to third parties. In these instances, however, it appears that AGCO never received any portion of the purchase prices.

the original amount invoiced, retaining an excess amount of $635.00.

Bellanca likewise sold a fourth aircraft from its group of thirteen to a third party subsequent to its transfer in Bellanca's records to AGCO. The aircraft, a Champion carrying the work order designation of E–338, was originally invoiced to AGCO on December 20, 1979, in the amount of $24,114.00.[17] In May 1980, though, that sale to AGCO was reversed in Bellanca's books and records. While the record indicates that the original invoice amount was never returned to AGCO, contemporaneous with the May reversal on E–338 Bellanca invoiced AGCO on another Champion aircraft. Designated as E–072, this new Champion was invoiced to AGCO on May 19, 1980, in the amount of $27,516.75. No funds were paid by AGCO on the May 19 invoice, and the record supports the conclusion that in effect E–338 was transferred to Bellanca in exchange for E–072. By an invoice dated July 22, 1980, Bellanca ultimately sold E–338 for $23,000.00 and retained the proceeds.

It is undisputed, with respect to E–072 and the nine remaining Vikings and Champions originally involved in the thirteen aircraft transfers arising out of the November 12 grant of authority to Gerald Sears, that bills of sale on such aircraft were ultimately filed by AGCO with the F.A.A. Registry. Aside from the March 25, 1980, filing on E–309, though, no bill of sale on these aircraft was filed prior to May 7, 1980—more than four months after the original transactions occurred. Moreover, no bills of sale were filed by AGCO with the F.A.A. on B–129, B–130, and B–138 which were sold by Bellanca to third parties subsequent to the transactions with AGCO.

In March 1980 a third set of aircraft transactions occurred. Roughly contemporaneous with the receipt of funds from Bellanca in early March on sales of B–129

and B–138 by Bellanca to third parties, AGCO reinjected Bellanca with $102,229.84 by way of a check dated March 7, 1980. The record clearly indicates that this check was tendered to Bellanca with respect to two Viking aircraft designated as B–142 and B–143. Both aircraft were subsequently invoiced to AGCO on March 31, 1980, in the aggregate amount of $145,268.50. Accounting for the unpaid $43,038.66 balance due on the two Vikings, Bellanca's cash receipts and sales recap journal and its general ledger reveal a corresponding debit to Bellanca's miscellaneous accounts payable. Significantly, a nearly simultaneous journal entry elsewhere in Bellanca's general ledger reflects a full $145,268.50 credit against Bellanca's accounts receivable for aircraft sold to AGCO. It is clear that Bellanca accounted for the unpaid balance due on the March 31 invoice by reducing Bellanca's accounts payable to AGCO by that same amount. The record, however, reflects that AGCO mistakenly believed that the combined value of B–142 and B–143 equaled the amount indicated on its March 7 check. Therefore, no corresponding $43,038.66 credit was ever recorded in AGCO's accounts receivable from Bellanca.

As to both B–142 and B–143, bills of sale were issued by Bellanca to AGCO. AGCO filed the bills of sale with the F.A.A. Registry on May 7, 1980. Subsequently, the two aircraft were conveyed by AGCO to a third party, Miller Flying Service. Miller was issued a bill of sale by AGCO for B–142 on May 30, 1980, and paid AGCO $61,600 for the aircraft on September 5, 1980. On April 23, 1980, a bill of sale was issued by AGCO to Miller on B–143. As with B–142, AGCO received payment from Miller on B–143 on September 5, 1980. That payment was in the amount of $64,428.28.

With respect to the above three sets of aircraft transactions, the record indicates that, except for E–207 which was used by

---

17. E–338 was actually invoiced to AGCO by Bellanca nearly two months earlier on October 25, 1979, in the amount of $24,139.00. That sale to AGCO was reversed in Bellanca's books and

records in November however. The evidence fails to adequately establish any reason for such reversal.

an AGCO flying club, all aircraft conveyed to AGCO in Bellanca's books and records remained at Bellanca's facilities until they were sold to third parties. Aside from E–207, such aircraft, however, were reported on AGCO's books and records as inventory held for resale, and, specifically as to at least the thirteen November aircraft transactions, the aircraft were reported to the SEC and AGCO's shareholders as purchased from Bellanca. Moreover, testimony at the hearing by Gerald Sears indicated that the November transactions were intended by the parties to constitute aircraft sales and not secured borrowing.[18] While the $700,000 cash infusion into Bellanca in November was designed to help Bellanca with its default under the terms of the 1978 loan agreement which set certain limits for Bellanca's accounts payable, it is clear that Bellanca and AGCO were concerned about other aspects of the term loan agreement as well. Specifically, that agreement required Bellanca to maintain a ratio of current assets to current liabilities of 1.5 to 1.0. The agreement also set at $2.7 million Bellanca's maximum allowable net worth deficit. The record indicates that it was anticipated that profits generated by sales of the aircraft would help reduce Bellanca's accounts payable while improving its current assets to liabilities ratio as well as its net worth.[19] Sears also indicated the delay in filing certain bills of sale with the F.A.A. was due to the expectation that the aircraft purchased by AGCO would be quickly resold to third parties. As to the aircraft which were promptly sold by Bellanca to third parties after reflected as sold in Bel-

lanca's books and records to AGCO, the F.A.A. registration information applicable thereto was generally destroyed by Sears.

A final set of aircraft transactions occurred in April 1980. These transactions concerned two aircraft—B–146, the last Viking manufactured by Bellanca, and A–01, the first Aries T–250 off the Belanca production line. Unlike the previous November and March aircraft transactions, however, Bellanca's books and records do not reflect, nor do the Defendants contend, that any purchases of such aircraft were effectuated by AGCO.

The transactions concerning both B–146 and A–01 transpired in the following manner. On March 24 and March 25, 1980, AGCO loaned $65,000.00 and $2,000.00 respectively to Bellanca in anticipation of a subsequent sale of B–146 to a third party—Aerial Production International, Inc. On April 15, 1980, pursuant to a March 27, 1980, invoice on the aircraft, Aerial Production remitted a cashier's check payable to the order of Bellanca in the amount of $63,973.32. Concurrent with the remittance of the cashier's check by Aerial Production, Bellanca invoiced Miller Flying Service on A–01 in the amount of $80,-638.50. Previously, on January 1, 1980, Miller had paid $10,000.00 of the purchase price, leaving a balance due of $70,638.50. This balance was paid by Miller by way of a check dated April 16, 1980.

Excluding the original $10,000.00 paid by Miller on A–01, the remaining $134,611.82 of proceeds on the combined sales of B–146 and A–01 were intended by the parties to

---

18. It should be noted, however, that various AGCO officers have described the transactions arising out of the November 12 grant of authority to Gerald Sears as something similar to a secured lending arrangement. For example, references were made by Sears to a "revolving credit line" and a "revolving loan program", and by Juan Gomez to a "floorplanning" operation. Other references made included descriptions of the aircraft as security or collateral.

19. In his notes on Bellanca strategies, Sears describes in somewhat contradictory language AGCO's initial plans as to the November aircraft transactions:

AGCO purchase approximately $700,000 of completed, open aircraft from Bellanca for cash. AGCO consign aircraft to selected dealers and move them to dealers location. It is important that we do this to protect our security interest in the aircraft, as to leave them at Bellanca would make the transaction appear to be a loan collateralized by the aircraft, and subsequent action could cause that "Loan" to be subordinated.

A plain reading of these remarks, however, suggests that Sears was concerned with the transaction's potential inaccurate characterization as a collateralized loan—not with any scheme to conceal such a loan in the guise of a purchase.

be paid over to AGCO to reduce AGCO's accounts receivable with Bellanca. The record indicates that the parties originally contemplated depositing the two Miller and Aerial Production checks into Bellanca's general checking account at the Alexandria Bank & Trust Co. A Bellanca check dated April 21, 1980, and signed by Juan Gomez, who simultaneously served as an employee of AGCO, was drawn on the Alexandria Bank account in the amount of $134,611.82 and made payable to the order of AGCO. That check, which was apparently intended for deposit in AGCO's checking account at Bank of the Southwest in Houston, Texas, was never so deposited. Instead, concurrent with the drawing of the April 21 check, Gomez mailed the two Miller and Aerial Production checks to Bank of the Southwest for deposit in a Bellanca account therein. On April 25, 1980, the $134,611.82 proceeds from those checks were transferred to the AGCO checking account at Bank of the Southwest and a stop payment order was issued on the original April 21 check drawn by Gomez. As intended, the proceeds received on the sales of B–146 and A–01 were applied against Bellanca's indebtedness to AGCO.[20]

### 2. The $600,000 Transfer

In late 1979, probably subsequent to the November 12, 1979, grant of authority to Gerald Sears to commit $1.0 million to the purchase of Bellanca aircraft, Sears became actively interested in establishing a Bellanca finance subsidiary to floor plan Bellanca aircraft. The subsidiary, which was to be called Bellanca Financial Corporation, would have offered below market rate financing to Bellanca's dealers and their customers in an effort to stimulate sagging aircraft sales. Ultimately, Sears entered into serious negotiations with Commercial Credit Equipment Corporation (CCEC) which had displayed an interest in committing from $7.0 to $8.0 million to the project—conditioned upon somebody else contributing the first $1.0 million.

Believing the arrangement with CCEC would be completed shortly, Sears undertook efforts to obtain through both Bellanca and AGCO the $1.0 million to be initially invested. On December 13, 1979, Sears met with Thomas Delevan, a loan officer with First City National Bank of Houston, to discuss setting up the needed $1.0 million line of credit. Testimony by Sears indicated that AGCO was interested in structuring the loan as one directly to Bellanca so that either Bellanca or Bellanca Financial would be obligated to make all interest payments. The record indicates that structuring the loan as one to either AGCO or Aviation would have precluded AGCO or Aviation from receiving any interest payment reimbursements from Bellanca due to the provisions of the 1978 term loan agreement between Bellanca and the Alexandria Bank & Trust Co., as consented to by AGCO and Aviation, and a related 1978 standby agreement between Bellanca, AGCO, and Aviation. In light of these circumstances and other evidence adduced at the trial, I am satisfied that the loan transaction resulting from the negotiations with Delevan involved a $1.0 million loan to Bellanca, which was guaranteed by AGCO. Despite this structuring of the loan, First City National Bank never evaluated Bellanca's credit worthiness and looked solely to AGCO for repayment of the debt. On December 19, 1979, AGCO executed the guarantee agreement and First City issued to Sears a $1.0 million cashier's check made payable to Bellanca. On Sears' instructions the check was deposited into a separate Bellanca savings account established for this purpose.

Simultaneous with First City's issuance of the $1.0 million cashier's check, on Sears' instructions Bellanca prepared a check in the amount of $600,000 made payable to AGCO. The record indicates this check was drawn and held by Juan Gomez in the event the CCEC deal relating to Bellanca Financial Corp. failed. Sears testified that an estimated $600,000 had been committed by AGCO in the various aircraft

craft transactions, see Appendix D.

transactions arising out of the November 12, 1979, grant of authority to him, leaving a residue from that grant in the amount of approximately $400,000. With its guarantee of the First City loan, however, AGCO had effectively committed an additional $1.0 million to Bellanca, thereby raising its post-November 12 cash infusions in Bellanca to $1.6 million. The purpose behind the December 19 check was to reduce this $1.6 million amount to the $1.0 million which was originally authorized by AGCO's board of directors on November 12.[21]

Approximately three days after Bellanca received the First City loan, it became clear that the deal with CCEC would not materialize. At that time Sears directed Gomez to deposit the $600,000 check into an AGCO account, which deposit occurred on December 22, 1979. On December 27, pursuant to Sears' directions, Gomez closed out the Bellanca savings account which was established to hold the $1.0 million First City loan proceeds. Those proceeds and accrued interest were transferred on the same day to Bellanca's general checking account in part to cover AGCO's December 22 deposit of the $600,000 check. The $600,000 check was paid by the Alexandria Bank & Trust Co. on December 27, 1979. On December 28, 1979, Sears directed Gomez to prepare a second Bellanca check payable to AGCO in the amount of $400,000. This check, which was to effectuate a reimbursement to AGCO for its intended repayment of the remainder of the First City loan proceeds, was voided on December 31. Sears had decided at that time to allow Bellanca to retain the funds for use as working capital. In lieu of the $400,000 payment, Sears instructed Bellanca to give AGCO title to the next $400,000 of aircraft off Bellanca's production line as "security" for that amount.[22] No such transfers of title ever occurred.

On December 31, 1979, AGCO's financial records reflected as an account receivable the $400,000 of First City loan proceeds retained by Bellanca. The record further indicated a liability by AGCO to First City for the full $1.0 million of Bellanca's indebtedness to First City which was guaranteed by AGCO. In January 1980, AGCO replaced the Bellanca obligation to First City with two promissory notes executed by AGCO in the amounts of $600,000 and $400,000. These notes, including accrued interest, were subsequently paid by AGCO a few months thereafter.

### 3. The $150,000 and $100,000 Transfers

On Friday, December 14, 1979, Gerald Sears was informed that certain Bellanca checks had been mailed to vendors without his authorization. The record indicates that Bellanca had a practice of preparing checks in large batches whether or not sufficient funds existed at the time for their payment. As a matter of convenience, the checks would then be held until authority to release them was granted by either Sears or Juan Gomez. On December 14, however, without the requisite authorization, checks totaling approximately $250,000 had been released on the asserted justification that materials were badly needed

---

**21.** Although AGCO had originally transferred a total of $700,000 to Bellanca in connection with the various aircraft transactions discussed previously, the record indicates that as early as November 21, 1979, AGCO could have anticipated that amount to be reduced to about $630,000. On that day Bellanca had invoiced the third party purchaser of B–130 in the amount of $69,528.60. Moreover, consistent with Sears' later attempt to restrict funds committed by AGCO to the $1.0 million amount authorized on November 12, 1979, AGCO ultimately reduced the overall amount expended on Bellanca finished aircraft to $591,885.84 by recouping the sale pro-

ceeds on B–129, B–130, and B–138. The remaining $408,114.16 authorized to be expended by Sears was almost entirely consumed by the $400,000 of First City loan proceeds left with Bellanca.

**22.** In his September 25, 1984, deposition, Sears remarked, "I instructed ... [Bellanca] to give me title to the next $400,000 worth of airplanes that came off the line to serve as security for that 400,000. As it happened, no titles were ultimately issued as collateral for this $400,000 advance." Deposition at 80.

and that adequate receipts were certain to be deposited with Bellanca on the following Monday, December 17, to cover the checks.

Wishing to avoid the possibility of a bank overdraft, Sears authorized a $250,000 wire transfer from AGCO's account at Bank of the Southwest to Bellanca's account at the Alexandria Bank & Trust Co. Instructions were given for the wire transfer after the wires had shut down, however, and the wire was not actually transmitted until the following Monday. Nevertheless, the funds arrived in time to assure that no overdraft occurred.

On Monday, December 17, Sears directed Gomez to prepare two Bellanca checks in the respective amounts of $150,00 and $100,000. Not knowing whether all of the anticipated receipts had been deposited at Bellanca, Sears intended to deposit the checks to reimburse AGCO on the wire transfer as soon as adequate funds were accumulated to cover them. Sears testified that the purpose for preparing two checks, instead of one for the full amount, was so that a partial reimbursement could be promptly achieved if Bellanca received only enough receipts to cover one of the checks.

AGCO deposited the $150,000 check on December 19, 1979. That check was paid by the Alexandria Bank & Trust Co. eight days later on December 27. On December 24, 1979, the $100,000 check was also deposited by AGCO. It was paid shortly thereafter on December 28. AGCO accounted for the December 17 wire transfer by increasing its accounts receivable in the amount of $250,000. It accounted for the receipt and deposit of the two Bellanca checks by crediting its accounts receivable accordingly.

### 4. *Bellanca Reimbursements on AGCO Payments to Lycoming*

Prior to the fall of 1979, Lycoming, a major supplier of aircraft engines to Bellanca, had been supplying such engines to Bellanca on open account. By late 1979, however, Bellanca was seriously in arrears with Lycoming to the extent of approximately $435,000. In the interest of maintaining an orderly flow of materials from Lycoming to Bellanca, Sears visited the Lycoming plant and arranged for the purchase by AGCO of all of Bellanca's future engine and engine parts requirements. The engines and parts were then resold by AGCO to Bellanca on open account. Deliveries, however, were made directly from Lycoming to Bellanca.

From October 26, 1979, to April 21, 1980, AGCO paid Lycoming a total of $867,581.05 for engines and engine parts delivered to Bellanca under the purchase arrangement between AGCO and Lycoming. Bellanca reimbursed AGCO on some of these purchases. Specifically, Bellanca's Lycoming-related reimbursements were as follows:

TABLE III

Bellanca Reimbursements for AGCO's
Lycoming Payments

| Bellanca Check Number | Date of Check/Delivery | Date of Deposit | Date Check Paid | Amount of Transfer |
|---|---|---|---|---|
| 02014 | 10/28/79 | 10/30/79 | 11/05/79 | $133,105.60 |
| 03750 | 02/18/80 | 02/22/80 | 02/26/80 | $ 61,980.00 |
| 03892 | 02/23/80 | 02/28/80 | 03/03/80 | $ 45,441.00 |
| 03954 | 03/05/80 | 03/10/80 | 03/12/80 | $ 26,719.00 |
| 04043 | 03/10/80 | 03/13/80 | 03/17/80 | $ 42,752.00 |
| 04105 | 03/16/80 | 04/23/80 | 04/25/80 | $ 26,624.00 |

Overall, Bellanca reimbursed AGCO on the Lycoming purchases in an amount totaling $336,621.60.

5. *Bellanca Reimbursements on AGCO Payments to Vendors of Eagle Aircraft Materials*

Pursuant to the nonexclusive license agreement with Eagle Aircraft Co. and the purchase agreement with Eagle Aircraft Sales Co., Bellanca had begun manufacturing a light agricultural aircraft known as the Eagle. It was agreed in the early stages of Bellanca's performance under the contracts that Bellanca would purchase the materials necessary for the Eagle's manufacture and then be reimbursed by Eagle Aircraft. Later, however, Bellanca's accounts with suppliers of Eagle materials became past due as a result of Bellanca's nonpayment on purchases of materials unrelated to the production of the Eagle. Eagle Aircraft became concerned that its reimbursements to Bellanca for payment on purchases of Eagle materials could be misapplied by the suppliers against Bellanca's preexisting indebtedness. Eagle Aircraft feared that materialmen's liens could be asserted against its aircraft.

To alleviate the concerns of Eagle Aircraft, a verbal agreement was reached between Bellanca, Aviation, and possibly AGCO, whereby future purchases of Eagle materials would be accomplished on Aviation purchase orders. Under this agreement, the materials were shipped from the vendors directly to and became the property of Bellanca. The record, however, reflects no payments by Aviation on the ensuing purchases of Eagle materials. In fact, the evidence demonstrates payments only by AGCO to the Eagle vendors.

From January through June 1980, AGCO paid Eagle vendors on Eagle-related materials delivered to Bellanca a total of $107,547.86. On five occasions Bellanca reimbursed AGCO for a small portion of these payments. Overall, Bellanca reimbursed AGCO on the Eagle materials purchases in the total amount of $28,762.13. Similarly, on one occasion Bellanca reimbursed Aviation for Eagle-related payments made by AGCO. That reimbursement was achieved by Bellanca check number 2269 in the amount of $1,760.94. Bellanca's Eagle-related reimbursements are described in Table IV below.

TABLE IV

Bellanca Reimbursements for AGCO's
Payments to Eagle Suppliers

| Bellanca Check Number | Date of Check/Delivery | Date of Deposit | Date Check Paid | Amount of Transfer |
|---|---|---|---|---|
| 03617 | 02/11/80 | 02/19/80 | 02/21/80 | $15,787.02 |
| 03897 | 02/26/80 | 02/29/80 | 03/04/80 | $ 7,332.82 |
| 04170 | 05/07/80 | 05/10/80 | 05/15/80 | $ 1,825.68 |
| 04171 | 05/07/80 | 05/10/80 | 05/15/80 | $ 1,296.32 |
| 04184 | 05/14/80 | 05/20/80 | 05/22/80 | $ 2,520.29 |
| 2269 | 06/03/80 | 06/04/80 | 06/04/80 | $ 1,760.94 (to Aviation) |

6. *Bellanca Payments on Installment Purchase of IBM Address–O–Graph Machine*

During the one year period prior to the filing of its bankruptcy petition, Bellanca utilized and made installment payments on an Address–O–Graph machine owned by AGCO. The record indicates that during this period Bellanca paid AGCO a total of $600.00 toward the purchase of the machine. In addition, as the final installment payment on the machine, Bellanca prepared Bellanca check number 2372 in the amount of $5.62. Although made payable to

AGCO, this check was endorsed by Aviation and deposited in an Aviation account. The following installment payments on the Address–O–Graph machine were made by Bellanca during this period:

## TABLE V

### Bellanca Installment Payments on Address-O-Graph Machine
### In Year Preceding Bankruptcy

| Bellanca Check Number | Date of Check/Delivery | Date of Deposit | Date Check Paid | Amount of Transfer |
|---|---|---|---|---|
| 01123 | 07/30/79 | 08/03/79 | 08/03/79 | $ 60.00 |
| 01639 | 08/31/79 | 09/10/79 | 09/10/79 | $ 60.00 |
| 01862 | 10/04/79 | 11/15/79 | 11/15/79 | $ 60.00 |
| 02126 | 11/16/79 | 11/21/79 | 11/21/79 | $ 60.00 |
| 02614 | 12/06/79 | 01/03/80 | 01/03/80 | $ 60.00 |
| 03209 | 01/04/80 | 01/09/80 | 01/11/80 | $ 60.00 |
| 03460 | 02/01/80 | unknown | 02/06/80 | $ 60.00 |
| 03966 | 03/05/80 | 04/02/80 | 04/02/80 | $ 60.00 |
| 04179 | unknown | 05/15/80 | 05/19/80 | $120.00 |
| 2372 | 06/26/80 | 07/16/80 | 07/16/80 | $ 5.62 |
| | | | | (to Aviation) |

7. *Miscellaneous Bellanca Check Transfers to AGCO*

By way of checks numbered 1619 and 4060, Bellanca transferred a total of $101,335.92 to AGCO as follows:

## TABLE VI

| Bellanca Check Number | Date of Check/Delivery | Date of Deposit | Date Check Paid | Amount of Transfer |
|---|---|---|---|---|
| 01619 | 08/31/79 | 09/05/79 | 09/10/79 | $95,600.00 |
| 04060 | 03/15/80 | 04/23/80 | 04/25/80 | $ 5,735.92 |

The proceeds transferred by check number 1619 constituted a reimbursement for an August 13, 1979, AGCO payment of insurance billings for Bellanca in the aggregate amount of $45,600.00, as well as an AGCO loan in the amount of $50,000.00 which was wire transferred to Bellanca on August 15, 1979. The $50,000 wire transfer to Bellanca constituted funds advanced for payment by Bellanca to certain vendors. The purpose of the transfer of funds to AGCO by check number 4060 was to forward the money for subsequent payment by AGCO of an invoice from Collins Radio to Bellanca. The record indicates that upon receipt of the $5,735.92 transferred by check number 4060, AGCO transmitted a like amount to Collins Radio as payment on the invoice.

8. *Miscellaneous Bellanca Check Transfers to Aviation*

By way of checks numbered 2234 and 2294, Bellanca transferred a total of $16,192.69 to Aviation as follows:

## TABLE VII

| Bellanca Check Number | Date of Check/Delivery | Date of Deposit | Date Check Paid | Amount of Transfer |
|---|---|---|---|---|
| 2234 | 05/29/80 | 05/30/80 | 05/30/80 | $7,412.69 |
| 2294 | 06/06/80 | 06/09/80 | 06/09/80 | $8,780.00 |

The proceeds transferred by check number 2234 constituted a reimbursement to Aviation for payments made on behalf of Bellanca on two utilities bills and a bill for a newspaper advertisement. The record supports my conclusion that the payments on all three bills were made by Aviation and not AGCO. As to check number 2294, I find that this check was delivered to Aviation as an advance of funds subsequently paid by AGCO to Hartzell Propeller on behalf of Bellanca.[23]

### E. *Transfers to or on Behalf of Bellanca*

#### 1. *Direct Money Transfers to Bellanca*

The record indicates that thirteen transfers of money were made directly to Bellanca during the one year period immediately preceding the filing of Bellanca's bankruptcy petition. All thirteen, many of which have been previously discussed, were accomplished either directly or indirectly by AGCO or Aviation.

Direct transfers from AGCO or Aviation were made by both wire and check transfers. Wire transfers occurred as follows:

### TABLE VIII

Direct Wire Transfers from AGCO to Bellanca

| Date Transferred from AGCO and Received by Bellanca | Amount |
|---|---|
| 08/15/79 | $ 50,000.00 |
| 09/14/79 | $ 50,000.00 |
| 11/30/79 | $223,494.40 |
| 12/17/79 | $250,000.00 |
| 03/24/80 | $ 65,000.00 |
| 03/25/80 | $ 2,000.00 |
| 04/10/80 | $ 43,873.56 |

During the one year period prior to the commencement of the bankruptcy, AGCO wire transferred a total of $684,367.96 to Bellanca. AGCO's check transfers to Bellanca occurred as follows:

### TABLE IX

Direct Check Transfers from AGCO to Bellanca

| AGCO Check Numbers | Date of Check | Date Charged to AGCO Bank Account | Amount |
|---|---|---|---|
| 25161 | 10/11/79 | 10/18/79 | $ 50,000.00 |
| 25536 | 11/19/79 | 11/28/79 | $176,505.60 |
| 26734 | 03/07/80 | 03/12/80 | $102,229.84 |

AGCO's check transfers to Bellanca during this period totaled $328,735.44.

An eleventh transfer of funds in the amount of $300,000.00 occurred on November 16, 1979. Unlike the above transfers, however, this transaction involved a transfer to Bellanca directly from Aviation. The record further indicates that Aviation originally became the recipient of the funds by virtue of a November 15, 1979, transfer in that amount from AGCO. Prior to the transfer to Aviation, AGCO had borrowed the entire sum from the Alexandria Bank & Trust Co.

Finally, two additional transfers of funds occurred on October 9 and 12, 1979. These transfers arose out of a September sale of an AGCO-owned aircraft to a third party named J.T. Callier. The Callier transaction involved a Bellanca-manufactured aircraft which was initially sold to AGCO prior to the one-year period in dispute. Upon the

---

**23.** Although Juan Gomez testified at trial that check number 2294 constituted an advance of funds to AGCO which were subsequently paid over to Hartzell Propeller, no documentary evidence was introduced to support the assertion. Bellanca's checking records, however, include a notation made contemporaneously with the preparation of the check that the payment to Aviation was "for reimbursement of pre-paids by AGCO." This notation was apparently made in connection with a June 5, 1980, telephone conference which included Gomez, and indicates that AGCO had transmitted funds in the same amount to Hartzell prior to the preparation of check number 2294.

subsequent sale of the aircraft to Callier, however, a substantial portion of the purchase price was paid by Callier directly to Bellanca. Bellanca's cash receipts ledger for October 9 and 12 reflects payments received from Callier on the aircraft in the respective amounts of $6,082.90 and $33,000.00. These payments, totaling $39,082.90, were accounted for by Bellanca as a debt owing to AGCO and were recorded as such in its accounts payable. AGCO's general journal ledger reflects a corresponding entry to its accounts receivable from Bellanca.[24]

### 2. *Engineering, Shop, and Other Services Rendered to Bellanca*

In 1979 and 1980, engineering, shop, and other services were provided to Bellanca. Aviation regularly invoiced Bellanca for such services at weekly intervals, at cost, and Bellanca accounted for the services on its accounts payable. However, for work done on July 30, 1979, and thereafter, Bellanca did not pay any of the invoices. From July 30, 1979, to February 9, 1980, Bellanca received services, for which it never paid, in the aggregate amount of $161,502.95.

### 3. *Indirect Money Transfers to Bellanca*

In addition to the direct money transfers to Bellanca elucidated above, the Defendants indirectly transferred funds to Bellanca through direct payments to AVCO Lycoming, Eagle suppliers, and other vendors of Bellanca, as well as payments on: (1) Bellanca salaries and expenses; (2) Bellanca debts for professional services rendered; (3) Bellanca insurance premiums or administrative fees; (4) Bellanca's rent obligations; and (5) unpaid utility invoices to Bellanca.

During the one year period immediately preceding the filing of Bellanca's bankruptcy petition, the Defendants made such indirect transfers of funds to Bellanca as are summarized below:

TABLE X

Indirect Transfers by Defendants to Bellanca in Year Preceding Bankruptcy Filing

| Description of Transfer | Amount Paid by Aviation | Amount Paid by AGCO |
|---|---|---|
| Payments to AGCO Lycoming | none | $867,581.05 |
| Payments to Eagle Suppliers | none | $107,547.86 |
| Payments to Other Suppliers | none | $190,396.16[25] |
| Salary and Expense Payments | $18,013.48 | $1,640.11 |
| Payments for Professional Services | none | $51,016.13 |
| Insurance Premiums and Administrative Fee Payments | none | $113,990.23[26] |

---

**24.** Defendants also contend that $400,000.00 of the $1.0 million borrowed by Bellanca from the Alexandria Bank & Trust Co. as seed money for Bellanca Financial Corp., which loan was guaranteed by AGCO constitutes a transfer from AGCO to Bellanca. *See supra* text following note 20. This assertion shall be addressed later in this Order.

**25.** As to a $7,000.00 check payable to the Alexandria Bank & Trust Co., a $16,423.37 check payable to Randolph Paint, a $32,598.56 check payable to Collins Radio and an $8,780.00 check payable to Hartzell Propeller, insufficient invoice amounts or other information was supplied to adequately indicate what portion of the checks represent payments on behalf of Bellanca. However, in light of the parties' agreement that the checks were paid pursuant to an AGCO guarantee and requests by Bellanca, I am satisfied that the full amount of each check represents a transfer by AGCO on behalf of Bellanca.

**26.** Of the total premium and fee payments made by AGCO prepetition, $4,510.00 represent premiums paid on policies covering both Bellanca and AGCO. The parties have stipulated that the cost of the policies were the same whether or not AGCO was named as an insured.

| Description of Transfer | Amount Paid by Aviation | Amount Paid by AGCO |
|---|---|---|
| Rent Payments | $6,720.00 | $1,750.00 |
| Utilities Payments | $2,520.41 | $1,150.00 |
| TOTAL | $27,253.89 | $1,335,071.54 |

Similar indirect transfers of funds to Bellanca occurred postpetition as well. These postpetition transfers are summarized below:

TABLE XI

Indirect Postpetition Transfers by Defendants to Bellanca

| Description of Transfer | Amount Paid on Prepetition Debts by | | Amount Paid on Postpetition Debts by | |
|---|---|---|---|---|
| | Aviation | AGCO | Aviation | AGCO |
| Payments to Other Suppliers | none | $832.38 | $40.53 | $644.34 |
| Salary and Expense Payments | $2,875.89 | none | $29,130.39 | $219.19 |
| Payments for Professional Services | none | $13,204.73 | none | $1,860.87 |
| Insurance Premiums and Administrative Fee Payments | none | $97,503.00 | $5,530.60 | $40,668.89 [27] |
| Rent Payments | none | none | $5,040.00 | $1,250.00 |
| Utilities Payments[28] | $32.61 | $7.05 | $1,123.87 | $15.21 |
| TOTAL | $2,908.50 | $111,567.16 | $40,865.39 | $44,648.50 |

**F. *Bellanca Transfers to Creditors Other than AGCO or Aviation***

From December 1979 to July 1980, Bellanca made payments on payroll obligations, operating expenses, state and federal payroll tax obligations, secured debt, and unsecured debt, other than that owing to the Defendants, in the aggregate amount of $5,116,259. These payments occurred as described in Table XII below.

27. AGCO insurance payment allocations are based upon the documentary evidence submitted with respect to AGCO check numbers 28281 and 28358. These documents and the parties' respective burdens of proof support the conclusion that check number 28281 and $31,614.00 of check number 28358 were paid toward Bellanca debt incurred postpetition. Of the $31,614.00 advanced on check number 28358, that amount represents a premium paid on a policy covering Bellanca, Eagle Aircraft, and AGCO. The parties have stipulated that the cost of the policy was the same whether or not AGCO was named as an insured. The remainder of check number 28358 allocable to Bellanca generally was paid toward Bellanca debt incurred prepetition.

28. Utilities payments allocations to prepetition and postpetition Bellanca debts were achieved by prorating payments, where necessary, in accord with the amount of service provided prepetition and postpetition. Such proration occurred with respect to AGCO check number 88048 and Aviation check numbers 118, 119 and 128.

## TABLE XII

### Bellanca Cash Disbursements to Other Than AGCO or Aviation (December 1979–July 1980)

| Date | Payroll & Op. Exp. Payments | State & Fed. Pay- roll Tax Payments | Payments to Secured Creditors | Payments to AGCO Guaran- teed Vendors | Payments to Other Creditors |
|---|---|---|---|---|---|
| 12/79 | $302,889 | $108,420 | $87,233 | $63,759 | $553,354 |
| 1/80 | $284,075 | $125,573 | $86,837 | $128,426 | $423,421 |
| 2/80 | $322,111 | $124,007 | $8,357 | $39,688 | $386,454 |
| 3/80 | $295,873 | $106,438 | $2,111 | $62,222 | $328,128 |
| 4/80 | $213,986 | $83,599 | $46,857 | $0 | $76,055 |
| 5/80 | $122,397 | $67,145 | $4,223 | $0 | $62,712 |
| 6/80 | $133,427 | $43,547 | $40,500 | $3,905 | $72,177 |
| 7/80 | $46,756 | $31,257 | $167,950 | $8,330 | $52,060 |
| Total | $1,721,514 | $689,986 | $444,068 | $306,330 | $1,954,361 |

In contrast, cash disbursements from Bellanca to AGCO during the period covered in Table XII totaled $1,524,510.75.[29]

### G. *Public Disclosures by Bellanca*

In addition to Bellanca's September 30 and December 31, 1979 balance sheet figures which were reported to the Securities Exchange Commission, Bellanca made other public disclosures of its financial status by way of press releases and letters to Bellanca trade creditors. One such press release was issued on November 19, 1979, in which Bellanca disclosed its cash flow problems and resulting default, due to excessive trade accounts payable, under the 1978 term loan agreement with the Alexandria Bank & Trust Co. It was revealed that in an effort to cure this default, AGCO had agreed to purchase finished aircraft of Bellanca in November and thereby infuse Bellanca with additional funds with which to meet its obligations to trade creditors.

A February 18, 1980, press release from Bellanca reiterated the corporation's financial problems while describing its overall financial health as considerably improved—apparently in light of recently improved sales figures and reduced net losses. On February 25, 1980, however, Bellanca issued a somewhat bleaker press release discussing its continuing losses as well as its expectation that only full production of the Aries T–250 would stem such losses. Reasons for the losses were indicated to be a significant build-up of aircraft inventory due primarily to high interest rates and tight credit. It was also revealed once again that Bellanca was in default under its bank loan agreements. As to the Defendants' involvement with Bellanca, it was disclosed that Aviation had previously assisted Bellanca with loans and other credit support, and with the purchase of the completed aircraft. Future support, however, was stated to be limited to management involvement, and some technical, accounting, and engineering assistance.

By March 13, 1980, caught up in the vortex of steady financial deterioration, Bellanca issued a letter to its trade creditors detailing its financial difficulties and

---

**29.** *See supra* Section D. This figure includes $283,565.63 attributable to sales by Bellanca to third parties of aircraft which were involved in the September and November aircraft transactions previously discussed. Similarly, this figure does not include $721,790.20 which represents the value of the remaining aircraft transferred in Bellanca's books and records to AGCO which were retained by AGCO and not subsequently sold by Bellanca to third parties.

its largely fruitless efforts to remedy the problem. This letter further provided as follows:

During the next 90–120 days, the Company's management will be pursuing any means it can to assure Bellanca's survival and continuing operation based on its new Aries T–250 aircraft and its contract to produce the Eagle agricultural plane. Of necessity, our efforts will probably be directed toward the sale of a significant part, if not all, of Bellanca's other operations. During this period of 90–120 days, it will not be possible for Bellanca to pay any amount on any of its trade indebtedness. No further credit is asked of any vendor, but shipments of materials and supplies on a C.O.D. or C.I.A. basis is requested and is essential for Bellanca to be able to ultimately pay all of its debts. (Plaintiff's Exhibit 119.)

Promising a future progress report, Bellanca sent a follow-up letter to its trade creditors on April 23, 1980. This letter, which included a copy of an April 18 general press release, reiterated certain disclosures made in the prior letter as well as the earlier press releases. Both the April 23 letter and April 18 press release reemphasized Bellanca's precarious financial circumstances and disclosed the suspension of production on the Champion aircraft line. Indicating that continued Eagle production was expected to remain a profitable venture, Bellanca stated, however, that production of the Aries T–250 line was proceeding at the very low rate of one per month with a generally reduced Bellanca workforce of sixty employees. Although the letter indicated that Bellanca was attempting to consolidate its records by moving certain accounting operations back to its Alexandria facilities, as well as to generate more cash through the sale of its Viking and Champion operations, it was stated that an up-turn in the economy would be the best medicine Bellanca could receive.

The record, as a whole, indicates that no specific disclosures were made by way of SEC reports, press releases, or general mailings as to any arrangements made between the Defendants, Bellanca, and Lycoming and Bellanca's Eagle suppliers concerning the purchase of materials by and subsequent reimbursement to AGCO or Aviation. Moreover, no disclosures were made with respect to: (1) the cancellation of 1980 aircraft purchase orders by one of Bellanca's major Champion dealers; (2) a January 17, 1980, moratorium on the payment of Bellanca accounts payable aside from payroll and related taxes, and bank debts; or (3) the fact that, as early as April 3, 1980, and possibly as early as fall 1979, Bellanca's board of directors considered the prospect of later continuing operations under the protective ambit of the Bankruptcy Code. Similarly, although the record reflects that certain small vendors were aware and critical of Bellanca transfers to AGCO and Aviation, no specific disclosures of such transfers was ever made by Bellanca.

## DISCUSSION

### I. PREFERENTIAL TRANSFERS

#### A. *Plaintiff's Prima Facie Case*

Plaintiff contends that, pursuant to 11 U.S.C. § 547, preferential transfers to Defendants occurred regarding the following property of Bellanca: (1) twenty finished aircraft; (2) a $600,000 check representing a portion of funds originally transferred to Bellanca and earmarked for use in the creation of Bellanca Financial Corporation; (3) two checks in the amounts of $100,000 and $150,000 representing repayment of funds originally wire transferred from AGCO to Bellanca; (4) reimbursements for AGCO payments to Lycoming and vendors of Eagle Aircraft materials; (5) installment payments toward the purchase of an address-o-graph machine; and (6) other miscellaneous reimbursements for payments of bills and invoices on behalf of Bellanca. Defendants, however, contest the characterization of these transfers as preferential on the following grounds: (1) Bellanca was not insolvent during the period in question; (2) many of the alleged transfers were not

transfers of property in which Bellanca had an interest; (3) certain alleged transfers were not for or on account of an antecedent debt; (4) certain alleged transfers were contemporaneous exchanges; and (5) all alleged transfers were netted out by subsequent advances of new value from Defendants to Bellanca.

Section 547(b) of the Bankruptcy Code provides the statutory framework governing a trustee's avoidance powers with respect to preferential transfers. That section provides in relevant part as follows:

> Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—
>
> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made—
>
> (A) on or within 90 days before the date of the filing of the petition; or
>
> (B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—
>
> (i) was an insider; and
>
> (ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and
>
> (5) that enables such creditor to receive more than such creditor would receive if—
>
> (A) the case were a case under chapter 7 of this title;
>
> (B) the transfer had not been made; and
>
> (C) such creditor received payment of such debt to the extend provided by the provisions of this title.

11 U.S.C. § 547(b) (1983). It is well established that under this section the burden of proof remains on the trustee to prove each and every element of a preference by a preponderance of the evidence. *Constructora Maza, Inc. v. Banco de Ponce*, 616 F.2d 573, 576 (1st Cir.1980) (applying section 60 of the Bankruptcy Act); *First Nat'l Bank of Clinton v. Julian*, 383 F.2d 329, 333 (8th Cir.1967) (applying section 60 of the Bankruptcy Act); *AAB v. Wesco Corp., (In re Casco Electric Corp.)*, 28 B.R. 191, 195 (Bktcy.E.D.N.Y.1983); *Sbraga v. Iacovelli, (In re Sbraga)*, 27 B.R. 199, 200–201 (Bktcy.M.D.Penn.1982); *Young v. Scandore Paper Box Corp., (Matter of Lucasa Int'l Ltd.)*, 13 B.R. 596, 598 (Bktcy.S.D.N.Y.1981); *Cf.* 11 U.S.C. § 547(g) (Supp. II 1984) (1984 amendment allocating to trustee burden of proof under section 547(b)).[30]

As to section 547(b)(1), there can be no question but that the transfers at issue were to or for the benefit of AGCO or Aviation, both creditors of Bellanca. See 11 U.S.C. § 101(9) (1982). Similarly, the record clearly establishes that Defendants received more by virtue of the transfers than they would have in a liquidation under Chapter 7 of the Code had such transfers not been made. 11 U.S.C. § 547(b)(5). While Defendants do not appear to seriously question Plaintiff's interpretation of the record on these two issues, they do however, strongly dispute many of Plaintiff's contentions concerning the remainder of his prima facie case.

### 1. *Property of the Debtor*

Defendants generally do not contest the characterization of the various alleged transfers as being those of property of the debtor, Bellanca. However, as a preliminary issue, they do assert that the $600,000 check transfer which occurred in December 1979 was not a transfer of Bellanca's property. This assertion is based upon the contention that the $1.0 million in loan proceeds from First City National Bank, out of

---

**30.** Section 547(a) was recently enacted as section 462(g) of the Bankruptcy Amendments and Federal Judgeship Act of 1984. As the bankruptcy case out of which the present matter arises was filed prior to the effective date for section 547(b), that section is not herein directly applicable. *See* Bankruptcy Amendments and Federal Judgeship Act of 1984, § 553(a), Pub.L. No. 98–353 (codified as a note under 11 U.S.C. § 101 (Supp. II 1984).

which the $600,000 check was paid, were wholly controlled by AGCO and earmarked only for use in the Bellanca Financial Corporation project. It is argued that where one entity transfers funds to a debtor and controls their disposition by the debtor, those funds never become the property of the debtor. As Plaintiff correctly points out, however, this is an overly broad recitation of the rule as it applies to the circumstances of this case.

■ The rule relied upon by the Defendants finds its genesis primarily in cases involving payments by a third party either directly or indirectly to a creditor of the debtor to satisfy an obligation owed by the debtor to the creditor. In these instances, where the funds of the third party are so earmarked, such funds are decreed not to constitute property of the debtor:

> The interest in property transferred must be the property of the debtor. Thus, no preference is created when the parent corporation of an insolvent debtor gives the debtor funds on condition that they be used to pay a specified creditor, and they are in fact so employed. In such case, the parent is controlling the transaction and the funds never become part of the debtor's assets.

4 Collier on Bankruptcy, ¶ 547.09 (15th ed. 1985) (footnote omitted). Similarly,

> [I]n cases where a third person makes a loan to a debtor specifically to enable him to satisfy the claim of a designated creditor, the proceeds never become part of the debtor's assets, and therefore no preference is created. The rule is the same regardless of whether the proceeds of the loan are transferred directly by the lender to the creditor or are paid to the debtor with the understanding that they will be paid to the creditor in satisfaction of his claim, so long as such proceeds are cleaerly "earmarked."

*Id.* at ¶ 547.25 (footnote omitted). The basic underpinnings for this rule are simply that such third party payments neither diminish the assets nor increase the liabilities of the debtor. The effect is no more than "a substitution of a new creditor for an old one." *Grubb v. General Contract Purchase Corp.*, 18 F.Supp. 680, 682 (S.D.N.Y. 1937), *aff'd* 94 F.2d 70 (2d Cir.1938).

In the present matter it is clear that the rule relied upon by Defendants is inapplicable. Here there was no intent to substitute one creditor for another, nor was such the result of the parties' dealings. Instead, Bellanca's total assets and liabilities increased by an amount equal to the $1.0 million received by Bellanca from First City. This is so despite AGCO's attempt to characterize the loan as one from AGCO by virtue of its guarantee. For Bellanca's right to use these funds, it incurred an obligation primarily to First City and secondarily to AGCO, which obligations were in excess of its already existing obligations. Moreover, these funds were provided to Bellanca for the express purpose of using them in its operations—specifically as a portion of the initial financing of Bellanca Financial Corp. Upon the failure of the Commercial Credit Equipment Corp. deal, $600,000 of these funds were paid back to AGCO by Bellanca by virtue of its secondary obligation to AGCO. This payment resulted in a $600,000 diminution of Bellanca's estate.

■ Defendants attach much importance to AGCO's control over the $1.0 million in loan proceeds. In fact, the record supports Defendants' assertion that the funds were controlled by AGCO and held initially in a separate Bellanca savings account in anticipation of the CCEC deal going forward. However, under these circumstances, such control does not affect Bellanca's property interest in the funds. Mere control over the use of funds advanced does not in and of itself alter the fact that Bellanca otherwise unconditionally received the loan proceeds from First City and became primarily liable to pay the principal and interest thereon. To hold otherwise would in the future invite creditors to place often meaningless restrictions on the debtors' use of funds on the pretense that such restrictions would somehow enable such creditors to retain their property interest in the funds while simultaneously

imposing upon their debtors the obligation to make periodic interest payments. Where money is advanced by a creditor and controlled by such creditor for a specific use in a debtor's operations, that money becomes the property of the debtor.

■■■ Additionally, there is some indication that Defendants seek to characterize the First City loan as in substance a conditional advance of funds from AGCO to Bellanca. Unlike the question of a creditor's control over funds, the conditional nature of an advance of funds might enable a creditor to retain its property interest in the money if the requisite condition fails to occur. In this instance there was no conditional advance of funds. While success of the CCEC deal may have constituted a condition to AGCO's guarantee of the loan, I do not believe the record supports any assertion that such a condition was imposed by the bank in granting the loan and delivering the proceeds to Bellanca. Between Bellanca and First City, Bellanca had an unconditional right to the proceeds, although First City may have understood to be "targeted" for use in Bellanca Financial Corporation. The fact that AGCO may have agreed with Bellanca to guarantee the loan on the condition that the proceeds would be returned upon the occurrence or nonoccurrence of a specified event does not diminish Bellanca's property interest in the proceeds. It merely gives AGCO a contractual right which might be actionable in the event of a breach.

### 2. *Transfers For or On Account of Antecedent Indebtedness*

As to all of the alleged preferential transfers, Plaintiff asserts that such transfers were for or on account of antecedent debts owed by Bellanca before such transfers were made. 11 U.S.C. § 547(b)(2) (1982). The record clearly indicates, and Defendants do not substantially dispute, that the following transfers were for or on account of antecedent debt: (1) the transfer of $134,611.82 of proceeds from aircraft designated as B–146 and A–01; (2) the six check reimbursements for payments made

to Lycoming; (3) the six check reimbursements for payments made to Eagle vendors; (4) the ten installment payments made toward the purchase of the address-o-graph machine; and (5) two of the four additional reimbursements for miscellaneous payments to Bellanca insurers, suppliers, and other creditors. With respect to the remaining aircraft transactions at issue, Defendants contest Plaintiffs' characterization of the true nature of those transactions and assert that all transfers arising therefrom were not for or on account of antecedent debt. Similarly, Defendants contend that the $600,000, $150,000, $100,000, $5,735.92, and $8,870.00 check transfers were also not for or on account of antecedent debt.

■■ Section 547(e)(2) of the Bankruptcy Code specifies when a transfer under section 547 is made. That subsection specifically provides that a transfer is made—:

(A) at the time such transfer takes effect between the transferor and the transferee, if such transfer is perfected at, or within 10 days after, such time;

(B) at the time such transfer is perfected, if such transfer is perfected after such 10 days; or

(C) immediately before the date of the filing of the petition, if such transfer is not perfected at the later of—

(i) the commencement of the case; and

(ii) 10 days after such transfer takes effect between the transferor and the transferee.

11 U.S.C. § 547(e)(2) (1982), *amended by* 11 U.S.C. § 547(e)(2) (Supp. II 1984). Moreover, section 547(e)(1)(B) provides that as to fixtures and property other than real property, a transfer is perfected "when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee." 11 U.S.C. § 547(e)(1)(B) (1982). The clear effect of these provisions is that a transfer actually made contemporaneous with the debt will be deemed for or on account of an antecedent debt if such transfer is not perfected at the time or within ten days after the transfer occurred. *See Corn Exchange Nat'l Bank & Trust*

Co. v. Klauder, 318 U.S. 434, 63 S.Ct. 679, 87 L.Ed. 884 (1943).[31]

*The aircraft transactions*

Plaintiff's initial basis for asserting that the aircraft transactions were for or on account of antecedent debt is that such transactions evolved from a floor planning or revolving credit arrangement between Bellanca and Defendants. In essence, Plaintiff characterizes the funds advanced by Defendants on the aircraft as loans which necessarily preceded any of the transfers of aircraft or proceeds which it is alleged subsequently occurred. While Defendants, on the other hand, describe the various aircraft transactions as sales which gave rise to contemporaneous exchanges of aircraft and funds, Plaintiff further contends that this description is unavailing for Defendants. It is Plaintiff's overriding contention that, regardless of whether the aircraft transactions involved loans or sales, the times at which all relevant transfers were perfected were no earlier than when third party sale proceeds were conveyed to AGCO or when aircraft bills of sale were filed with the FAA. Therefore, under Plaintiff's analysis, even if sales occurred as to all aircraft at issue, the resulting aircraft transfers to AGCO did not occur until those transfers were perfected much later through AGCO's FAA filings.

■ Whether any of the aircraft transactions constituted sales is a question of fact to be determined in light of the applicable state law. In this case, finished aircraft fall within the broad definition of "goods" under Minn.Stat. § 336.2–105(1)[32] and, therefore, transactions with respect to the aircraft must be evaluated pursuant to Article 2 of the Uniform Commercial Code (U.C.C.). Minn.Stat. § 336.2–102 (1984).

31. In *Klauder,* the Supreme Court addressed the applicability of the preference provision under the Bankruptcy Act to loans made on assignments of accounts receivable. Interpreting section 60(a) of the Act, a predecessor provision to section 547 of the Code, the Court remarked:

[The] apparent command [of the Act] is to test the effectiveness of a transfer, as against the trustee, by the standards which applicable state law would enforce against a good-faith purchaser. Only when such a purchaser is precluded from obtaining superior rights is the trustee so precluded. So long as the transaction is left open to possible intervening rights to such a purchaser, it is vulnerable to the intervening bankruptcy. By thus postponing the effective time of the transfer, the debt, which is effective when actually made, will be made antecedent to the delayed effective date of the transfer and therefore will be made a preferential transfer in law, although in fact made concurrently with the advance of money.

*Klauder,* 318 U.S. at 436–37, 63 S.Ct. at 681 (footnote omitted).

Significantly, at the time *Klauder* was decided, section 60(a) provided a "bona-fide purchaser test" for both real and personal property—similar to the test presently incorporated in section 547(e)(1)(A) of the Code as to real property only. As enacted in 1938, section 60(a) provided in pertinent part as follows:

For the purposes of subdivisions a and b of this section, a transfer shall be deemed to have been made at the time when it became so far perfected that no bona-fide purchaser from the debtor and no creditor could thereafter have acquired any rights in the property so transferred superior to the rights of the transferee therein, and, if such transfer is not so perfected prior to the filing of the petition in bankruptcy ..., it shall be deemed to have been made immediately before bankruptcy. Section 60(a), 11 U.S.C. § 96(a) (amended 1950). In 1950 Congress amended section 60(a) by replacing the "bona fide purchaser test" with a "lien creditor test" for transfers of property other than real property. As so amended, section 60(a) provided that such a transfer "shall be deemed to have been made or suffered at the time when it became so far perfected that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract could become superior to the rights of the transferee." Section 60(a), 11 U.S.C. § 96(a)(2) (amended 1978). Enacted in 1978, the Bankruptcy Code essentially incorporated this "lien creditor test" for property other than real property into section 547(e)(1)(B). Congress' abandonment of the bona-fide purchaser test" as to personalty, however, did not alter the import of the Supreme Court's analysis in *Klauder* quoted above to the extent that the effective time of a transfer under section 547 turns on when and whether the transfer was properly perfected.

32. Minn.Stat. § 336.2–105(1) provides in part:

"Goods" means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (article 8) and things in action.

Minn.Stat. § 336.2–105(1) (1984).

*See* Minn.Stat. §§ 336.2–101 to .2–725 (1984). While certainly subject to contradictory interpretations, the circumstances of this case warrant a finding that sales occurred as to all aircraft transactions at issue excluding the April 1980 transactions concerning the aircraft designated as B–146 and A–01.

U.C.C. § 2–106 describes a sale as "the passing of title from the seller to the buyer for a price." Minn.Stat. § 336.2–106 (1984).[33] In *United States v. Investors Diversified Services, Inc. (I.D.S.)*, 102 F.Supp. 645 (D.Minn.1951), the district court adopted a definition of a "sale" substantially similar to that provided in section 2–106 and further descried the characteristics of a loan, clarifying the distinctions between the two types of transactions. In that opinion the court stated:

> A sale is an absolute transfer of property or something of value for a consideration from the seller to the buyer. A loan of money, on the other hand, is an advance of money or credit upon an understanding that an equivalent is to be returned to the lender by the borrower on demand or within a specified time.

*I.D.S.*, 102 F.Supp. at 647 (citation omitted); *see also Bichel Optical Laboratories, Inc. v. Marquette Nat'l Bank of Minneapolis*, 336 F.Supp. 1368, 1371 (D.Minn.1971) (quoting *I.D.S.*). Unlike a loan, therefore, a sale involves no agreement or understanding concerning the full repayment of funds advanced by the purchaser.

■ Despite Plaintiff's assertions to the contrary, the record concerning the three September 1979 aircraft transactions strongly supports the conclusion that sales occurred. Significantly, the facts indicate that funds were never directly advanced on any of the aircraft involved. Instead, it is clear that Bellanca received as consideration only a reduction in its general accounts payable to AGCO and in AGCO's accounts receivable from Bellanca. The aircraft,

designated as B–083, E–207, and E–266, therefore, served as no more than repayment of a portion of Bellanca's outstanding debt to AGCO, which debt was wholly unrelated to the three aircraft conveyed.

■ Unlike the September 1979 transactions, Plaintiff is not altogether incorrect in his portrayal of the remaining aircraft transactions at issue as part of a general floorplanning or revolving credit arrangement. Both parties attach significant importance to Gerald Sears' description of these transactions in a report prepared for Defendants' counsel. In that report, Sears describes these aircraft transactions as one of the steps taken by Defendants to help cure Bellanca's defaults on its bank loans and ease its cash and accounts and notes payables crisis:

> Establish a $700,000 supplemental revolving credit line, similar to the $450,000 line furnished by the bank, to provide [Bellanca] cash for completed, but undelivered airplanes. With the banks consent, [Aviation] was given title to the planes, but did not file such with the FAA until later. As airplanes were sold, new ones were financed so that the full $700,000 line was utilized until [Bellanca] ceased operations. The funds were used by [Bellanca] to pay delinquent payables and purchase materials. It should be noted here that aircraft financed under this plan were treated as aircraft purchases by [Aviation] and as sales by [Bellanca], principally because of the need for [Aviation] to be able to perfect a security interest if necessary, and the intent was that [Aviation] would not be reimbursed except by third party purchase of the airplane. The "purchase price" agreed on was list price less the average dealer discount of 23%, which gave [Bellanca] a good profit and would hopefully allow [Aviation] to break even (excluding interest on [Aviation's] funds) on an overall basis.

---

**33.** The section 2–106 definition of a sale essentially continues the definition previously provided under Minn.Stat. § 512.01(2):

"A sale of goods is an agreement whereby the seller transfers the property in goods to the buyer for a consideration called the price." Minn.Stat. § 512.01(2) (repealed 1965).

Report of Gerald Sears, section III, at p. 21. The record clearly indicates that Defendants intended to and did implement a financing plan which shared many of the attributes of a revolving credit line. In fact, as the record as a whole noticeably reflects, floorplanning terminology, such as "credit line", "security interest", and "collateral", were often invoked in discussions or references concerning the aircraft transactions. Nevertheless, based upon the record presented, and in light of the Plaintiff's burden of proof on this issue, I find that actual sales occurred as to those transactions involving aircraft designated as B-118, B-126, B-128, B-129, B-130, B-131, B-133, B-136, B-137, B-138, B-142, B-143, E-072, E-309, E-317 and E-338.[34]

In all instances, Defendants treated the sixteen November 1979 and March and May 1980 transactions as purchases in more than a simple bookkeeping sense. In particular, as Sears indicates in his report, the intent of Bellanca and the Defendants was that reimbursement on the funds delivered to Bellanca was not to occur except by third party purchases of the aircraft.[35] Moreover, aside from Bellanca's repur-

chase of E-338, cash disbursements of other payments to AGCO relating to the aircraft actually occurred only through such third party purchases either from AGCO directly or indirectly through Bellanca.[36] As to those aircraft sold through Bellanca, the record supports my conclusion that at all times AGCO received the full sale proceeds allocable to it by virtue of its title to the aircraft.[37] Furthermore, although the payments made to AGCO through Bellanca generally equaled the amounts originally invoiced to AGCO, the third party payment on B-138 exceeded the original invoice amount to AGCO on that aircraft by $2,535.00. This amount was apparently paid over to AGCO as its gross profit on that sale. Finally, most, if not all, of the remaining aircraft, which were not sold through Bellanca, were retained and ultimately sold by AGCO directly to third parties. Occasionally, AGCO received less for these aircraft than it originally paid. The record supports my conclusion that neither Defendant ever turned to Bellanca to make up any shortfall arising out of these sales. There is similarly insufficient indication

---

**34.** The Sears Report discusses the methods AGCO and Aviation might use to structure their dealings with a troubled company in the most advantageous manner. I find nothing inappropriate about this attempt to avoid preference claims through cautious planning. It is obvious AGCO and Aviation saw that their dealings with Bellanca could be viewed in different lights depending upon the "paper trail" they created, the oral agreements made, and the actions they took to conclude their dealings with Bellanca in regard to the aircraft transactions at issue here. In this case, I find that business planning was successful. With several choices available to them as to how to "finance" an ailing Bellanca Aircraft Corporation, AGCO and Aviation chose the option which foreclosed Bellanca from calling the arrangement "floor-planning".

**35.** Sears describes the terms of the aircraft sales to Defendant as follows: "The 'purchase price' agreed on was list price less the average dealer discount of 23%, which gave [Bellanca] a good profit and would hopefully allow [Aviation] to break even (*excluding interest on [Aviation's] funds* ) on an overall basis." Report of Gerald Sears, section III, p. 21 (emphasis added). It is unclear whether Sears' reference to interest refers to interest owed by Bellanca on funds advanced or to interest which would have accrued

to Aviation had the funds advanced been invested elsewhere. In light of the absence of support elsewhere in the record for the assertion that Bellanca owed interest on the $700,000 advanced, I find that no interest was owing.

**36.** As to E-338, the record supports Plaintiff's assertion that AGCO exchanged that aircraft for another aircraft, E-072, in May 1980. By virtue of this exchange, AGCO acquired title to E-072 while contemporaneously providing Bellanca with consideration in the form of E-338. I, therefore, conclude that AGCO effectuated a purchase of E-072.

**37.** With respect only to B-130, the record indicates that AGCO received less than the total sale proceeds paid to Bellanca from the third party purchaser. A comparison of the invoices from Bellanca to both AGCO and the purchasing third party, however, suggests that the $635.00 shortfall, which was retained by Bellanca, constitutes sale proceeds for external antennas and dealer sales material which were not included in the original sale of that aircraft to AGCO. Absent sufficient evidence to the contrary, I find that AGCO was entitled only to the $68,893.60 it originally paid for the aircraft and ultimately received from Bellanca on the aircraft's resale.

that the Defendants ever forgave unpaid indebtedness of Bellanca which Plaintiff implicitly contends must have arisen by virtue of the less than full reimbursement of the funds originally advanced by AGCO.[38]

My conclusion that the aircraft transactions constituted sales and not secured loans does not end the analysis of whether transfers for or on account of antecedent debt occurred though. Pursuant to sections 547(e)(1)(B) and 547(e)(2) of the Code, it remains necessary to ascertain when the transfers of aircraft to AGCO were perfected under the "judicial lien creditor test" prescribed by Congress. Defendants contend that the question of perfection here should be governed, as is ordinarily the case, by state law. *See, e.g., Corn Exchange Nat'l Bank & Trust Co. v. Klauder,* 318 U.S. at 436–37, 63 S.Ct. at 681; *In re Ramco American Intern'l, Inc.,* 754 F.2d 130, 132 (3d Cir.1985); *In re Newcomb,* 744 F.2d 621 (8th Cir.1984). Plaintiff, however, asserts that because aircraft are involved federal law controls. Plaintiff essentially argues that section 503 of the Federal Aviation Act, 49 U.S.C. § 1403 (1982), and the United States Supreme Court's recent decision in *Philko Aviation, Inc. v. Shacket,* 462 U.S. 406, 103 S.Ct. 2476, 76 L.Ed.2d 678 (1983), control when perfection of a transfer of aircraft occurred under section 547 of the Bankruptcy Code. Defendants correctly point out, however, that Plaintiff's reliance on federal law is misplaced.

Plaintiff's argument is rooted in the assertion that the Federal Aviation Act of 1958 provides the sole means of perfection of an interest in aircraft against the rights of all innocent parties—including innocent judicial lien creditors. Section 503 of that Act directs the Secretary of Transportation to establish and maintain a system for the recording of any "conveyance which affects the title to, or any interest in, any civil aircraft of the United States." Federal Aviation Act § 503(a)(1), 49 U.S.C. § 1403(a)(1) (1982). It further provides in part as follows:

> No conveyance or instrument the recording of which is provided for by subsection (a) of this section shall be valid in respect of such aircraft, aircraft engine or engines, propellers, appliances, or spare parts against *any person* other than the person by whom the conveyance or other instrument is made or given, his heir or devisee, or any person having actual notice thereof, until such conveyance or other instrument is filed for recordation in the office of the Secretary of Transportation.

Federal Aviation Act § 503(c), 49 U.S.C. § 1403(c) (1982) (emphasis added). Interpreting section 503(c), Plaintiff insists that, until the filing of the bills of sale by AGCO on the transferred aircraft, there was no valid conveyance of such aircraft to AGCO as against a potential judicial lien creditor and, thus, no perfected transfer under the Bankruptcy Code as well.[39]

Authority for Plaintiff's interpretation of section 503(c) is grounded not only in the statutory language itself, but in the Supreme Court's *Philko Aviation* decision. The facts in that case indicate that separate sales of the same aircraft were effective from a single seller to two separate buyers. The initial purchasers of the aircraft, the defendant Shackets, never filed for recording with the FAA any title documents whatsoever. In contrast, the subsequent purchaser of the aircraft, the plaintiff Philko, properly filed its title doc-

---

**38.** While Plaintiff places much significance on the absence of a written consignment agreement between Bellanca and the Defendants, I find this argument unpersuasive. Little weight has been given to the absence of a writing of this nature—particularly in light of the fact that there is similarly no evidence that a written floor-planning agreement existed. The record indicates that Bellanca's and Defendants' relationship regarding the aircraft transactions was,

aside from references in the corporations' internal books and records, substantially oral.

**39.** Adoption of Plaintiff's interpretation of this section of the Federal Aviation Act would yield in many cases perfection dates several months antecedent to when Bellanca incurred its respective obligations to convey aircraft to AGCO. *See* Appendix D.

uments for recording with the FAA. In an action commenced by the Shackets to determine title to the aircraft, the district court granted summary judgment in favor of the Shackets, reasoning that section 503 did not preempt substantive state law which provided under the Illinois U.C.C. that title remained with the Shackets. The court of appeals affirmed, adopting the district court's reasoning. The Supreme Court reversed and remanded, however, holding that it was error to grant summary judgment in favor of the Shackets on the ground that a valid sale under state law was also valid against an innocent third party purchaser (Philko) when the sale to the Shackets was not recorded with the FAA.

Plaintiff points to the following language in the Supreme Court's discussion in *Philko Aviation* as a broader statement than indicated above of the Court's holding:

> Section 503(c) means that every aircraft transfer must be evidenced by an instrument, and every such instrument must be recorded, before the rights of *innocent third parties* can be affected. Furthermore, because of these federal requirements, state laws permitting undocumented or unrecorded transfers are preempted, for there is a direct conflict between § 503(c) and such state laws, and the federal law must prevail.

*Philko Aviation*, 103 S.Ct. at 2478–79 (emphasis added) (footnote omitted). Although the decision is certainly susceptible to an interpretation that would include judicial lien creditors within the nearly limitless category of "innocent third parties," I am not persuaded that the Court intended the phrase to be so interpreted.[40] This case, therefore, presents the issue of whether the rule established in *Philko Aviation* as to bona fide purchasers should be extended to reach innocent judicial lien creditors as well.

■■■■ Despite the fact that Congress has enacted legislation in the general field

of aircraft interests, the supremacy clause requires the invalidation of state law only if it conflicts with a federal statute, it would frustrate a federal scheme, or the totality of the circumstances shows that Congress sought to occupy the field to the exclusion of the States. In this analysis, the intent or purpose of Congress "is the ultimate touchstone." *Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443, 450 (1978). Preemption of state law by federal statute is not favored "in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakenly so ordained." *Chicago & North W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258, 265 (1981); *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963). In light of these considerations, and for the reasons set forth below, I am constrained to conclude that presumption is inappropriate and that the question of perfection of the aircraft transfers is governed by state law.

Absent controlling federal law, it has been generally held that the validity, nature, and effect of liens in bankruptcy proceedings are governed by the law of the state where the property is situated. *Duck v. Wells Fargo Bank Nat'l Assoc., (In re Spectra Prism Industries, Inc.)*, 28 B.R. 397, 399 (Bktcy.App. 9th Cir.1983); *Lewis Energy Corp. v. Action Well Service, Inc., (In re Lewis Energy Corp.)*, 36 B.R. 205, 207 (Bktcy.D.Colo.1983); *In re My Place or Yours, Inc.*, 34 B.R. 197, 198 (Bktcy.D.Vt. 1983); *Peoples Bank of Tuscaloosa v. Computer Room, Inc., (In re Computer Room, Inc.)*, 24 B.R. 732, 736 (Bktcy.N.D. Ala.1982). Moreover, under Minnesota law, it is well established that a judgment creditor may acquire a lien in personal property only to the extent that an interest in such property is retained by the judg-

**40.** Significantly, *Philko Aviation* involves no discussion as to the scope of section 503 as it relates to "innocent third parties" generally. I

am, therefore, hesitant to attach a definition to that phrase that exceeds in breadth the Supreme Court's rationale in that decision.

ment debtor. *See, e.g., Union Investment Co. v. Abell,* 148 Minn. 229, 181 N.W. 353 (1921); *Heberling v. Jaggar,* 47 Minn. 70, 49 N.W. 396 (1891); *Leonard v. Maginnis,* 34 Minn. 506, 26 N.W. 733 (1886). Where personal property has been conveyed by the judgment debtor to a third party, therefore, no lienable interest in such property remains with the judgment debtor, and the judgment creditor must look elsewhere to satisfy his claim. *Cf. Ellsworth v. Fitzpatrick, (In re Fitzpatrick),* 29 B.R. 701, 703 (Bktcy.W.D.Wis.1983) (under 11 U.S.C. § 544(a)(1), court held judgment creditor would have no lien on real property conveyed to third party as Wisconsin recording act affords no protection to judgment creditors).[41]

Although Plaintiff contends that section 503(c) of the Federal Aviation Act alters the treatment of judicial lien creditors with respect to aircraft, I do not believe the statute supports this assertion. It is clear upon a plain reading of the statutory language that section 503(c) does not serve to invalidate, as between the immediate parties to the aircraft transactions at issue, otherwise valid aircraft sales. *See*

*Philko Aviation,* 103 S.Ct. at 2481 ("undisputed that the sale to the Shackets was valid and binding as between the parties").[42] Despite AGCO's delayed filing of or failure to file bills of sale with the FAA, then, immediately subsequent to the various aircraft sales Bellanca no longer retained any interest whatsoever in the aircraft sold. Therefore, as a judgment creditor's right under Minnesota law to acquire a lien in personal property is derivative of the rights and interests of the judgment debtor in such property, I conclude that upon their sale Bellanca no longer retained a lienable interest in the aircraft. This result is in accord with the majority of decisions from other courts which have addressed this issue. *See Curtis v. Carey,* 393 S.W.2d 185 (Tex.Civ.App.1965); *Smith v. Joliet Airmotive, Inc.,* 35 Ill.App.2d 2, 181 N.E.2d 817 (1962); *Marshall v. Bardin,* 169 Kan. 534, 220 P.2d 187 (1950); *but see Wilson v. Barnes,* 359 Mo. 352, 221 S.W.2d 731 (1949).[43]

An interpretation of section 503(c) that would entitle Plaintiff to prevail on this issue would in effect substantially ig-

**41.** Plaintiff seeks to distinguish this line of cases by asserting that these decisions establish only that a judicial lien creditor cannot obtain an interest in property which his debtor has transferred in a perfected transfer. *In re Juran,* 178 Minn. 55, 226 N.W. 201 (1929), cited by Plaintiff, supports his position so far as it relates to transfers of real property. Such transfers are presently governed by the recording act, Minn. Stat. § 507.34 (1984), which explicitly protects the interests of attaching creditors or judicial lienholders. That provision, however, finds no application with respect to personal property. Moreover, in light of my decision that the recording provision under the Federal Aviation Act affords no protection to judicial lien creditors, I find Plaintiff's distinction unpersuasive.

**42.** Section 503(c) provides on its face that, until the filing of the requisite title documents, no conveyance of aircraft shall be valid against any person "other than *the person by whom the conveyance ... is made or given ...* or any person having actual notice thereof." Federal Aviation Act § 503(c), 49 U.S.C. § 1403(c) (1982) (emphasis added). *See also California Chieftan v. Air Vermont, Inc., (In re Air Vermont, Inc. ),* 761 F.2d 130, 135 (2d Cir.1985) (conditional aircraft sales contract held valid

between contracting parties under section 503(c); *Air America, Inc. v. Hatton Brothers, Inc.,* 570 F.Supp. 747, 748 (S.D.Fla.1983) (*"Philko Aviation ...* is a case dealing with the protection provided to third-party, *bona fide* purchasers and in no way affects the rights as between parties to a contract).

**43.** Language in *Wilson v. Barnes* appears to support Plaintiff's general contention that section 503(c) of the Federal Aviation Act invalidates aircraft conveyances as against third party attaching creditors. *Wilson,* 359 Mo. at 355, 221 S.W.2d at 732. That decision, however, was decided on alternate grounds and fails to explicitly consider the derivative nature of an attaching creditor's rights as they relate to the interests affected under the predecessor provision to section 503(c). Accordingly, I attach little weight to the result reached by that court.

Additional support for Plaintiff's decision lies in certain cases construing the recording provisions under the Ship Mortgage Act. *See* 46 U.S.C. § 921(a) (1982). *See also Secrist v. The German Insurance Co.,* 19 Ohio St. 476 (1869); *The Parker Mills v. Jacot,* 21 N.Y.Super.Ct. 161, 8 Bosw. 161 (1861). To the extent these decisions accurately state the current law in those jurisdictions, I decline to follow them.

nore the inherent purpose behind Congress' enactment of the recording provisions. That purpose is "to protect persons who have dealt on the faith of the FAA register, as to whom it would be fraud to give effect to unrecorded interests to their detriment." *CIM Int'l v. United States*, 641 F.2d 671, 674 (9th Cir.1980); *Feldman v. Chase Manhattan Bank, N.A.*, 368 F.Supp. 1327, 1330–31 (S.D.N.Y.1974); *Marsden v. Southern Flight Service, Inc.*, 227 F.Supp. 411, 415 (M.D.N.C.1961). While it is clear that purchasers of or persons taking security interests in aircraft must and do significantly rely on the FAA register in their respective dealings, the same cannot be said of general creditors. Unlike purchasers or holders of security interests, general creditors do not look to specific items of property or collateral of their debtors for financial security. Instead, such creditors bargain on the basis that, in the absence of collection, a debt may be later reduced to judgment and thereby be enforced against the then existing property interests of the judgment debtor. At best, although a general creditor may look to the FAA register in analyzing the debtor's financial condition as it relates to aircraft owned or held as security, this reliance occurs at or near the time business is transacted and bears an unsubstantial relationship to the creditor's realistic expectations at the time a judicial lien is sought. The creditor accepts the risk that a debtor's interest in aircraft may subsequently dissipate, for example, to the delivery of materials on account, and, therefore, does not deal on the faith of the FAA register to the extent that he should benefit from its protections. Therefore, pursuant to section 547(e)(1)(B), upon the sale of the aircraft to AGCO, a creditor of Bellanca on a simple contract could not acquire a judicial lien in the aircraft superior to the interest of AGCO.

Based upon my decision that, notwithstanding the recording provisions under the Federal Aviation Act, state law governs the issue of perfection of the aircraft transfers, it is clear that perfection occurred in each instance at least upon the completion of the various sales. Once they were properly conveyed by Bellanca to AGCO, Bellanca relinquished its lienable interest in the aircraft. It is unnecessary to determine just when the sales were completed and title transferred, though, as I am satisfied that under Article 2 of the U.C.C. AGCO received, upon identification of the aircraft to the contract an interest in the aircraft superior to any interest which a judgment creditor of Bellanca could acquire through a judicial lien.

U.C.C. § 2–401 provides that, "[t]itle to goods cannot pass under a contract for sale prior to their identification to the contract . . ., and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this chapter." Minn.Stat. § 336.2–401 (1984). Even though the goods so identified are nonconforming and he has an option to return or reject them, the buyer nevertheless obtains this special property and an insurable interest in the goods. Minn.Stat. § 336.2–501(1) (1984). Although not specifically defined, this interest received by the buyer includes certain rights and protections against unsecured creditors of the seller. The U.C.C. provides in pertinent part:

> Except as provided in subsections (2) and (3), rights of unsecured creditors of the seller with respect to goods which have been identified to a contract for sale are subject to the buyer's rights to recover the goods under this article (sections 336.2–502 and 336.2–716).

Minn.Stat. § 336.2–402(1) (1984). In explanation of this provision, the Minnesota Code Comment states:

> This subsection . . . is one of the many specific parts of the Code that carry out the U.C.C.'s policy of minimizing the importance of the location of title to goods. It provides that a buyer of goods that have been identified to the contract is entitled to them as against the seller's creditors even though title to the goods has not passed to the buyer under § 2–401.

Minn.Stat.Ann. § 336.2–402(1) (West 1966).

However, that identification alone is insufficient to entirely protect a buyer's

"special property and insurable interest" in specific goods. U.C.C. § 2–501(2) describes the defeasible nature of a buyer's interests as follows:

> The seller retains an insurable interest in goods so long as title to or any security interest in the goods remains in him and where the identification is by the seller alone he may until default or insolvency or notification to the buyer that the identification is final substitute other goods for those identified.

Minn.Stat. § 336.2–501(2) (1984). In this case, however, identification of the aircraft was not achieved solely by Bellanca; AGCO played an active role in the selection. Moreover, as subsequently determined herein, the record establishes that Bellanca was insolvent both prior to and after the aircraft transactions. *See* Minn. Stat. § 336.1–201(22) (1984).

The time at which identification occurs is specified in U.C.C. § 2–501(1). That section provides:

> Such identification can be made at any time and in any manner explicitly agreed to by the parties. In the absence of explicit agreement identification occurs
> (a) when the contract is made if it is for the sale of goods already existing and identified;
> (b) if the contract is for the sale of future goods other than those described in paragraph (c), when goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers;

Minn.Stat. § 336.2–501(1) (1984). The record fails to indicate any agreement between Bellanca and AGCO as to identification.

■ Uncontradicted testimony of Gerald Sears, however, sheds some light on when identification as to the November aircraft sales occurred:

> At all times I kept a log of Bellanca's aircraft at both the Viking and Champion plant in its production line. I posted the movement of those airplanes in that line on a daily, sometimes weekly, basis. I posted who the airplanes were ordered by, which dealer. I posted when the airplanes were complete and financed through the Alexandria Bank and Trust revolving credit agreement. I posted when the dealer to whom the airplane had been sold to paid for it.
>
> So at all times I knew the status of every airplane and the production line, and I knew the status of every airplane in the finished goods inventory. Status being whether it was financed through the bank or not.
>
> *When we made—when AGCO made the decision to purchase the airplanes, I personally selected the airplanes from that log that I wanted to purchase.*

Transcript, vol. III–B, at 157 (emphasis added). With due regard to Plaintiff's burden of proof concerning section 547(b)(2), and in light of the fact that Sears served concurrently as an officer of both Bellanca and AGCO, I am satisfied that actual identification of those aircraft occurred at the time the aircraft were selected by Sears—on or about November 12, 1979, when AGCO granted Sears authority to purchase up to $1.0 million of Bellanca finished aircraft. Therefore, pursuant to U.C.C. § 336.2–402(1), statutory identification occurred no later than when the funds were advanced by AGCO on the aircraft.

With respect to the March aircraft transfers, it is clear that Sears followed essentially the same procedure of identifying aircraft prior to the advancement of funds. As to those transfers, the record indicates that Sears specifically identified the aircraft while directing Juan Gomez to effectuate their purchase. Therefore, I conclude that identification of these aircraft also occurred no later than when funds were advanced by AGCO for their purchase. *Cf. Harris v. Foosaner, (In re Polar Chips Int'l, Inc.),* 40 B.R. 586, 589 (Bktcy.S.D.Fla.1984) (court concludes that "at the time ice vending machines were identified by number and location they were sufficiently identified and delivered for title to pass to buyer").

■ No such procedure was apparently adopted, however, as to the three aircraft sold by Bellanca to AGCO in September 1979. A review of the record reveals no earlier date of identification of those aircraft than that reflected on the respective invoices. Therefore, I find that transfers of B–083, E–207, and E–266 occurred as of the date each aircraft was invoiced.

■ A determination of whether transfers of aircraft occurred for or on account of antecedent debt necessitates a comparison of the dates upon which debts arose and the dates transfers were made. In all cases, the relevant debts arose on the dates funds or other consideration were advanced by the Defendants. Upon such advance of funds, it is clear that AGCO received a right to payment as that phrase is defined in 11 U.S.C. § 101(4) (1982). See Minn.Stat. §§ 336.2–711, and .2–716 (1984). Moreover, under section 547(e)(2) of the Bankruptcy Code, the time at which a transfer is made is dependent in part upon when perfection occurs. The law is clear in this case that the date of identification of the aircraft at issue constitutes the date of perfection under 11 U.S.C. § 547(e)(1)(B) (1982). Where perfection occurs at or within ten days after the transfer takes effect between the transferor and transferee, the transfer is made when it so takes effect. 11 U.S.C. § 547(e)(2)(A) (1982). As to all of the aircraft transfers, I am satisfied that the transfers took effect simultaneous with perfection. Therefore, I conclude that, as to the following aircraft, transfers occurred contemporaneous with their respective debts: B–118, B–126, B–128, B–129, B–130, B–131, B–133, B–136, B–137, B–138, B–142, B–143, E–072, E–309, E–317, and

E–338.[44] Transfers concerning these aircraft were not preferential.

### The $600,000 check transfer

Although the parties differ somewhat in their characterization of the events surrounding the $1.0 million infusion of funds into Bellanca from First City National Bank, there is general agreement that this advance simultaneously gave rise to a debt owing from Bellanca to AGCO. The record indicates that on December 19, 1979, when the proceeds were transmitted to Bellanca by way of cashier's check, AGCO executed a guarantee agreement with First City, thereby guaranteeing the loan between First City and Bellanca. By virtue of this guarantee, Bellanca effectively became liable on a claim accruing to AGCO in the form of a contingent or unmatured right to payment. 11 U.S.C. § 101(4)(A) (1982). See McColley v. Matmon Gem Co., Inc. (In re Candor Diamond Corp.), 44 B.R. 195, 198 (Bktcy.S.D.N.Y.1984); 4 Collier on Bankruptcy ¶ 547.18 (15th ed. 1985). A debt, therefore, arose on December 19, 1979, between Bellanca and AGCO in the amount of $1.0 million. 11 U.S.C. § 101(11) (1982).

Defendants assert, however, that no transfer occurred for or on account of an antecedent debt because the $600,000 transfer occurred simultaneous with AGCO's execution of the guarantee agreement. Conceding that perfection of that transfer did not occur until the check was honored, eight days after its delivery to AGCO, Defendants argue that, pursuant to 11 U.S.C. § 547(e)(2)(A), the transfer took effect between Bellanca and AGCO upon delivery of the check to AGCO and, therefore, the time of transfer relates back from

**44.** As to E–072, the record indicates that the transfer of that aircraft exceeded in value the consideration given by AGCO in the form of E–338 by $3,402.75. There is no indication, though, that this amount was ever allocated as a credit to either AGCO's or Aviation's accounts receivable with Bellanca. Therefore, no transfer for or on account of antecedent debt ever occurred in this regard.

While the transfers of B–142 and B–143 exceeded in value the funds previously advanced by

AGCO by $43,038.66, no corresponding advance or reduction in accounts receivable for such excess by AGCO ever occurred. Although it is clear that Bellanca unilaterally accounted for the excess through a reduction in its accounts payable, I believe this, alone, is insufficient to characterize the $43,038.66 in additional value as a transfer for or on account of antecedent debt.

perfection to the December 19, 1979, delivery. Although the issue of when a transfer is complete is a federal question, it must be decided by reference to state law. *McKenzie v. Irving Trust Co.*, 323 U.S. 365, 65 S.Ct. 405, 89 L.Ed. 305 (1945); *Olsen-Frankman Livestock Mktg. Service, Inc. v. Citizens Nat'l Bank*, 4 B.R. 809, 812–13 (D.Minn.1980); *In re Ramy Seed Co.*, 57 B.R. 425, 428–29 (Bktcy.D.Minn. 1985).

"Transfer" is a defined term within the Bankruptcy Code and means "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest." 11 U.S.C. § 101(48) (1982). It is undisputed that a check constitutes an acceptable mode of disposing of or parting with property. The question, however, is when, under state law, the maker parts with funds represented by a check.

■ As it relates to transfers under section 547(b), this question has been fully and deliberately addressed in this district as well as many others. Under Article 3 of the Uniform Commercial Code, as enacted in Minnesota, it is clear that a check does not operate as an assignment of funds in an account but only as an order to the drawee to pay the amount on demand, Minn.Stat. §§ 336.3–409(1), .3–104 (1984), and a promise by the drawer to pay the amount if the bank refuses to do so. *Id.* at § 336.3–413. It is upon presentment and acceptance that a transferee actually receives any money, and it is, therefore, not until then that the transferor either absolutely or conditionally disposes of or parts with the property or any interest therein. *See In re Ramy Seed Co.*, 57 B.R. at 428–29;[45] *Olsen-Frankman Livestock Mktg. Service, Inc. v. Citizens Nat'l Bank*, 4 B.R. at 813. The fact that delivery of a check suspends *pro tanto* the underlying obligation of the transferor, *see* Minn.Stat. § 336.3–802(1)(b) (1984), and sets in motion "the inevitably time-consuming process of transferring the drawer's property, in the form of bank funds, to the payee," *Eisenberg v. J.L. Int'l., (In re Sider Ventures & Services Corp.)*, 47 B.R. 406, 409 (S.D.N.Y. 1985), does not alter my conclusion. A transfer of funds by check is not only incomplete upon check delivery alone as to judicial lien creditors, but is likewise not completed as to the payee. Only upon completion of the transfer as between the transferor and transferee does either an absolute or conditional transfer "take effect" under section 547(e)(2)(A). Until then, the drawer retains unfettered control over the funds held on his behalf by the drawee.

■ Citing *Ray v. Gulf Oil Prods., (In re Blanton Smith Corp.)*, 37 B.R. 303 (Bktcy.M.D.Tenn.1984), Defendants effectively contend that the rule in this district, as well as in many others, fails to comport with the mandate set forth in section 547(e)(2)(A) of the Code. In that decision, the court states in pertinent part:

A literal reading of this provision mandates that a transfer by check does not occur (or is not "perfected") until a creditor on a simple contract cannot acquire a judicial lien superior to the interest of the transferee. The only exception to

---

**45.** *See also Merrill v. Abbott (In re Independent Clearing House Co.)*, 41 B.R. 985 (Bktcy.D.Utah 1984); *Tidwell v. Atlantic Gas Light Co. (In re Georgia Steel, Inc.)* 38 B.R. 829 (Bktcy.M.D.Ga. 1984); *Video East, Inc. v. Acadia Video Co. (In re Video East Inc.)*, 33 B.R. 61 (Bktcy.E.D.Pa. 1983); *Naudain, Inc. v. Schaad Detective Agency (In re Naudain, Inc.)*, 32 B.R. 875 (Bktcy.E.D.Pa. 1983); *Quinn v. TTI Distrib. Corp. (In re Moran Air Cargo, Inc.)*, 30 B.R. 406 (Bktcy.D.R.I.1983); *Gander Mountain, Inc. v. Holden (In re Gander Mountain, Inc.)*, 29 B.R. 266 (Bktcy.E.D.Wis. 1983); *Meister v. State Nat'l Bank of Connecticut (In re Mailbag Int'l Inc.)* 28 B.R. 905 (Bktcy.D. Conn.1983); *Campbell v. Kimberly Clark Corp. (In re Skinner Lumber Co. Inc.)*, 27 B.R. 669 (Bktcy.D.S.C.1982); *Grogan v. Chesebrough-Ponds Inc. (In re Advance Glove Mfg. Co.)* 25 B.R. 521 (Bktcy.E.D.Mich.1982); *Artesani v. Travco Plastics Co. Inc. (In re Super Mkt. Distrib. Corp.)* 25 B.R. 63 (Bktcy.D.Mass.1982); *Gropper v. Matador Fabrics, Inc. (In re Fabric Buys of Jericho, Inc.)* 22 B.R. 1010 (Bktcy.S.D.N.Y.1982); *Itule v. Luhr Jensen & Sons, Inc. (In re Sportsco, Inc.)* 12 B.R. 34 (Bktcy.D.Ariz.1981); *In re Duffy* 3 B.R. 263 (Bktcy.S.D.N.Y.1980).

this rule is if the transfer of the check is "perfected" within ten days after the transfer takes effect between the transferor and the transferee, in which case the date of transfer relates back to the time that the transfer actually took effect between the parties. Under the law of Tennessee, as in most states, a transfer of a check is not "perfected" as defined by § 547(e)(1)(B) until the date that the bank actually honors the check.

Despite the specific provisions of § 547(e), most courts have either not addressed or refused to apply the "10 day relation back" exception in considering whether a transfer by check occurred within the 90 day preference period preceding the filing of the bankruptcy petition. These courts have instead adopted the simple rule that a check is deemed transferred when honored by the bank. *Ray v. Gulf Oil Products, (In re Blanton Smith Corp.),* 37 B.R. at 308 (citations omitted). The more reasonable explanation for this apparent "nonapplication" of the "ten day relation back" exception is that most courts faced with the issue have simply determined the time of transfer to be the same as the time of perfection in check transfer cases. While it is true that until acceptance funds in an account remain susceptible to judicial liens by third party creditors, such funds also remain subject to conduct of the drawer. The drawer may, for example, deplete his account or issue a stop payment order. Minn.Stat. § 336.4–403(1) (1984). Although such conduct may give rise to a cause of action against the drawer, Minn.Stat. §§ 336.3–122, .3–413 (1984), the drawer has not, as a consequence of that conduct, disposed of or parted with property or an interest therein. Until acceptance by the drawee a check transfer does not take effect between the transferor and the transferee. *See* 11 U.S.C. § 547(e)(2)(A) (1982).

█ In the present case, the $600,000 check transfer took effect between Bellanca and AGCO on December 27, 1979, upon payment by the Alexandria Bank & Trust Co. As the transfer was perfected on that same date, it is deemed "made" at that time as well. Therefore, since the debt preceded the transfer by eight days, the transfer was made for or on account of an antecedent debt.

*The $150,000 and $100,000 check transfers*

As with the $600,000 check transfer, Defendants contend that the $150,000 and $100,000 check transfers occurred when the checks were delivered to AGCO and not when they were paid by the Alexandria Bank & Trust Co. on December 27 and December 28, 1979, respectively. For the reasons stated above, I conclude that the check transfers took effect between Bellanca and AGCO and were perfected on the date each check was paid. Therefore, both check transfers were made for or on account of antecedent debt, which debt arose several days earlier on December 17, 1979.

*The $5,735.92 and $8,870.00 check transfers*

█ Defendants contend that, as to both of these transfers, funds were advanced to Defendants for subsequent payment to other creditors of Bellanca. Consequently, they argue, the alleged preferential transfers were not for or on account of antecedent debt owed to Defendants. The record supports the assertion that both transfers were advances for contemporaneous or subsequent payment of debts owed by Bellanca to other creditors. As both amounts were actually contemporaneously or subsequently paid by AGCO to the third party creditors of Bellanca, I am persuaded that such transfers were not for or on account of an antecedent debt owed to either Defendant. *See* 4 Collier on Bankruptcy ¶ 547.17 (15th ed. 1985). In this case, Plaintiff's right, if any, to recover those funds should be actionable only against the third party creditors who in fact received payment and not against Defendants.

### 3. *Insolvency*

Plaintiff contends that, as to every transfer which he seeks to avoid, such transfers were made while Bellanca was insolvent, as

that term was defined in section 101(26) of the Code. As it relates to the present matter, that section provides that "insolvent" means:

(A) with reference to an entity other than a partnership, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the estate under section 522 of this title; ....

11 U.S.C. § 101(26)(A) (1982) (currently codified at 11 U.S.C. § 101(29)(A) (Supp. II 1984)).[46]

While, as previously indicated, the burden of proof remains on the trustee to establish each element of a preference, including insolvency, section 547(f) alters the initial burden of going forward with evidence as to transfers occurring during the ninety days immediately preceding the date of filing of the petition. That section provides that the debtor is presumed to have been insolvent during such ninety day period. *See* 11 U.S.C. § 547(f) (1982). Section 547(f) thereby requires the party against whom the presumption exists to come forward with some evidence to rebut the presumption. H.Rep.R. No. 595, 95th Cong., 1st Sess. (1977); *reprinted in* U.S.Code Cong. & Ad.News, 5963, 6268–71; S.R. No. 989, 95th Cong., 2d Sess. 89 (1978), *reprinted in* U.S.Code Cong. & Ad.News 5787, 5809–12. *See, e.g., In re Bennett,* 35 B.R. 357, 359 (Bktcy.N.D.Ill.1984); *(Lancaster v. City and County Bank of Wisconsin* ), 31 B.R. 49, 51 (Bktcy.E.D.Tenn.1983); *Lafayette Trust Bank v. Cressman, (In re*

*Thomas Farm Systems, Inc.),* 18 B.R. 541, 542 (Bktcy.E.D.Pa.1982).

Plaintiff asserts that a fair valuation of Bellanca's property demonstrates a negative equity position on behalf of the corporation throughout a one year period prior to the July 25, 1985, filing of its petition. Defendants, however, dispute many of Plaintiff's valuations and submit that a more accurate valuation will dramatically alter Plaintiff's characterization of Bellanca's financial condition. Specifically, Defendants object not only to market and liquidation value amounts proposed by Plaintiff, but to the "fair valuation" standard applied by him as well.

The concept of fair valuation, as embodied in the statutory language of the Bankruptcy Code, was similarly enunciated in the earlier insolvency provision found in the Bankruptcy Act.[47] That provision, which remained unchanged since its original enactment in 1898, gave rise for the first time in the history of American bankruptcy legislation to the "balance sheet test" for insolvency currently in effect, and concurrently marked the demise of the "inability to pay debts," or "equity," approach previously favored. *See* National Bankruptcy Act of 1898, ch. 541, § 1(15), 30 Stat. 544 (amended 1978). *See also* H.R. Rep. No. 595, 95th Cong., 1st Sess. 311–14 (1977); *reprinted in* U.S.Code Cong. & Ad. News, 5963, 6268–71; S.Rep. No. 989, 95th Cong., 2d Sess. 24–26 (1978) *reprinted in* U.S.Code Cong. & Ad.News 5787, 5809–12 (Code incorporates traditional balance sheet test found in Act). *See generally* 1 Collier on Bankruptcy ¶ 0.06 (14th ed. 1976). Despite the endurance of the fair valuation concept and the balance sheet test incorporating it, however, courts interpreting and applying the principles devolving therefrom

---

**46.** "Entity" is defined at 11 U.S.C. § 101(14) (1982) to include a person. Pursuant to 11 U.S.C. § 101(30) (1982), *amended by,* 11 U.S. C.A. § 101(33) (Supp.1985), person is defined to include a corporation.

**47.** The Act provided the following definition for insolvency:

A person shall be deemed insolvent within the provisions of this title whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, removed, or permitted to be concealed or removed, with intent to defraud, hinder, or delay his creditors, shall not at a fair valuation be sufficient in amount to pay his debts;

11 U.S.C. § 1(19) (amended 1978).

have experienced difficulty in formulating an entirely consistent body of case law on the subject of insolvency.

The law is substantially uniform that the mandates of fair valuation contemplate an estimate of proceeds realizable within a reasonable time frame through either collection or sale at regular market value. *See, e.g., American Nat'l Bank & Trust of Chicago, Illinois v. Bone,* 333 F.2d 984, 986–87 (8th Cir.1964); *Syracuse Eng. Co. v. Haight,* 110 F.2d 468, 471–72 (2d Cir.1940); *First Nat'l Bank of Stigler Oklahoma v. Perdue Housing Indus. Inc., (In re Perdue Housing Indust., Inc.),* 437 F.Supp. 36, 37–38 (W.D.Okla.1977); *Hunter Press, Inc. v. Connecticut Bank and Trust Co.,* 420 F.Supp. 338, 341 (D.Conn. 1976); *In re Bichel Optical Laboratories, Inc.,* 299 F.Supp. 545, 546–47 (D.Minn. 1969); *Foley v. Briden, (In re Arrowhead Gardens, Inc.),* 32 B.R. 296, 299 (Bktcy.D. Mass.1983); *Utility Stationery Stores Inc. v. American Portfolio, (In re Utility Stationery Stores, Inc.),* 12 B.R. 170, 176 (Bktcy.N.D.Ill.1981).[48] Adopting the rule established in *Syracuse Eng'g. Co.,* the Eighth Circuit has specifically held that

under the "balance sheet test" ... "insolvency" results when the aggregate of a debtor's property is not sufficient at a fair valuation to pay his debts, which means a fair market price that can be made available for payment of debts within a reasonable period of time, and "fair market value" implies a willing seller and a willing buyer.

*American Nat'l Bank & Trust of Chicago, Illinois,* 333 F.2d at 987 (quoting decision of Referee in Bankruptcy). Under this formulation, it is clear that liquidation value, or a distressed or forced sale price is generally not the proper standard. *Syracuse Eng'g. Co.,* 110 F.2d at 471; *Hunter Press,*

*Inc.,* 420 F.Supp. at 341; *Foley v. Briden, (In re Arrowhead Gardens, Inc.),* 32 B.R. at 299. Similarly, it is well established that values assigned by a debtor to assets for balance sheet or other purposes are not determinative of their fair valuation. *See, e.g., Foley v. Briden, (In re Arrowhead Gardens, Inc.), supra; Utility Stationery Stores, Inc. v. American Portfolio, (In re Utility Stationery Stores, Inc.), supra.*

Despite the relative clarity with which many courts summarily define the fair valuation standard, the case law reflects that such standard is often implemented in an obfuscatory manner. At the crux of this confusion is the apparent inconsistency with which judicial decisions, applying the generally accepted market value approach to fair valuation, have addressed the related concept of "going concern value." *See, e.g., Stewart v. Chappell, (In re Cook),* 4 B.C.D. 1157, 1159 (S.D.Ohio 1978) (held that going concern value properly applied and that bankruptcy judge correctly recognized that such value might have been well above "simple value"); *First Nat'l Bank of Stigler Oklahoma v. Perdue Housing Indus. Inc., (In re Perdue Housing Industries, Inc.),* 437 F.Supp. 36, 37–38 (W.D. Okla.1977) (held that evidence of going concern value should be disregarded where applicable standard is market value); *Utility Stationery Stores, Inc. v. American Portfolio, (In re Utility Stationery Stores, Inc.),* 12 B.R. at 176 ("unless business is on deathbed, fair value of assets ... is going concern value or fair market price"—implying an interchangeability between the two valuation concepts). Rather than demonstrative of any inherent misunderstanding by courts of this concept, however, a review of the relevant authorities, with due regard to the vacillating character of prop-

---

**48.** *Cf. Varon v. Trimble, Marshall & Goldman, P.C., (In re Euro-Swiss International Corp.),* 33 B.R. 872, 885 (Bktcy.S.D.N.Y.1983); *Pirrone v. Toboroff, (In re Vaniman International, Inc.),* 22 B.R. 166, 185 (Bktcy.E.D.N.Y.1982). While characterizing the "fair valuation" standard under section 101(26) of the Code as calling for a fair market valuation, these decisions rely on a Second Circuit Court of Appeals opinion which

seeks only to construe a separate insolvency definition found in section 67(d)(1)(d) of the Bankruptcy Act. *See Rubin v. Mfrs. Hanover Trust Co.,* 661 F.2d 979, 995 (2d Cir.1981); 11 U.S.C. § 107(d)(1)(d) (amended 1978). In light of the Second Circuit's earlier decision in *Syracuse Eng'g Co. v. Haight,* 110 F.2d 468 (2d Cir. 1940), however, the result in both *Euro-Swiss Int'l* and *Vaniman Int'l* appears appropriate.

erty valuation generally, persuades me to conclude that in the aggregate the existing decisions on the subject reflect a judicial recognition of an ever-shifting relationship between going concern and ordinary market values.

 A common thread running through these two valuation methods is that any resulting price estimate evolves from an assumed arms length transaction between a willing buyer and seller. In this sense, going concern value can be viewed as simply one form of market value. Unlike the traditional market value approach, however, going concern valuation incorporates more than a summation of market values attributable to an entity's various assets. It indicates the market value of an ongoing business as a whole and thereby includes an additional element of value that attaches to property, considered in the aggregate, by reason of the property having been assembled for the conduct of the business and the property's fitness for such use. *Atlanta Knitting Mills v. Nathanson Bros. Co., (In re Nathanson Brothers Co.)*, 64 F.2d 912, 913 (6th Cir. 1933). *See* Black's Law Dictionary 622 (rev. 5th ed. 1979). This additional increment of value reflects in part, not only the business' earning power, *cf., In re Gibson Hotels Inc.*, 24 F.Supp. 859, 863 (S.D.W.Va. 1938), but the ready availability of customer lists, established supply lines, and other attributes making it possible for a purchaser to step in and immediately commence operations. Although one court has indicated otherwise, see *Glosband v. Watts Detective Agency, Inc.*, 21 B.R. 963, 975–76 (D.Mass.1981), I am further satisfied that goodwill is included as an element of going concern value.[49] *Cf. Woodward v. White*

*Satin Mills Corp.*, 42 F.2d 987 (8th Cir. 1930).

 One commentator has correctly observed that "[t]here is overwhelming authority to the effect that normally ... [the valuation of a business enterprise] must be made from the vantage of a going concern." 2 Collier on Bankruptcy ¶ 101.29, at 101–63 (15th ed. 1985). *See, e.g., Robinson v. Watts Detective Agency*, 685 F.2d 729, 735 (1st Cir.1982), *cert. denied Sub. nom. Consolidated Service Corp. v. Robinson*, 459 U.S. 1105, 103 S.Ct. 728, 74 L.Ed.2d 953, *Sub. nom. Robinson v. Consolidated Service Corp.*, 459 U.S. 1204, 103 S.Ct. 1191, 75 L.Ed.2d 436 (1983), (addressing going concern value under section 67(d) of the Act); *Danning v. Progressive Pharmaceutical Systems, (In re Western Adams Hospital Corp.)*, 609 F.2d 929, 930 (9th Cir.1979) (applying sections 1(19) and 67(a) of the Act); *Edward R. Bacon Company v. Grover*, 420 F.2d 678, 679 (9th Cir.1970) (applying section 1(19) of Act); *Mossler Acceptance Co. v. Martin*, 322 F.2d 183, 185–86 (5th Cir.1963) *cert. denied*, 376 U.S. 921, 84 S.Ct. 679, 11 L.Ed.2d 616 (1964) (addressing insolvency issue in context of involuntary petition in bankruptcy); *Langham, Langston & Burnett v. Blanchard*, 246 F.2d 529, 532 (5th Cir.1957) (applying sections 1(15) and 67(a) of the Act); *Pittman v. Union Planters Nat'l Bank & Trust Co. (In re Nat'l Cottonseed Prod. Corp.)*, 118 F.2d 211, 215 (6th Cir. 1941), *cert. denied*, 314 U.S. 632, 62 S.Ct. 65, 86 L.Ed. 507 (1941) (discussing going concern valuation in preference action under section 60 of the Act); *In re Nathanson Bros. Co.*, 64 F.2d at 913 (defining going concern value with respect to insolvency issue underlying involuntary petition in bankruptcy).[50] It has been further stat-

---

**49.** In *Glosband,* the court attempts to distinguish goodwill from going concern value by characterizing the former as inconstant and capable of evaporating, while describing the latter as fixed in amount as long as the business assets can be transferred together. The decisions, however, are otherwise uniform that a defunct operation should be valued on some basis other than a going concern. *See, e.g., Langham,*

*Langston & Burnett v. Blanchard,* 246 F.2d 529 (5th Cir.1957) (discussed in *Glosband* ).

**50.** *See also Glosband v. Watts Detective Agency, Inc.,* 21 B.R. 963, 967 (D.Mass.1981); *Utility Stationery Stores, Inc. v. American Portfolio (In re Utility Stationery Stores, Inc.),* 12 B.R. 170, 177 (Bktcy.N.D.Ill.1981); *Stewart v. Chappell (In re Cook ),* 4 B.C.D. 1157, 1159 (S.D.Ohio 1978); *In re Windor Industries, Inc.,* 459 F.Supp. 270, 276–*

ed that "subsequent dismemberment or impossibility to dispose of plant, equipment, inventory, etc., as an entirety should not enter into the picture," 2 Collier on Bankruptcy ¶ 101.29, at 101–63. In contrast, one court has suggested that the financial outlook of a debtor corporation, or the intention of its stockholders and directors to liquidate at an early date, might be factors in determining if a business is a going concern. *Nathanson Bros.*, 64 F.2d at 913. If the business is in fact being conducted at the relevant time, though, then its assets must be valued, not as isolated articles separated from the whole, but as parts of the whole and as useful in that relationship. *Id.* Only where a business is wholly inoperative, defunct, or dead on its feet, will going concern valuation be abandoned in favor of an item by item fair market valuation. *Langham, Langston & Burnett*, 246 F.2d at 532–533; *Mitchell v. Investment Secs. Corp.*, 67 F.2d 669, 671–72 (5th Cir.1933); *In re Windsor Indus., Inc.*, 459 F.Supp. 270, 276–77 (N.D.Tex.1978).

■ In the present matter, the record clearly reflects that until November 1979 Bellanca was producing both Viking and Champion aircraft with little indication that it intended to either sell or abort either line. By November, however, the corporation had entered into negotiations to sell both lines and had made plans to shut down at least the Viking aircraft production. While no sale ever materialized during this period, Bellanca nevertheless proceeded to permanently close down its Viking line in February 1980. In the following month it shut down the Champion line as well, leaving the working process on that line intact. Despite Bellanca's increasing debt load and steadily deteriorating financial condition throughout 1979 and 1980, it is evident that until at least March 1980 the corporation was a going, though not thriving, concern. A fair valuation of its assets, therefore, must take into account whatever vestige of additional value might have inured to the business as a whole as a result of its then struggling existence.

Central to the parties' contradictory allegations concerning the insolvency issue is the proper value to be attributed to the exclusive license to market and manufacture the Aries T–250 and the Eagle contract. Defendants, apparently seeking to apply a going concern standard with respect to the Eagle contract, place an aggregate value on the two assets of approximately $6.0 million. Plaintiff, on the other hand, espousing only the traditional market value approach, asserts that both assets have no value whatsoever. Under both the market value and going concern value approaches, I am compelled to adopt Plaintiff's values.

Plaintiff correctly points out that both the Aries license and Eagle contract restrict Bellanca's rights to assign by requiring the consent of Aviation or Eagle Aircraft respectively. While Defendants characterize these assignment restrictions as essentially inconsequential in nature, I am not so persuaded. Certainly, there exist transfer restrictions that do not entirely negate all value to a prospective purchaser in a particular asset. Where stated requirements explicitly or impliedly constitute the standards for granting approval of a transfer, one's right to transfer the asset might be objectively evaluated, and, as a result, a valuation of the asset could be only nominally speculative. *Cf. Board of Trade v. Johnson*, 264 U.S. 1, 44 S.Ct. 232, 68 L.Ed. 533 (1923). Similarly, where a contract conditions a right to assign upon receipt of one party's consent, the assignment right may be capable of objective evaluation if the contract provides that consent will not be unreasonably withheld. Neither the Aries license nor the Eagle

77 (N.D.Tex.1978); *Kramer v. Malco, Inc.*, 225 F.Supp. 344, 347 (S.D.Ill.1964); *In re Georgia Jewelers, Inc.*, 219 F.Supp. 386, 398 (N.D.Ga. 1962); *In re Ouellette*, 98 F.Supp. 941, 942–44 (D.Maine 1951); *In re Calton Crescent*, 80 F.Supp. 822, 824 (S.D.N.Y.1948); *In re Gibson Hotels Inc.*, 24 F.Supp. 859, 863 (S.D.W.Va.1938); *In re Wickwire Spencer Steel Co.*, 12 F.Supp. 528, 533 (W.D.N.Y.1935); for additional decisions addressing going concern valuation in relation to the issue of insolvency.

contract, however, were capable of any such objective evaluation.

 Both agreements simply conditioned Bellanca's right to assign upon the consent of another contracting party—which consent, ostensibly, could be reasonably or unreasonably withheld. Significantly, had both contracts expressly prohibited any assignment whatsoever, Bellanca could have secured an unfettered right to assign them had the other parties later agreed or consented to such. Consequently, Bellanca's conditional right to assign under each contract must be viewed as the functional equivalent of no right whatsoever. The limitations on alienability contained in each compel the conclusion that neither contract had any market value. *See, Allan v. Archer-Daniels-Midland Co., (In re Commodity Merchants, Inc.)*, 538 F.2d 1260, 1264 (7th Cir.1976). It is likewise clear that these limitations negate any going concern value in either contract to a prospective purchaser of Bellanca's operation as a whole.

 In light of my determination that neither the Aries license nor the Eagle contract are includable as assets in the

section 101(26) balance sheet test, it is evident, based upon the various market values previously ascribed to Bellanca's other assets, that Bellanca's total ~~assets~~ exceeded its total ~~liabilities~~ at all relevant times by at least $1,282,242 and as much as $3,781,444. *See* Appendix C.[51] Due in part to the general economic climate in the aircraft industry, Bellanca's history of financial deterioration and disasterous condition in the year prior to the filing of its petition, as well as the approaching obsolescence of the Viking line, I am satisfied that at all relevant times any additional value inuring to Bellanca's assets as a result of its going concern status was less than $1,282,242.[52] Therefore, based upon a fair valuation of Bellanca's property, I have no alternative but to hold that Bellanca was insolvent throughout the one year period preceding the filing of its bankruptcy petition.[53]

### 4. The Preference Period

As the final element in his prima facie case, Plaintiff also contends that a one year preference period should be applicable to this action. Section 547(b)(4)(A) of the

**51.** Defendants also question the characterization of Bellanca's $1.5 million convertible loan obligation to Aviation as a liability. It is apparently suggested that this obligation, which was convertible at Aviation's option into approximately 82 percent of Bellanca's then outstanding common stock, should not constitute a liability of Bellanca. *Cf., e.g., Clay v. Traders Bank, (In re Briarbrook Development Corp.,* 11 B.R. 515, 4 C.B.C.2d 871, 875, 877 (Bktcy.W.D.Mo.1981) (capital investment held not includable as liability of debtor when determining balance sheet insolvency). The record indicates, however, that Aviation never exercised its option to convert the loan obligation. Therefore, at all relevant times, Bellanca remained liable for the full amount of the loan. To treat the loan obligation any differently would unfairly accord Aviation a benefit that it was contractually required to affirmatively elect itself.

**52.** Moreover, it is clear that by March 1980, when both the Viking and Champion lines had been shut down, the corporation's assets had little, if any, going concern value in excess of their market value. At best, some going concern value may have been retained by virtue of the fact that the Champion product line was left intact. Although development of the Aries T–250 and production of the Eagle aircraft line

continued during this period, neither project in any way contributed to the going concern value of Bellanca's assets and, therefore, should not measurably affect the valuation of the otherwise inoperative portion of the corporation's operation.

**53.** Both parties contend that, as to the insolvency issue, notices of bad faith pursuant to Minn. Stat. § 549.21 were properly served on opposing counsel. Accordingly, each seeks an award of certain disbursements, costs, and fees as they relate to the question of Bellanca's insolvency during the year preceding the filing of its bankruptcy petition. Whether or not these assertions of bad faith have been properly presented for resolution herein, I am satisfied that they must fail. In light of my conclusion that Bellanca was insolvent, as contended by Plaintiff, it is clear that Defendants' request cannot succeed. Moreover, I cannot conclude that Defendants or their counsel acted in bad faith, asserted a claim or defense knowing it to be frivolous, asserted an unfounded position solely to delay the ordinary course of the proceedings or to harass, or committed a fraud upon the court. *See* Minn. Stat. § 549.21 (1984).

Code creates an automatic ninety day period within which transfers of property of the debtor may be challenged. Section 547(b)(4)(B), however, extends the period to a full year before the date of the filing of the bankruptcy petition if the defendant creditor, at the time of the transfer at issue:

(i) was an insider; and

(ii) had reasonable cause to believe the debtor was insolvent at the time of the transfer. . . .

11 U.S.C. § 547(b)(4)(B) (1982) (amended 1984). Plaintiff asserts and Defendants do not significantly contest, that both prongs of the section 547(b)(4)(B) test have been met. I am similarly satisfied that a one year preference period should apply.

■ The facts clearly establish both AGCO's and Aviation's status as insiders of Bellanca. As it relates to a corporate debtor, "insider" is statutorily defined to include a "person in control of the debtor." 11 U.S.C. § 101(25)(B)(iii) (1982). In the present matter the requisite control is amply demonstrated by: (1) AGCO's and Aviation's representation, through their officers and directors, on Bellanca's board of directors; (2) the assumption of certain chief Bellanca executive positions by AGCO and Aviation officers and directors; (3) Aviation's right to vote 68% of the outstanding common shares of Bellanca in all matters affecting Bellanca; and (4) the 100% ownership of Aviation by AGCO.[54] There can be no doubt but that the Defendants had a sufficiently close relationship with Bellanca that their conduct should be subject to that close scrutiny intended by Congress with respect to insiders. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 311–14 (1977), *reprinted in* U.S.Code Cong. & Ad.News 5963, 6268–71; S.Rep. No. 989, 95th Cong., 2d Sess. 24–26 (1978) *reprinted in* U.S. Code Cong. & Ad.News 5787, 5809–12.

It is similarly clear that Defendants had reasonable cause to believe Bellanca was insolvent at all relevant times. Both AGCO and Aviation, through their management and directorial control of Bellanca, became thoroughly embroiled in Bellanca's financial affairs. Such active involvement in the affairs of Bellanca was sufficient to place an ordinary prudent person on notice and inquiry of Bellanca's financial condition. *See Frederick S. Wyle P.C. v. Texaco, Inc.*, 764 F.2d 604, 611–612 (9th Cir. 1985) (applying section 60 of the Act); *Constructora Maza, Inc. v. Banco de Ponce*, 616 F.2d 573, 578 (1st Cir.1980) (applying section 60 of Act); *Green v. A.G. Edwards & Sons, Inc.*, 582 F.2d 439 (8th Cir.1978) (extensively discussing the "reasonable cause" requirement under section 60 of the Act). Concerning the "reasonable cause" requirement, it is well established that a creditor's actual knowledge or belief is irrelevant.

### B. *Defendants' Affirmative Defenses*

■ Defendants raise as affirmative defenses sections 547(c)(1) and (4) of the Code. They contend, in essence, that certain check transfers alleged by Plaintiff to be preferential may not be avoided as they were intended to be contemporaneous exchanges for new value given to Bellanca, and in fact were substantially contemporaneous. As to those transfers which do not fall within the safe harbor of the substantially contemporaneous exchange exception, it is further asserted that such transfers may be offset by subsequent advances by the Defendants of new value to or for the benefit of Bellanca, and similarly may not be avoided. Regarding these issues, the Defendants bear the burden of affirmatively showing that the transfers fall within the stated exceptions. *In re American Ambulance Service, Inc.*, 46 B.R. 658, 659 (Bktcy.S.D.Cal.1985); *Edmondson v. Bradford-White Corp., (In re Tinnell Traffic Services, Inc.)*, 41 B.R. 1018, 1022 (Bktc.M. D.Tenn.1984). To the extent so established, such transfers shall be insulated from preferential attack. *A.I. Credit*

---

**54.** In light of my determination that the above-described factors sufficiently constitute the requisite control contemplated by section 101(25)(B)(iii), it is unnecessary to address the applicability to this issue of Bellanca's $1.5 million convertible loan obligation to Aviation and Aviation's resulting contingent 82% interest in the outstanding shares of Bellanca.

*Corp. v. Drabkin, (In re Auto-Train Corp.),* 49 B.R. 605, 611 (E.D.Mich.1985).

### 1. *Substantially Contemporaneous Exchanges for New Value*

Defendants assert that the following transfers may not be avoided because they fall within the section 547(c)(1) substantially contemporaneous exchange exception:[55] (1) the $600,000 check transfer; and (2) the $150,000 and $100,000 check transfers. That exception provides that a transfer alleged to be preferential may not be avoided:

> to the extent that such transfer was—
>
> (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
>
> (B) in fact a substantially contemporaneous exchange.

11 U.S.C. § 547(c)(1) (1982). To establish a section 547(c)(1) defense, the Defendants must demonstrate as to each transfer that it was both intended by the parties to be a contemporaneous exchange for new value and in actual fact was substantially contemporaneous. Based upon a review of the record and applicable case law, I am compelled to conclude that, as to all transfers at issue here, Defendants have failed to carry their burden of proof on the question of intent.

With respect to the $600,000, $150,000, and $100,000 check transfers, the record is clear that no contemporaneous exchanges for new value were intended by either AGCO or Bellanca. Defendants contend, however, that the legislative history to the Bankruptcy Code mandates otherwise. They point to the following legislative history as dispositive of the matter: "Normally, a check is a credit transaction. However, for the purposes of this paragraph [section 547(c)(1)], a transfer involving a check is considered to be 'intended to be

contemporaneous.'" S.Rep. No. 989, 95th Cong., 2d Sess. 88, *reprinted in* 1978 U.S. Code Cong. & Ad.News 5787, 5874; H.R. Rep. No. 595, 95th Cong., 2d Sess. 373, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 6329. Whether or not a check transfer is normally intended by the parties to the transfer to be contemporaneous with an advance of new value, such is not, as this case amply demonstrates, always the case. In the present circumstances, the facts indicate that, as to all three check transfers, the parties' actual intentions were that the occurrence of the transfers were wholly dependent upon the happening of other events.

■ As to the $600,000 check transfer, for example, it is clear that such check was drawn on December 19 on Gerald Sears' instructions and was to be held by Juan Gomez in the event that the Commercial Credit Equipment Corp. deal relating to Bellanca Financial Corp. failed. The purpose behind the check was to reduce, if necessary, the recent infusions of cash either actually committed or effectively committed through AGCO's guarantee of Bellanca's $1.0 million loan obligation to First City. Although AGCO certainly anticipated the possibility that the CCEC deal would fail, thereby causing it to deposit the $600,000 check, there is no indication whatsoever that either AGCO or Bellanca intended such a result. In fact, the purpose behind the $1.0 million loan, the guarantee of which AGCO characterizes as new value, was to help foster the successful completion of the CCEC deal and the creation of Bellanca Financial. Therefore, it is clear that the parties never intended the $600,000 to be transferred to AGCO by way of the December 19 check contemporaneous with AGCO's guarantee of the First City loan.

■ The record similarly establishes that both the $150,000 and $100,000 check transfers to AGCO were not intended to be

---

**55.** Defendants concede that the transfers of B–083, E–207 and E–266 were not in exchange for transfers of new value to Bellanca but were instead in exchange for a corresponding reduc- tion in AGCO's accounts receivable. It is, therefore, not asserted that these transfers constituted substantially contemporaneous exchanges under section 547(c)(1).

contemporaneous with AGCO's December 17, 1979, advance of $250,000 to Bellanca. As with the $600,000 check, the two checks at issue here were drawn in anticipation that they might be deposited quickly. In fact, in this case it is clear that AGCO hoped to deposit both checks possibly contemporaneous with the $250,000 advance. The purpose behind the $250,000 advance, however, was to cover potential check overdrafts by Bellanca, and repayment of the advance was intended to occur only upon Bellanca's receipt of sufficient other deposits to cover the two checks to AGCO. Moreover, testimony by Sears established that the purpose behind preparing two checks, instead of one for the full amount, was so that a partial reimbursement could be promptly achieved if Bellanca received only enough receipts to cover one of the checks. In light of these facts, I conclude that neither the $150,000 nor $100,000 check transfers were intended by the parties to be contemporaneous exchanges for new value.

While the legislative history to section 547(c)(1) lends some guidance to the application of the statutory provisions, I do not consider it controlling over the otherwise clear mandate expressed by Congress. At best, the legislative history may express some intent by Congress that check transfers which are not considered credit transactions may under this section be afforded a presumption that they are intended to be contemporaneous exchanges. Whether or not such a presumption lies, I hold that Defendants have failed in their overall burden of proof on this issue as all three check transfers were clearly not intended by the parties to be contemporaneous exchanges. The parties herein intended credit transactions which do not generally avail themselves of the protections afforded by section 547(c)(1). *See, e.g., Philadelphia Light Supply Co. v. B.R.R. Electronics, (In re Philadelphia Light Supply Co.)*, 33 B.R. 734, 737–38 (Bktcy.E.D.Pa.1983); *Gropper v. Samuel Kunstler Textiles, Inc., (In re Fabric Buys of Jericho, Inc.)*, 22 B.R. 1013, 1016 (Bktcy.S.D.N.Y.1982).

## 2. *Subsequent Advances of New Value*

As to their final defense to Plaintiff's claim that they received preferential transfers from Bellanca, both AGCO and Aviation assert an entitlement to offsets for new value subsequently advanced. Specifically, Defendants contend that new value was advanced to Bellanca as follows: (1) wire transfers totaling $460,873.56; (2) a check transfer in the amount of $50,000; (3) transfers totaling $39,082.90 representing money owed to AGCO by J.T. Callier, the transferor; (4) AGCO's guarantee for the $1.0 million First City National Bank loan, or in any event $400,000 of that loan representing loan proceeds never returned to either the bank or AGCO; (5) payments to Lycoming, Eagle suppliers, and other guaranteed and nonguaranteed vendors totaling $1,165,525.07; (6) $396,779.91 in payments to meet various Bellanca obligations including employee salaries and expenses, rent, insurance, utilities, and amounts owing for outside professional services rendered; and (7) engineering, shop, and other services rendered to Bellanca and invoiced on Aviation invoices in the total amount of $161,502.95.[56] Defendants further contend that these advances may serve to offset otherwise preferential transfers by AGCO regardless of Aviation's role with respect to certain of the advances. It is argued in all instances that Aviation's role was no more than ministerial, that its separate cor-

---

**56.** Additional wire and check transfers from AGCO totaling $502,229.84, as well as a $300,000.00 transfer from an Aviation account at the Alexandria Bank & Trust Co., are deemed no longer asserted by Defendants as new value transfers under section 547(c)(4) as these transfers have previously been determined to have been made for the purchase of the various aircraft allegedly preferentially transferred by Bellanca to AGCO. In light of my decision that the aircraft were not preferentially transferred, these money transfers are no longer available to Defendants under their section 547(c)(4) new value affirmative defense. *See* 11 U.S.C. § 547(c)(4)(B) (1982). The same is true with respect to AGCO's June 9, 1980 check to Hartzell Propeller in the amount of $8,780.00 which was paid from funds originally advanced to Aviation by Bellanca.

porate existence should be disregarded, and that AGCO must be viewed as the actual provider of new value. Plaintiff, on the other hand, contests Defendants' characterization of several of the alleged new value advances, as well as their characterization of Aviation's role in certain instances.

The "subsequent advance rule", upon which Defendants rely, is codified at section 547(c)(4) and reads as follows:

> The trustee may not avoid under this section a transfer—
>
> * * * * * *
>
> (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
>
> (A) not secured by an otherwise unavoidable security interest; and
>
> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

11 U.S.C. § 547(c)(4) (1982). The Code rejects the judicially created "net result rule" previously applied by some courts under the Bankruptcy Act and mandates that a transfer may not be avoided under this section to the extent that new value is advanced "after" the transfer. *See Waldschmidt v. Ranier, (In re Fulghum Constr. Corp.),* 706 F.2d 171, 173–74 (6th Cir.1983), *cert. denied sub. nom., Ranier & Associates v. Waldschmidt,* 464 U.S. 935, 104 S.Ct. 342, 78 L.Ed.2d 310 (1983); *Thomas W. Garland Inc. v. Union Electric Co., (In re Thomas W. Garland, Inc.),* 19 B.R. 920, 925–26 (Bktcy.E.D.Mo.1982); *Pettigrew v. Trust Co. Bank, (In re Bish-*

*op),* 17 B.R. 180, 183–84 (Bktcy.N.D.Ga. 1982). As an exception to section 547(b) of the Code, however, it nevertheless continues to serve as an encouragement to creditors to continue dealing with troubled businesses. *Gold Coast Seed Co. v. Spokane Seed Co., (In re Gold Coast Seed Co.),* 30 B.R. 551, 553 (Bktcy. 9th Cir.1983); *Chemical Separations Corp. v. Irons, (In re Chemical Separations Corp.),* 36 B.R. 141, 143 (Bktcy.E.D.Tenn.1984).

*Prepetition advances*

One of the Plaintiff's primary contentions is that many of the advances asserted by Defendants fail to comport with the statutory definition of new value and the underlying legislative purpose behind the section 547(c)(4) exception. "New value" is defined in section 547(a)(2) to mean

> money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, but does not include an obligation substituted for an existing obligation.

11 U.S.C. § 547(a)(2) (1982) (amended 1984). The legislative history to section 547 adds to this definition only to the extent that it states that new value is defined in its "ordinary sense" and in such a manner as to "avoid any confusion or uncertainty" surrounding the term. S.Rep. No. 989, 95th Cong., 2d Sess. 87, *reprinted in* 1978 U.S. Code Cong. & Ad.News 5787, 5873; H.R. Rep. No. 595, 95th Cong., 1st Sess. 372, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5963, 6328.[57]

---

**57.** "New value", however, may be additionally understood by contrasting the section 547(a)(2) definition with that provided under the U.C.C. for the term "value":

> Except as otherwise provided with respect to negotiable instruments and bank collections (section 336.3–303, 336.4–208 and 336.4–209) a person gives "value" for rights if he acquires them
>
> (a) in return for a binding commitment to extend credit or for the extension of immediately available credit whether or not drawn upon and whether or not a chargeback is

provided for in the event of difficulties in collection; or

(b) as security for or in total or partial satisfaction of a preexisting claim; or

(c) by accepting delivery pursuant to a preexisting contract for purchase; or

(d) *generally, in return for any consideration sufficient to support a simple contract.*

Minn.Stat. § 336.1–201(44) (1984) (emphasis added). A comparison of these two definitions clearly indicates for "new value" a narrower circumscription than that intended under the U.C.C. for "value." In particular, section

Plaintiff effectively contends that all payments made by AGCO or Aviation directly to employees and creditors of Bellanca on debts owed by Bellanca, some of which debts to creditors were guaranteed by AGCO, fall outside the narrow definitional scope for "new value." Plaintiff similarly contends that to the extent guarantees were provided by AGCO on any of Bellanca's debts, such guarantees also do not constitute new value. A close reading of the new value definition in conjunction with section 547(c)(4), however, yields insufficient support for Plaintiff's position under the facts of this case.

 Upon a plain reading of section 547(a)(2) it cannot reasonably be disputed that, irrespective of the facts in this case, payments of money were clearly intended by Congress to constitute new value. This is true whether or not the debtor is the payment recipient. Section 547(a)(2) contains no requirement that a payment must be made to the debtor. A debtor's relationship to new value only becomes relevant in determining the *effect* of a new value transfer. Thus, a payment of new value from a creditor to a debtor has the effect in certain circumstances of offsetting an otherwise avoidable preferential transfer. Similarly, upon a strict reading of the statutory language, a creditor is also entitled to such an offset when new value is paid not to the debtor, but for the debtors' benefit. *See* 11 U.S.C. § 547(c)(4). *Cf. LaRose v. Crosby & Son Towing, Inc., (In re Dick Henley, Inc.)*, 38 B.R. 210, 213–14 (Bktcy. M.D.La.1984) (analogizing section 547(c)(1) to section 547(c)(4), court held that, where creditor's release of lien rights against third party inures to debtor's benefit, creditor gave new value both *for the benefit* of a debtor and *to* debtor); *see also Cooley v. General Elec. Corp., (In re Advanced Contractors)*, 44 B.R. 239, 241–42 (Bktcy.

M.D.Fla.1984) (adopting rationale expressed in *Dick Henley* ).[58]

 While Plaintiff appears to view this result as conflicting with the rationale underlying the new value defense, I reach a different conclusion. Certainly critical to a creditor's reliance on section 547(c)(4) is the requirement that new value advanced by the creditor must augment a debtor's estate subsequent to the receipt of a preference such that the debtor's estate is not depleted to the detriment of other creditors. *See In re Rustia*, 20 B.R. 131, 134 (Bktcy.S.D.N.Y.1982) (open credit line on charge accounts does not augment estate until debtors avail themselves of such by purchases or cash advances); *Matter of Duffy*, 3 B.R. 263, 266 (Bktcy.S.D.N.Y. 1982) (forbearance from repossessing leased vehicle does not enhance value of debtor's estate so as to offset diminution of estate resulting from preferential payment). Plaintiff misstates the policy behind the subsequent advance rule, though, by suggesting that the test is whether a new value advance makes available additional assets for distribution to creditors. The clear intent of Congress is that new value advanced by creditors should be available to debtors in the conduct of their business. Consequently, a debtor's purchase of supplies or payment of employee salaries and other expenses with new value received is the fully anticipated result of a new value advance, even though the immediate effect of such may be to temporarily expend funds otherwise available for distribution. That new value might be routed directly from a preferred creditor to a third party on behalf and for the benefit of a debtor, rather than to the debtor first, does not alter the fact that the estate is augmented, albeit indirectly, in a manner contemplated by the language of section 547(c)(4).

---

547(a)(2) expressly excludes from the new value definition "an obligation substituted for an existing obligation." 4 Collier on Bankruptcy ¶ 547.05 (15th ed. 1985). It is precisely this language, Plaintiff contends, that eliminates as a

section 547(c)(4) defense many of the advances Defendants characterize as new value.

**58.** I do not at this time express any opinion whatsoever as to the interpretations adopted in these decisions with respect to section 547(c)(1).

■ Concerning AGCO's and Aviation's direct payments to Bellanca employees and creditors on nonguaranteed debts owed by Bellanca, I am satisfied that new value was given by Defendants for the benefit of Bellanca at the time each payment was made. While Plaintiff asserts that such payments only serve to substitute obligations owed by Bellanca to Defendants for existing obligations similarly owed to Bellanca's employees and other creditors of Bellanca and, therefore, do not constitute new value, I do not adopt this view. Plaintiff ignores the narrow scope of the new value definition. While the ultimate effect of the giving of new value may be to substitute one obligation for another, that does not alter the fact that the new value given was not in and of itself such an obligation. Plaintiff's interpretation would, in essence, take every advance out of the new value definition to the extent a debtor personally applied funds so received against any of its outstanding obligations. Clearly, such was not the intent of Congress in enacting sections 547(a)(2) and (c)(4).

■ Despite compelling arguments raised by Plaintiff on the issue of guarantees, I conclude that, as to the guarantees given by AGCO to Bellanca suppliers, other creditors, and the First City National Bank, new value was ultimately advanced for the benefit of Bellanca. Preliminarily, it should be noted that a guarantee is nothing more than a contractual obligation evidenced by a writing and does not, alone, satisfy the definitional requirements set forth in section 547(a)(2). Moreover, Plaintiff correctly asserts, and logic dictates, that a setoff under section 547(c)(4) should be limited to the amount of the new value supplied. While this may suggest that new value in the form of materials or services supplied or loan proceeds may be allocable only to the supplier or lender and not the guarantor, I conclude otherwise. Upon honoring a guarantee, the guarantor gives new value for the benefit of a debtor and is thereby subrogated to the rights of the guaranteed supplier or lender. The supplier's or lender's claim to new value then vanishes and the guarantor becomes entitled to a section 547(c)(4) offset as to preferential transfers made prior to the original advance of new value by such supplier or lender. *Cf. Aetna Business Credit, Inc. v. Hart Ski Mfg. Co. Inc., (In re Hart Ski Manufacturing Co., Inc.)*, 7 B.R. 465, 468–69 (Bktcy.D.Minn.1980) (guarantee on letters of credit given to debtor treated as new value under 11 U.S.C. § 547(c)(1) where demand for payment was made on guarantor and guarantor was obligated to pay amounts owing).[59]

■ New value advances by AGCO, by virtue of its guarantee and subsequent payment of future debts incurred by Bellanca to its suppliers or other creditors, occurred for purposes of section 547(c)(4) at the time new value was originally advanced by the suppliers or creditors. The record, however, fails to clearly reflect in all cases when such advances to Bellanca occurred. Consequently, with due regard to Defendants' burden of proof on this issue, I conclude that each advance of materials supplied was made on the earliest of the following: (1) the date of shipment; (2) the date of delivery; (3) the invoice date; or (4) the date indicated on AGCO's check payment. As to AGCO's guarantee on the $1.0 million First City loan, the evidence indicates that AGCO honored its guarantee in January 1980 when it replaced Bellanca's obligation to First City National Bank with two new promissory notes in the same aggregate amount between the First City bank and AGCO. Those notes were paid in full on April 3, 1980. Consequently, AGCO gave $1.0 million in new value for the benefit of Bellanca and is entitled to an offset as to preferential transfers occurring prior to the original December 19, 1979, advance of the First City loan. To hold that no new

---

**59.** In *Hart Ski* the court's decision suggests that payment by the guarantor had been demanded but not yet made. I express no opinion at this time as to whether such circumstances suffice to establish an advance of new value by a guarantor, or as to the availability of a section 547(c)(1) defense by a guarantor relying on its guarantee as new value.

value was advanced here upon AGCO's giving and subsequently honoring its guarantees would be an unjust decision and would result in a windfall to Bellanca's guaranteed creditors and the First City bank which might otherwise be entitled to a set-off for new value advanced despite the fact they had received full repayment on the subject debts.

Ancillary issues are raised by Plaintiff concerning AGCO's payments to insurers of Bellanca, to Lycoming, and to suppliers of Eagle aircraft materials as well as concerning the rendering of engineering and other services to Bellanca. With respect to the insurance payments, Plaintiff questions the extent to which the payments actually benefitted Bellanca in that (1) in some instances the policies covered both Bellanca and the Defendants, and (2) inasmuch as Bellanca was insolvent during the periods of coverage, and therefore judgment proof, the policies were practically for the sole benefit of Defendants who had much to lose from a large judgment. Plaintiff's second argument is unavailing. To construe policies of insurance as of no benefit to a judgment proof insured not only conflicts with the realities of a troubled business struggling to survive in today's marketplace, but represents a step back from established public policy favoring insurance as an appropriate means of effectuating compensation. As to Plaintiff's first argument, I am satisfied that Defendants should not be entitled to new value advances to the extent such advances reflect insurance coverage for themselves. This is so despite the fact that the cost of those policies involved was the same whether or not Defendants were named as insured. Consequently, I hold that deductions from the new value advances in the form of insurance payments must be made proportionate with Defendants' share of the coverage under the subject policies.

With respect to AGCO's payments to Eagle aircraft suppliers, Plaintiff asserts such payments do not constitute new value on behalf of AGCO. Rather, Plaintiff characterizes the overall arrangement with the Eagle suppliers as purchases by Aviation, as evidenced in part by the use of Aviation purchase orders, and, therefore, characterizes the advances to Bellanca as Aviation advances. With due regard to the documentary evidence suggesting Aviation purchases, I believe the record as a whole indicates that the true purchaser here was AGCO. All payments to the Eagle suppliers were generated from and all Bellanca reimbursements but one were paid to AGCO. As to Aviation, the evidence reasonably supports only the conclusion that it acted in no more than an agency capacity in this particular matter. The materials purchased by AGCO and supplied thereby to Bellanca, then, constitute new value advances for which AGCO is entitled to an offset. The record supports the conclusion that, as to AGCO's purchases from both Lycoming and the Eagle aircraft suppliers, the materials purchased became the property of Bellanca upon delivery to Bellanca. Consequently, AGCO's new value advances, here, occurred simultaneous with each delivery.

Finally, as to engineering, shop, and other services rendered to Bellanca, Plaintiff contends these services were rendered by Aviation and not AGCO. Defendants contend otherwise, however, asserting that Aviation had no employees or payroll. Testimony submitted by Defendants, though tending to support their assertion, is, however, sufficiently rebutted by evidence introduced by Plaintiff indicating that at least to some extent Aviation supplied services. This is a close question, and I defer in this instance to documents prepared contemporaneous or nearly contemporaneous to the relevant time period. Defendants have not met their burden of proof on this issue, and I conclude that the various services rendered here were so rendered by Aviation. Moreover, in light of Defendants' burden of proof on the question of new value, I find that new value was supplied by Aviation as of the beginning of each week for which services were rendered.

*Postpetition advances*

█ Defendants also claim a section 547(c)(4) offset against preferential transfers to them by virtue of new value supplied to Bellanca after the commencement of the bankruptcy. While Plaintiff asserts that only new value supplied prior to the filing of the bankruptcy petition may be used to offset preferential transfers, Defendants claim that section 547(c)(4) applies by its terms to all advances of new value made after the alleged preferential transfer. *See Thomas W. Garland, Inc. v. Nooney Co., (In re Thomas W. Garland, Inc.),* 28 B.R. 87, 90 n. 7 (Bktcy.E.D.Mo.1983) (conclusory indication that postpetition delinquencies of rent may serve as a setoff under section 547(c)(4) ); *see also Keydata Corp. v. Boston Electric Co., (In re Keydata Corp.),* 37 B.R. 324, 328 (Bktcy.D. Mass.1983) (application without discussion of postpetition utility service as section 547(c)(4) setoff) (*citing In re Thomas W. Garland, Inc.* for different proposition). With due regard to the authorities cited by Defendants, I decline to follow those decisions and hold that advances postpetition may not be applied to offset preferential transfers.

Upon the filing of a petition for relief, an estate is created consisting of all the assets and properties of the debtor. *See* 11 U.S.C. § 541 (1982) (amended 1984). Such estate is a separate and distinct entity from the debtor. *In re Arctic Enterprises, Inc.,* 17 B.R. 839, 841 (Bktcy.D.Minn.1982). Moreover, although the debtor, as debtor in possession, is bestowed with nearly all of the rights and powers and is required to perform most of the functions and duties of a trustee, including the operation of the debtor's business, *see* 11 U.S.C. § 1107, 1108 (1982) (amended 1984), obligations incurred and assets received postpetition become the obligations and assets of the estate. *See Id.* at § 541(a)(7); *Arctic Enter. Inc. v. Fox Lake Harbor, (In re Arctic Enter., Inc.),*

17 B.R. at 841 (debt incurred postpetition is debt of estate and not that of debtor). Strictly applying the terms of section 547(c)(4), therefore, it becomes clear that postpetition advances of new value ostensibly to or for the benefit of the debtor should instead be allocated to the debtor's estate.

This result is well grounded not only in the policy underlying section 547(c)(4), but in the statutory framework set up to govern the treatment of costs and expenses incurred during the administration of a bankruptcy case. As Defendants contend, it is true that the purpose behind the subsequent advance rule is to encourage creditors to continue to deal with troubled businesses. That is not, however, the only mechanism set up by the Code to encourage such involvement. Subsequent to the filing of a petition, creditors are encouraged on a somewhat more limited basis to conduct business activities with the debtor. Section 364 of the Code, for example, permits the debtor to incur on behalf of the estate both unsecured and secured debt in a manner that affords varying degrees of protection to creditors continuing to do business with such debtor postpetition. Moreover, a creditor may also look to section 503(b)(1) for potential reimbursement even though a prior arrangement was neither reached with the debtor nor approved by the court under section 364. While these and other provisions do not permit entirely unrestricted interaction between a debtor and the business community, they do reflect a balancing of the multitude of interests which converge upon the filing of a petition. Where a single creditor freely offsets otherwise avoidable transfers with funds expended postpetition, the potentially conflicting interests of other creditors are inadequately represented and may be prejudiced.[60] To permit such offsets notwithstanding possible prejudice to other creditors would ignore the orderly mechanisms

---

**60.** For example, under the circumstances of this case, other creditors, if given the opportunity, may have contested the necessity of some payments by AGCO to satisfy debts which it guaranteed. While probably in the best interests of AGCO, such payments may or may not have been in the best interests of the estate. I express no opinion at this time, however, as to the reasonableness or necessity of any of these expenditures.

established by Congress to protect all interested parties concerned.

*Application of new value to preferential transfers*

The parties raise two additional concerns which must be addressed prior to determining the appropriate setoffs under section 547(c)(4). First, Defendants contend that for the purposes of applying the subsequent advance rule transfers from Bellanca to AGCO or Aviation by check should be deemed to "take effect" under section 547(e)(2)(A) at the time each check is delivered. Second, Defendants claim that advances apparently or actually emanating from Aviation should be allowed to serve as offsets for transfers made to both AGCO and Aviation. As to both issues, Plaintiff argues that Defendants' position is untenable. A review of the record and controlling law persuades me to agree with Plaintiff.

Defendants' contention that, for purposes of section 547(c)(4), preferential check transfers take effect upon delivery is based on legislative history to section 547(c) purportedly authorizing such a result. The various positions which courts have, to date, adopted on this issue are fully and adequately set forth in the decision of *Ray v. Gulf Oil Prods.*, (*In re Blanton Smith Corp.*), 37 B.R. 303, 307–309 (Bktcy.M.D.Tenn.1984), and need not be entirely reiterated herein. Those courts which have adopted the position tendered by Defendants have focused in part on the following comments made by both Representative Don Edwards and Senator Dennis DeConcini in presenting the final drafts of the Bankruptcy Code to Congress:

> Contrary to language contained in the House report, payment of a debt by means of a check is equivalent to a cash payment, unless the check is dishonored. Payment is considered to be made when the check is delivered for purposes of sections 547(c)(1) and (2).

124 Cong.Rec.S. 17,414 (daily ed. October 6, 1978) (statement of Sen. DeConcini); 124 Cong.Rec.H. 11,097 (daily ed. September 28, 1978) (statement of Rep. Edwards).

Additional attention has been given by the same courts to the following discussion contained in both the House and Senate reports concerning section 547(c)(1):

> The first exception is for a transfer that was intended by all parties to be a contemporaneous exchange for new value, and was in fact substantially contemporaneous. Normally, a check is a credit transaction. However, for the purposes of this paragraph, a transfer involving a check is considered to be "intended to be contemporaneous," and if the check is presented for payment in the normal course of affairs, which the Uniform Commercial Code specifies as 30 days, U.C.C. § 3–503(2)(a), that will amount to a transfer that is "in fact substantially contemporaneous."

H.R.Rep. No. 595, 95th Cong., 1st Sess. 373, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6329; S.Rep. No. 989, 95th Cong., 1st Sess. 88, *reprinted in* 1978 U.S. Code Cong. & Admin.News 5787, 5874.

While admittedly the comments by Edwards and DeConcini suggest an intention that in some instances delivery of a check is to constitute a transfer, I find the language contained in the House and Senate reports more representative of the statutory language contained in section 547. Under the rule adopted earlier in this decision with respect to the timing of a check transfer under section 547(b), it is clear that in light of those two reports a check delivered contemporaneous with a new value advance in a noncredit transaction will still be deemed "for or on account of antecedent debt." However, if presented for payment within thirty days it will be excepted from the trustee's avoidance powers as *"substantially* contemporaneous". Neither the House and Senate reports nor the statutory language provides a basis for adopting alternate rules for when a check transfer takes effect. Absent more, I am not persuaded at this time to adopt the rule suggested by Edwards and DeConcini, nor am I inclined to extend such to section 547(c)(4). As under section 547(b), the time at which a preferential check transfer

takes effect for purposes of section 547(c)(4) is upon presentment by the transferee and acceptance by the drawee.

■ Defendants' additionally claim a right to apply new value emanating from Aviation to set off preferential transfers to AGCO. Plaintiff, however, initially contests this claimed right on the basis that the statutory language expressly prohibits such a result. Plaintiff's argument is grounded in the following language of section 547(c)(4):

> The trustee may not avoid under this section a transfer—
>
> \* \* \* \* \* \*
>
> (4) to or for the benefit of a creditor, to the extent that, after such transfer, *such creditor* gave new value to or for the benefit of the debtor ....

11 U.S.C. § 547(c)(4) (1982) (emphasis added). Plaintiff essentially contends that the reference to "such creditor" means that that new value must be given by the same creditor that received the preferential transfer. Although correct in this contention,[61] Plaintiff's initial assertion is not dispositive of this matter. "Creditor" is defined under the Code to include a corporation with a prepetition claim against the debtor. *See* 11 U.S.C. § 101(9), (14) and (30) (1982) (amended 1984). It is Defendants' claim that, given the nature of Aviation's subsidiary nature to AGCO, the two corporations should in effect be treated as one.

As Defendants contend, it is true that it is a well established rule that the corporate status of a subsidiary can be disregarded in bankruptcy proceedings if the subsidiary is found to be a mere alter ego of the parent corporation. *See Hillebrand v. Sav-Co,* 353 F.Supp. 19, 21 (E.D.Ill.1972). In contrast to *Hillebrand* and the cases cited therein, though, AGCO here effectively

seeks for its own benefit to pierce its own corporate veil to reach new value advances of its subsidiary. On this question, I find persuasive the decision of *Eckles v. Petco Inc. Interstate, (In re Balducci Oil Co., Inc.),* 33 B.R. 847 (Bktcy.D.Colo.1983). In that case the court addressed whether a creditor, Petco Inc., Interstate, was entitled to set off under section 553 of the Code a debt owed to the debtor against a debt owed by the debtor to Petco's wholly owned subsidiary, Pinion Gas Company. Applying Colorado law, the court remarked as follows:

> "The alter-ego doctrine is a means by where creditors may hold stockholders personally liable for corporate obligations. It comes into play in cases where the corporate entity was used to defeat public convenience, or to justify or protect wrong, fraud or crime." *Rosebud Corp. v. Boggio,* 39 Colo.App. 84, 88, 561 P.2d 367 (1977). In *Contractors Heating v. Scherb,* 163 Colo. 584, 432 P.2d 237 (1967) the Colorado Supreme Court held, "Standing alone, informalities in the conduct of a corporate business do not form a basis for piercing the corporate form. The evidence in the record of this alone without fraud or some other wrong being perpetrated is insufficient to hold Mrs. Scherb personally liable." *Scherb, supra* at 587, 432 P.2d 237. Hence, under the corporate law of the state of Colorado, a corporate officer may not pierce the corporate veil at his whim or caprice or to perpetrate fraud. *Colorado Finance Co. v. B.F. Bennet,* 110 Colo. 1, 129 P.2d 299 (1942). Petco has cited no case where a court allowed a corporation to pierce its own veil or the veil of a subsidiary to achieve desired ends. Thus, as a matter of corporate law, without alleging fraud or some other wrong, Petco will not be al-

---

**61.** I do not by this interpretation of section 547(c)(4), however, reject the analysis adopted by the court in *Landsdowne v. Harbor Sec. Bank (In re Bagwell),* 29 B.R. 461 (Bktcy.D.Or.1983). It is true that an assignee is essentially subrogated to the rights and stands in the shoes of the assignor. As such, for the purposes of section

547(c)(4), the assignee becomes the creditor of the debtor in the same sense that the assignor was previously. While Plaintiff did not raise this issue with respect to AGCO's status as a guarantor, I find the analysis in *Bagwell* equally applicable to those circumstances.

lowed to disregard Pinion's corporateness to establish mutuality of obligation. *Eckles v. Petco Inc. Interstate, (In re Balducci Oil Co., Inc.)*, 33 B.R. at 853.

█ Defendants' attempts to distinguish section 547(c)(4) from section 553 are ineffectual. The alter-ego doctrine is a legal theory arising out of state law and not a precept born out of the peculiar sections of the Bankruptcy Code. As in *Balducci*, the Defendants here have cited no case where a court has permitted such a "reverse piercing" of a corporate veil.[62] I am not prepared to ascribe to the doctrine at issue an application unsupported by its purpose.[63]

█ Moreover, I do not find that the record as a whole supports Defendants' position either. Defendants did introduce testimony at trial to the effect that Aviation merely acted as a cost center for AGCO to account for AGCO's aircraft-related investments and that it served merely as a custodian of AGCO's funds with no employees or active existence of its own.

Plaintiff, however, introduced substantial documentary evidence prepared contemporaneous or nearly contemporaneous with the matters at issue tending to contradict many of Defendants' assertions here. Consequently, upon an in depth review of all of the relevant evidence, I conclude that Defendants have not met their burden of proof on this issue. I find that to some extent at least Aviation did maintain an active existence separate from that of AGCO, although it is clear that the two corporations worked closely together in many of their dealings with Bellanca.

█ Defendants finally contend, applying language in the *Balducci* decision, *see Eckles v. Petco Inc. Interstate, (In re Balducci Oil Co., Inc.)*, 33 B.R. at 853, that Bellanca, AGCO, and Aviation expressly agreed to treat AGCO and Aviation as one entity. Whether or not this argument is relevant, I do not find such an express agreement established by the record. At best, one might infer that from time to time the parties in actual fact treated

---

**62.** Texas case law does allow piercing of the corporate veil to reach shareholders of a corporation when the corporation is engaged in fraudulent or morally culpable behavior. *Tigrett v. Pointer*, 580 S.W.2d 375 (Tex.Civ.App.—Dallas 1978 n.r.e.); *George v. Houston Boxing Club, Inc.*, 423 S.W.2d 128 (Texas Civ.App.—Houston 1974 n.r.e.). However, no Texas cases that I found allowed reverse piercing of the corporate veil. The case of *Weaver v. State of Texas*, 652 S.W.2d 420 (Tex.Civ.App.—Houston 1982 n.r.e.) held that an individual who owned three corporations could not pierce the corporate veil between the corporations for purposes of a defense in his criminal case. The criminal charge upon which the owner of the three corporations was found guilty was securities fraud. He used monies invested in one of the three corporations to pay debts of another. He argued that since all three corporations were his alter ego and alter egos of one another there was no fraud. The Court held that "the alter ego doctrine is merely a means of piercing the corporate veil to hold individuals personally liable in certain actions, and is remedial in nature, not defensive." at 652 S.W.2d 422. It is clear to me Texas law does not allow use of the alter ego theory by a shareholder of a company, even a 100% shareholder, to escape liability to third parties.

Minnesota case law does allow reverse piercing of the corporate veil for limited purposes.

*Roepke v. Western National Mutual Insurance Co.*, 302 N.W.2d 350 (1982); *Kuennen v. Citizens Security Mutual Insurance Company*, 330 N.W.2d 886 (1983); *Cargill Inc. v. Hedge*, 375 N.W.2d 477 (Minn., 1985), *aff'g* 358 N.W.2d 490 (Minn.Ct.App.1984). A reverse pierce will only be allowed 1) where very significant policy reasons justify it, 2) where there is virtually no distinction between the individual and his corporation, and 3) where others will not be harmed by the pierce. In this case, I do not think any of the three criteria are met. There are no policy reasons requiring a pierce. AGCO and Aviation, although closely intertwined, did maintain their separate corporate identities. Clearly others—namely the debtor and its unsecured creditors—will be harmed if the pierce is allowed.

**63.** I do not by this interpretation of section 547(c)(4), however, reject the analysis adopted by the court in *Landsdowne v. Harbor Sec. Bank (In re Bagwell)*, 29 B.R. 461 (Bktcy.D.Or.1983). It is true that an assignee is essentially subrogated to the rights and stands in the shoes of the assignor. As such, for the purposes of section 547(c)(4), the assignee becomes the creditor of the debtor in the same sense that the assignor was previously. While Plaintiff did not raise this issue with respect to AGCO's status as a guarantor, I find the analysis in *Bagwell* equally applicable to those circumstances.

AGCO and Aviation as one and the same. However, the parties' contractual activities reflect an understanding that separate corporate identities were involved and sufficiently negate any inference of an express agreement to the contrary.

Application of the subsequent advance rule with regard to the principles above stated yields the following result. Property of Bellanca preferentially transferred to Aviation is entirely offset by Aviation's subsequent new value advances. *See* Appendix F. Consequently, Plaintiff is not entitled to avoid any transfers to Aviation. As to AGCO, however, there is only a partial offset against preferential transfers. Plaintiff is entitled to avoid for the benefit of the estate preferential transfers in the amount of $411,010.38. *See* Appendix E.

## II. POSTPETITION TRANSFERS

Plaintiff also raises in his complaint the allegation that postpetition transfers to Defendants occurred which may be avoided pursuant to 11 U.S.C. § 549 (1982) (amended 1984). Specifically, Plaintiff contends that the postpetition filing of certain aircraft bills of sale constituted transfers of property of the estate. In light of my decision that sales of the relevant aircraft occurred prior to the commencement of the bankruptcy case, however, I conclude that such transfers may not be avoided by Plaintiff under section 549 of the Code.

## III. ADMINISTRATIVE EXPENSE CLAIM

■ AGCO and Aviation claim that certain of their expenditures postpetition for the benefit of Bellanca should be determined to be administrative expenses. Administrative expenses receive a higher payment priority than prepetition unsecured claims.

11 U.S.C. § 503(b) provides:

(b) After notice and a hearing, there shall be allowed administrative expenses ... including—

(1)(A) the actual, necessary costs and expenses of preserving the estate ....

"Notice" pursuant to the Bankruptcy Rules of intent to claim an administrative expense priority requires notice to parties other than the debtor. In fact a motion is required. Bankruptcy Rule 2002. Here, the Court file indicates notice, at most to Bellanca. Therefore, I cannot rule on this issue in the context of this adversary proceeding and will dismiss AGCO and Aviation's claim without prejudice to the filing of an appropriate motion for administrative expense priority in the main case file.

## IV. EQUITABLE SUBORDINATION

■ 11 U.S.C. § 510(c)(1) allows a court to "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim ... or interest ...". This District has adopted a two-part test to determine whether equitable subordination should be imposed. *F & M Marquette Bank of Minneapolis v. Investment Sales Diversified, Inc., (In re Investment Sales Diversified)*, Civ. 3–84–18 (D.Minn. September 13, 1984). The test is:

1) A claimant must have engaged in some type of inequitable conduct; and

2) The misconduct must have resulted in injury to the creditors of the Debtor or conferred an unfair advantage on the claimant.

*Wilson v. Huffman (In re Missionary Baptist Foundation of America, Inc.)*, 712 F.2d 206 (5th Cir.1983); *In re Minnesota Kicks*, 48 B.R. 93 (Bktcy.Minn.1985). Some other courts have added a third requirement—that the equitable subordination of claimant's claim would not be inconsistent with the Bankruptcy Code. *In re Castillo*, 7 B.R. 135 (Bktcy.S.D.N.Y.1980); *Moore v. Grasso (In re Formaggio Mfg., Inc.)*, 23 B.R. 688 (Bktcy.R.I.1982); *In re All Products Co.*, 32 B.R. 811 (Bktcy.E.D.Mich. 1983); *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692 (5th Cir.1977) (pre-Bankruptcy Code).

■ According to some case law, there is a different standard of proof of misconduct that must be proved by a debtor depending upon whether the creditor whose

claim the debtor wishes to subordinate is an insider of the debtor or not. If the creditor is not an insider, the misconduct of a creditor sufficient to require equitable subordination is very substantial. The burden of proof is less as to an insider's conduct. *In the Matter of W.T. Grant Company*, 4 B.R. 53 (Bktcy.S.D.N.Y.1980). As discussed earlier in this order, I have determined that AGCO and Aviation were "insiders" as to Bellanca. Therefore, only the lower standard of proof need be met. This lower standard of proof requires a less than "very substantial" proof of misconduct or injury.

■ However, even under the less stringent standard of proof of misconduct of an insider, I do not find that Bellanca has proven that AGCO and Aviation engaged in inequitable conduct and/or engaged in conduct that injured other creditors of Bellanca or conferred an unfair advantage on AGCO or Aviation. As the facts show, AGCO and Aviation transferred the following sums of money to Bellanca in the period from December of 1979 to July of 1980 to Bellanca:

| | |
|---|---|
| Table VIII— | $684,367.96 |
| Table IX— | $328,735.44 |
| Engineering & Shop Services— | $161,502.95 |
| Table X— | $1,362,325.43 |
| Table XI— | $199,969.55 |
| TOTAL | $2,736,901.33 |

Bellanca paid $1,954,361 to non-AGCO guaranteed creditors from December of 1979 to July of 1980. Bellanca paid $306,330 to AGCO guaranteed vendors. Bellanca paid $444,068 to secured creditors other than AGCO. Bellanca paid to AGCO only $2,246,300.95 during the same time period. Bellanca paid a total of $5,116,259 on non-AGCO debts. Its payment to AGCO constitutes only 44% of its total disbursements to creditors during December of 1979 to July of 1980.

AGCO's payments to Bellanca and Bellanca's payments to AGCO do not appear to give AGCO or Aviation any inequitable benefit at all. In light of Bellanca's large debt to AGCO, the numbers appear to treat AGCO and Aviation less favorably than it could proportionally expect.

■ The fact that AGCO and Aviation were paid by Bellanca and that Bellanca paid debts AGCO and Aviation guaranteed does not of itself establish Debtor's burden of proving equitable conduct. As stated in *Sinclair v. Barr (In re Mid-Town Produce Terminal, Inc.)*, 599 F.2d 389, 393 (10th Cir.1979) (citing Herzog and Zweibel, The Equitable Subordination of Claims in Bankruptcy, 15 Vand.L.Rev. 83, 112 (1961)):

> To recapitulate: mere control or domination of a corporation is not proscribed by law and is in itself insufficient to justify piercing the corporate veil and subordinating claims. The fiction of a separate legal entity will be respected unless to the elements of domination and control are added certain factors which will motivate the bankruptcy court, sitting as a court of equity, to disregard the fiction. These "plus" factors may be fraud, plain and simple, or a history of spoilation, mismanagement and faithless stewardship which is tantamount to fraud; they may be simply the violation of rules of fair play and good conscience which amounts to a breach of the fiduciary standards of conduct owed to the corporation, a use of the powers of an "insider" for personal advantage to the detriment of creditors—all of which constitutes a "wrong" which equity will undo or intervene to prevent.

Bellanca has not met this burden. The *opportunity* to do wrong is not sufficient evidence to require equitable subordination. *In re All Products Co., supra.*

As to the second element of proof of a § 510(c)(1) claim, Bellanca must show that injury to creditors other than AGCO and Aviation occurred or that AGCO and/or Aviation gained an unfair advantage over other creditors. No such evidence was adduced. AGCO and Aviation did not obtain any advantage. In fact, as the figures show, AGCO and Aviation continued to advance funds to Bellanca in excess of repayments until the chapter 11 filing occurred.

Bellanca issued SEC reports and press releases and wrote letters to its creditors in 1979 and 1980 in regard to its financial condition. As the findings indicate, these public disclosures to creditors, while apparently stating no untruths, did not disclose many of Bellanca's dealings with AGCO and Aviation. These nondisclosed dealings included significant facts for creditors—

1. The arrangements of Lycoming and Eagle suppliers with AGCO and Aviation re purchase of materials for Bellanca;

2. Cancellation of orders by a major Champion dealer; and

3. Discussions of Bellanca re filing of a chapter 11 petition as early as April of 1980.

Although every creditor would like to receive information like the facts noted above, I do not find that Bellanca's failure to provide the information is grounds for subordination, even if AGCO and/or Aviation through their control of Bellanca drafted and/or caused to be drafted the SEC reports, press releases and letters. There was no evidence that AGCO or Aviation intentionally withheld information from other creditors. The conduct of AGCO and Aviation did not rise to the level of fraud or mismanagement. In fact, AGCO and Aviation's conduct was, as the evidence shows, directed toward keeping Bellanca operating for all creditors' benefit. An operational Bellanca was the best way AGCO and Aviation saw to realize the construction of the Aries T–250 and to cut AGCO and Aviation's already substantial losses. These activities, as I see it, were also in the best interests of the other creditors.

The third element of a subordination claim is whether the subordination would be inconsistent with the Bankruptcy Code. I do not need to reach this issue as I find that the other two facets of the § 510(c)(1) test have not been met. In any event, I find no activities of AGCO or Aviation to be inconsistent with the Code nor were any raised to me.

IT IS THEREFORE ORDERED that:

1. Anderson-Greenwood & Co. shall pay to Edward W. Bergquist, trustee of the bankrupt estate of Bellanca Aircraft Corporation the sum of Four Hundred Eleven Thousand Ten and 38/100ths Dollars ($411,010.38) together with costs and disbursements herein.

2. Edward W. Bergquist, trustee of the bankrupt estate of Bellanca Aircraft Corporation shall make no recovery against Anderson-Greenwood Aviation Corp.

LET JUDGMENT BE ENTERED ACCORDINGLY.

## APPENDIX A

### BELLANCA AIRCRAFT CORPORATION
### FINANCIAL STATUS
#### AS REPORTED ON AUDITED AND UNAUDITED BALANCE SHEETS

| | 6/30/79 | 7/31/79 | 8/31/79 | 9/30/79 | 10/31/79 | 11/30/79 | 12/31/79 | 1/31/80 | 2/29/80 | 6/30/80 |
|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS:** | | | | | | | | | | |
| **CURRENT ASSETS:** | | | | | | | | | | |
| CASH | 429,239 | 577,484 | 213,266 | 328,018 | 19,414 | 580,331 | 19,640 | (728,656) | (417,906) | 525 |
| TRADE A/R | 872,119 | 816,100 | 795,747 | 814,128 | 1,066,359 | 962,272 | 915,557 | 933,590 | 1,048,033 | 449,445 |
| **INVENTORY:** | | | | | | | | | | |
| RAW MATERIALS–WIP–T–250 | 353,247 | 513,660 | 678,956 | 760,000 | | | | | | |
| INVENTORY (MATERIALS & WIP) | 2,990,530 | 3,158,518 | 3,412,421 | 3,122,791 | | | | | | |
| TOTAL RAW MATERIALS & WIP | 3,343,777 | 3,672,178 | 4,091,377 | 3,882,791 | 4,102,560 | 3,279,912 | | | 4,553,941 | 3,677,198 |
| FINISHED GOODS | 202,811 | 118,753 | 216,247 | 241,204 | 139,807 | | | | | 529,598 |
| DEMONSTRATOR AIRCRAFT | 12,274 | 11,749 | 11,224 | 0 | 10,173 | | | | | |
| TOTAL INVENTORY | 3,558,862 | 3,802,680 | 4,318,848 | 4,123,995 | 4,252,540 | 3,279,912 | 3,672,488 | 4,173,206 | 4,553,941 | 4,206,791 |
| PREPAIDS & OTHER CURRENT ASSETS | 168,372 | 146,933 | 75,167 | 82,671 | 153,671 | 70,940 | 193,499 | 204,352 | 154,074 | 185,723 |
| TOTAL CURRENT ASSETS | 5,028,592 | 5,343,197 | 5,408,028 | 5,348,812 | 5,491,984 | 4,893,455 | 4,801,184 | 4,582,492 | 5,338,142 | 4,842,484 |
| **PROPERTY, PLANT & EQUIPMENT:** | | | | | | | | | | |
| LAND | | | | 2,000 | | 2,000 | 2,000 | 2,000 | 2,000 | |
| BUILDINGS & IMPROVEMENTS | | | | 1,032,547 | | 1,034,106 | 1,035,539 | 1,035,517 | 1,036,518 | |
| DIES & JIGS | | | | 1,166,281 | | 1,193,536 | 1,202,176 | 1,281,650 | 1,292,403 | |
| MACHINERY & EQUIPMENT | | | | 619,738 | | 619,855 | 622,802 | 562,861 | 562,979 | |
| OFFICE FURNITURE & FIXTURES | | | | 107,343 | | 108,589 | 108,858 | 108,981 | 109,705 | |
| | | | | 2,927,909 | | 2,958,086 | 2,971,375 | 2,991,009 | 3,003,605 | 3,017,101 |
| LESS: ACCUMULATED DEPRECIATION | | | | (1,503,715) | | (1,538,942) | (1,552,502) | (1,566,062) | (1,579,312) | (1,633,552) |
| NET PROPERTY, PLANT, & EQUIPMENT | 1,448,252 | 1,476,967 | 1,492,089 | 1,424,194 | 1,496,443 | 1,419,144 | 1,418,873 | 1,424,947 | 1,424,293 | 1,383,549 |

BELLANCA AIRCRAFT CORPORATION

FINANCIAL STATUS

AS REPORTED ON AUDITED AND UNAUDITED BALANCE SHEETS

| | 6/30/79 | 7/31/79 | 8/31/79 | 9/30/79 | 10/31/79 | 11/30/79 | 12/31/79 | 1/31/80 | 2/29/80 | 6/30/80 |
|---|---|---|---|---|---|---|---|---|---|---|
| DEFERRED CHARGES AND OTHER ASSETS | 57,200 | 62,072 | 168,665 | 155,765 | 169,706 | 153,347 | 154,406 | 153,190 | 152,890 | |
| TOTAL ASSETS | $6,584,044 | $6,882,236 | $7,063,782 | $6,928,771 | $7,158,133 | $6,465,946 | $6,374,463 | $6,160,626 | $6,915,325 | $6,226,033 |
| LIABILITIES AND STOCKHOLDERS' EQUITY: | | | | | | | | | | |
| TOTAL LIABILITIES | $9,046,587 | $9,479,460 | $9,586,606 | $10,148,951 | $10,125,456 | $9,843,841 | $9,734,642 | $9,985,218 | $10,486,998 | $11,377,642 |
| TOTAL STOCKHOLDERS' EQUITY (DEFICIT) | ($2,512,543) | ($2,597,224) | ($2,522,824) | ($3,220,180) | ($2,967,323) | ($3,377,895) | ($3,360,179) | ($3,824,592) | ($3,571,673) | ($5,151,609) |

## APPENDIX B
## BELLANCA AIRCRAFT CORPORATION
### MARKET VALUE OF TANGIBLE ASSETS

| | 6/30/79 | 7/31/79 | 8/31/79 | 9/30/79 | 10/31/79 | 11/30/79 | 12/31/79 | 1/31/80 | 2/29/80 | 6/30/80 |
|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS:** | | | | | | | | | | |
| **CURRENT ASSETS:** | | | | | | | | | | |
| CASH | 429,239 | 577,484 | 213,266 | 328,018 | 19,414 | 580,331 | 19,640 | (728,656) | (417,906) | 525 |
| TRADE A/R | 872,119 | 816,100 | 795,747 | 814,128 | 1,066,359 | 962,272 | 915,557 | 933,590 | 1,048,033 | 449,445 |
| **INVENTORY:** | | | | | | | | | | |
| RAW MATERIALS-WIP-T-250 | 353,247 | 513,660 | 678,956 | 760,000 | | | | | | |
| INVENTORY (MATERIALS & WIP) | 2,990,530 | 3,158,518 | 3,412,421 | 3,122,791 | | | | | | |
| TOTAL RAW MATERIALS & WIP | 3,343,777 | 3,672,178 | 4,091,377 | 3,882,791 | 4,102,560 | 3,279,912 | | | 4,553,941 | 3,677,193 |
| FINISHED GOODS[1] | 249,458 | 146,466 | 265,984 | 296,681 | 171,963 | | [651,406] | [651,406] | | 651,406 |
| DEMONSTRATOR AIRCRAFT | 12,274 | 11,749 | 11,224 | 0 | 10,173 | | | | | |
| TOTAL INVENTORY | 3,605,509 | 3,830,393 | 4,368,585 | 4,179,472 | 4,284,696 | 3,279,912 | 3,794,296 | 4,295,014 | 4,553,941 | 4,328,599 |
| PREPAIDS & OTHER CURRENT ASSETS | 168,372 | 146,933 | 75,167 | 82,671 | 153,671 | 70,940 | 198,499 | 204,352 | 154,074 | 185,723 |
| TOTAL CURRENT ASSETS | 5,075,239 | 5,370,910 | 5,452,765 | 5,404,289 | 5,524,140 | 4,893,455 | 4,922,992 | 4,704,300 | 5,338,142 | 4,964,292 |
| **PROPERTY, PLANT & EQUIPMENT:** | | | | | | | | | | |
| LAND | | | | | | | | | | |
| BUILDINGS & IMPROVEMENTS | | | | | | | | | | |
| DIES & JIGS | | | | | | | | | | |
| MACHINERY & EQUIPMENT | | | | | | | | | | |
| OFFICE FURNITURE & FIXTURES | | | | | | | | | | |
| LESS: ACCUMULATED DEPRECIATION | | | | | | | | | | |
| NET PROPERTY, PLANT, & EQUIPMENT[2] | 2,231,906 | 2,231,906 | 2,231,906 | 2,231,906 | 2,231,906 | 2,231,906 | 2,231,906 | 2,231,906 | 2,231,906 | 2,231,906 |
| OTHER TANGIBLE ASSETS[3] | 26,497 | 31,369 | 67,328 | 5,800 | 19,741 | 3,882 | 4,441 | 3,225 | 2,925 | |
| TOTAL TANGIBLE ASSETS | $7,333,642 | 7,634,185 | 7,751,999 | 7,641,995 | 7,775,787 | 7,128,743 | 7,159,389 | 6,989,481 | 7,572,973 | 7,196,198 |

1 Values based on highest available historical mark-up percentage of 23% as determined from the company's gross profit and cost of sales figures for the three months ended December 31, 1979. The bracketed amounts listed for the months ending 12/31/79 and 1/31/80 represent the amounts from the "Total Inventory" category in the table in Appendix A allocated by the Court to "Finished Goods" after adjusting for market valuation. The amounts provided in the "Total Inventory" category in the present table for those two months reflect the market value adjustment for finished goods.

2 Values based on the amount listed in the company's summary of debts and property included in its final Supplement and Amended Bankruptcy Schedules filed January 21, 1981.

3 Values determined by subtracting from the Deferred Charges and Other Assets category in Appendix A all established intangible assets in the form of deferred debt expense and deferred computer software costs as such amounts are provided for in the company's audited balance sheets for September 30, 1978, and September 30, 1979.

APPENDIX C
BELLANCA AIRCRAFT CORPORATION
MARKET VALUE OF INTANGIBLE ASSETS, TOTAL ASSETS,
AND RESULTING FINANCIAL STATUS

| | 6/30/79 | 7/31/79 | 8/31/79 | 9/30/79 | 10/31/79 | 11/30/79 | 12/31/79 | 1/31/80 | 2/29/80 | 6/30/80 |
|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS:** | | | | | | | | | | |
| INTANGIBLE ASSETS | | | | | | | | | | |
| DEFERRED SOFTWARE COSTS | 30,703 | 30,703 | 30,703 | 79,331 | 79,331 | 79,331 | 79,331 | 79,331 | 79,331 | |
| TYPE CERTIFICATES | | | | | | | | | | |
| VIKING | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| CHAMPION | 390,000 | 390,000 | 390,000 | 390,000 | 390,000 | 390,000 | 390,000 | 390,000 | 390,000 | 390,000 |
| ARIES T-250 LICENSE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| EAGLE AIRCRAFT CONTRACT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL INTANGIBLE ASSETS | 430,703 | 430,703 | 430,703 | 479,331 | 479,331 | 479,331 | 479,331 | 479,331 | 479,331 | 400,000 |
| TOTAL TANGIBLE ASSETS | 7,333,642 | 7,634,185 | 7,751,999 | 7,641,995 | 7,775,787 | 7,128,743 | 7,159,339 | 6,939,431 | 7,572,973 | 7,196,198 |
| TOTAL ASSETS | 7,764,345 | 8,064,888 | 8,182,702 | 8,121,326 | 8,255,118 | 7,608,074 | 7,638,670 | 7,418,762 | 8,052,304 | 7,596,198 |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | | | | | | | | | |
| TOTAL LIABILITIES | 9,046,587 | 9,479,460 | 9,586,606 | 10,148,951 | 10,125,456 | 9,843,841 | 9,734,642 | 9,985,218 | 10,486,998 | 11,377,642 |
| TOTAL STOCKHOLDERS' EQUITY (DEFICIT) | (1,282,242) | (1,414,572) | (1,403,904) | (2,027,625) | (1,870,338) | (2,235,767) | (2,095,972) | (2,566,456) | (2,434,694) | (3,781,444) |

APPENDIX D

AIRCRAFT TRANSACTIONS

| Work Order No. | Aircraft Transactions Between AGCO and Bellanca | | | | | Name of Purchaser | Aircraft Purchases by Third Parties | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Invoice Date | Invoice Amount | Sale Date on Bill of Sale | Bill of Sale Filing Date | Bill of Sale Recording Date | | Invoice Date | Sale Date on Bill of Sale | Purchase Price | Purchase Price Paid to |
| B-083 | 11/16/79 | $62,662.75 | 11/16/79 | | | Grane Aviation | 12/14/79 | 12/14/79 | $55,000.00 | Bellanca |
| E-207 | 09/10/79 | $20,243.25 | 09/11/79 | 11/19/79 | 12/31/79 | AERO Champ | 02/11/83 | 01/01/83 | $14,000.00 | AGCO |
| E-266 | 09/10/79 | $20,648.75 | | | | Screaming Eagle | 12/18/79 | 12/14/79 | $18,221.63 | Bellanca |
| B-118 | 10/25/79 | $63,329.70 | 10/25/79 | 05/07/80 | 07/30/80 | Miller Flying Service | | 04/23/80 | | AGCO |
| B-126 | 11/16/79 | $77,954.80 | 01/20/80 | 05/07/80 | 06/06/80 | Grane Aviation | | 05/30/80 | | AGCO |
| B-128 | 11/16/79 | $66,106.10 | 11/16/79 | 05/07/80 | 07/29/80 | Larry Wade | | 05/29/80 | | AGCO |
| B-129 | 11/16/79 | $74,752.40 | | | | Grane Aviation | 02/20/80 | 02/20/80 | $69,675.00 | Bellanca |
| B-130 | 11/16/79 | $68,898.60 | | | | Great Lakes Aviation | 11/21/79 | 12/19/79 | $69,528.60 | Bellanca |
| B-131 | 11/16/79 | $60,905.15 | 11/16/79 | 05/07/80 | 07/30/80 | Miller Flying Service | | 04/23/80 | | AGCO |
| B-133 | 11/16/79 | $66,839.85 | 11/16/79 | 05/07/80 | 07/30/80 | Miller Flying Service | | 04/23/80 | | AGCO |
| B-136 | 01/02/80 | $66,028.10 | 12/26/79 | 05/07/80 | 07/30/80 | Miller Flying Service | | 04/23/80 | | AGCO |
| B-137 | unknown | $74,790.60 | 12/27/79 | 05/07/80 | 07/30/80 | Miller Flying Service | | 04/23/80 | $68,828.28 | AGCO |
| B-138 | 12/28/80 | $69,240.40 | | | | South Raleigh Aviation | 02/29/80 | 02/29/80 | $71,775.40 | Bellanca |
| E-309 | 12/20/79 | $25,320.50 | 12/20/79 | 03/25/80 | 04/15/80 | William Hall | | 02/22/82 | | AGCO |
| E-317 | 12/20/79 | $25,320.50 | 12/20/79 | 12/08/80 | 01/26/81 | Lennart Renberg | | 08/20/81 | | AGCO |
| E-338 | 12/20/79 | $24,114.00 | | | | Tradewinds Aircraft Sales | 07/22/80 | 07/22/80 | $23,000.00 | Bellanca |
| E-072 | 05/19/80 | $27,516.75 | 05/16/80 | 08/25/80 | 12/11/80 | Larry Wade | | 05/29/80 | | AGCO |
| B-142 | 03/31/80 | $71,734.85 | 04/20/80 | 05/07/80 | 07/15/80 | Miller Flying Service | 08/31/80 | 05/30/80 | $61,600.00 | AGCO |
| B-148 | 03/31/80 | $73,553.65 | 04/09/80 | 05/07/80 | 07/30/80 | Miller Flying Service | | 04/23/80 | $64,428.28 | AGCO |
| B-146 | | | | | | Aerial Productions | 03/27/80 | 03/27/80 | $63,973.32 | Bellanca |
| A-01 | 04/15/80 | | | | | Miller Flying Service | 04/15/80 | 04/15/80 | $80,638.50 | Bellanca |

APPENDIX E
NEW VALUE SETOFFS FOR
PREFERENTIAL TRANSFERS TO AGCO

| Preferential Transfers to AGCO | | | New Value Advanced by AGCO | | | Preference After Setoff |
|---|---|---|---|---|---|---|
| Date of Transfer | Description of Transfer | Transfer Amount | Date of Advance | Description of Advance | Amount Advanced | |
| | | | 08/01/79 to | | | |
| | | | 08/03/79 | Insurance coverage provided | $26,743.57 | $0.00 |
| | | | 08/03/79 | Payments to nonguaranteed suppliers | $7,000.00 | $0.00 |
| 08/03/79 | Address-O-Graph payment | $60.00 | | | | $60.00 |
| | | | 08/04/79 to | | | |
| | | | 09/10/79 | Insurance invoices paid | $45,112.50 | $0.00 |
| | | | 09/10/79 | Wire transfer-Bellanca loan | $50,000.00 | $0.00 |
| 09/10/79 | Transfer of E-207 | $20,243.25 | | | | $20,243.25 |
| 09/10/79 | Transfer of E-266 | $20,648.75 | | | | $40,892.00 |
| 09/10/79 | Address-O-Graph payment | $60.00 | | | | $40,952.00 |
| 09/10/79 | Insurance and loan reimbursement | $95,600.00 | | | | $136,552.00 |
| | | | 09/11/79 to | | | |
| | | | 11/05/79 | Wire transfer-Bellanca loan | $50,000.00 | $86,552.00 |
| | | | | Check transfer-Bellanca loan | $50,000.00 | $36,552.00 |
| | | | | J. T. Callier aircraft payments | $39,082.90 | $0.00 |
| | | | | Employee expense payments | $304.26 | $0.00 |
| | | | | Payments or guarantees to suppliers | $235.41 | $0.00 |
| | | | | Lycoming materials provided | $291,487.22 | $0.00 |
| | | | | Eagle materials provided | $24.00 | $0.00 |
| | | | | Nonguaranteed prof. services payments | $8,863.99 | $0.00 |
| | | | | Guaranteed prof. services payments | $8,863.99 | $0.00 |
| 11/05/79 | Lycoming reimbursement | $133,105.60 | | | | $133,105.60 |
| | | | 11/06/79 to | | | |
| | | | 11/15/79 | Lycoming materials provided | $328,012.25 | $0.00 |
| 11/15/79 | Address-O-Graph payment | $60.00 | | | | $60.00 |
| | | | 11/16/79 | Eagle materials provided | $121.24 | $0.00 |
| 11/16/79 | Transfer of B-083 | $62,662.75 | | | | $62,662.75 |

## NEW VALUE SETOFFS FOR
## PREFERENTIAL TRANSFERS TO AGCO

| Preferential Transfers to AGCO | | | New Value Advanced by AGCO | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Date of Transfer | Description of Transfer | Transfer Amount | Date of Advance | Description of Advance | Amount Advanced | Preference After Setoff |
| | | | 11/17/79 to 11/21/79 | Eagle materials provided | $342.26 | $62,320.49 |
| | | | | Lycoming materials provided | $38,578.00 | $23,742.49 |
| 11/21/79 | Address-O-Graph payment | $60.00 | | | | $23,802.49 |
| | | | 11/22/79 to 12/27/79 | Eagle materials provided | $17,863.71 | $5,938.78 |
| | | | | Lycoming materials provided | $186,084.92 | $0.00 |
| | | | | Check transfer-Bellanca loan | $250,000.00 | $0.00 |
| | | | | Guaranteed payment-First City loan | $1,000,000.00 | $0.00 |
| 12/27/79 | Partial repayment-First City loan | $600,000.00 | | | | $600,000.00 |
| 12/27/79 | Partial repayment of $250,000 loan | $150,000.00 | | | | $750,000.00 |
| | | | 12/28/79 | Eagle materials provided | $947.64 | $749,052.36 |
| | | | 12/28/79 | Payments to nonguaranteed suppliers | $946.61 | $748,105.75 |
| 12/28/79 | Partial repayment of $250,000 loan | $100,000.00 | | | | $848,105.75 |
| | | | 12/29/79 to 01/08/80 | Guaranteed prof. services payments | $20,554.88 | $827,550.88 |
| | | | | Rental space provided | $250.00 | $827,300.88 |
| | | | | Lycoming materials provided | $11,606.25 | $815,694.63 |
| | | | | Eagle materials provided | $796.30 | $814,898.33 |
| 01/03/80 | Address-O-Graph payment | $60.00 | | | | $814,958.33 |
| | | | 01/04/80 to 01/11/80 | Eagle materials provided | $7,228.51 | $807,729.82 |
| | | | | Lycoming materials provided | $40,508.00 | $767,221.82 |
| | | | | Payments to nonguaranteed suppliers | $35,671.57 | $781,550.25 |
| | | | | Insurance invoices paid | $9,426.00 | $722,124.25 |
| | | | | Payments on guarantees to suppliers | $11,073.64 | $711,050.61 |
| 01/11/80 | Address-O-Graph payment | $60.00 | | | | $711,110.61 |
| | | | 01/12/80 to 02/06/80 | Guaranteed prof. services payments | $5,890.80 | $705,219.81 |
| | | | | Payments on guarantees to suppliers | $37,362.45 | $667,857.36 |
| | | | | Insurance invoices paid | $24,337.81 | $643,519.55 |
| | | | | Utilities invoices paid | $506.11 | $643,013.44 |
| | | | | Utilities provided | $318.58 | $642,694.86 |
| | | | | Payments to nonguaranteed suppliers | $3,494.95 | $689,199.91 |

NEW VALUE SETOFFS FOR
PREFERENTIAL TRANSFERS TO AGCO

| Preferential Transfers to AGCO | | | New Value Advanced by AGCO | | | Preference After Setoff |
|---|---|---|---|---|---|---|
| Date of Transfer | Description of Transfer | Transfer Amount | Date of Advance | Description of Advance | Amount Advanced | |
| | | | | Lycoming materials provided | $32,008.60 | $607,191.31 |
| | | | | Eagle materials provided | $30,776.50 | $576,414.81 |
| | | | | Rental space provided | $500.00 | $575,914.81 |
| | | | | Employee expense payments | $623.88 | $575,290.93 |
| 02/06/80 | Address-O-Graph payment | $60.00 | 02/07/80 to | | | $575,350.98 |
| 02/21/80 | | | 02/21/80 | Eagle materials provided | $15,919.01 | $559,431.92 |
| | | | | Lycoming materials provided | $92,969.10 | $466,462.82 |
| | | | | Payments to nonguaranteed suppliers | $119.98 | $466,342.84 |
| | | | | Payments on guarantees to suppliers | $23,435.19 | $442,907.65 |
| 02/21/80 | Eagle reimbursement | $15,787.02 | 02/22/80 to | | | $458,694.67 |
| 02/26/80 | | | 02/26/80 | Eagle materials provided | $1,251.85 | $457,442.82 |
| | | | | Lycoming materials provided | $37,284.44 | $420,158.38 |
| | | | | Utilities provided | $303.38 | $419,855.00 |
| | | | | Payments on guarantees to suppliers | $4,507.00 | $415,348.00 |
| 02/26/80 | Lycoming reimbursement | $61,980.00 | 02/27/80 to | | | $477,328.00 |
| 03/03/80 | | | 03/03/80 | Eagle materials provided | $16,622.90 | $460,705.10 |
| | | | | Lycoming materials provided | $33,885.30 | $426,819.80 |
| | | | | Payments on guarantees to suppliers | $427.40 | $426,392.40 |
| 03/03/80 | Lycoming reimbursement | $45,441.00 | | | | $471,833.40 |
| 03/04/80 | | | 03/04/80 | Eagle materials provided | $2,354.76 | $469,478.64 |
| | | | | Lycoming materials provided | $883.98 | $468,594.66 |
| 03/04/80 | Eagle reimbursement | $7,332.82 | 03/05/80 to | | | $475,927.48 |
| 03/12/80 | | | 03/12/80 | Eagle materials provided | $3,888.86 | $472,038.62 |
| | | | | Lycoming materials provided | $33,746.00 | $438,292.62 |
| | | | | Payments on guarantees to suppliers | $8,887.96 | $429,404.66 |
| 03/12/80 | Lycoming reimbursement | $26,719.00 | 03/13/80 to | | | $456,123.66 |
| 03/17/80 | | | 03/17/80 | Eagle materials provided | $325.10 | $455,798.56 |
| | | | | Lycoming materials provided | $12,835.00 | $442,963.56 |

NEW VALUE SETOFFS FOR
PREFERENTIAL TRANSFERS TO AGCO

| Preferential Transfers to AGCO | | | New Value Advanced by AGCO | | | Preference After Setoff |
|---|---|---|---|---|---|---|
| Date of Transfer | Description of Transfer | Transfer Amount | Date of Advance | Description of Advance | Amount Advanced | |
| 03/17/80 | Lycoming reimbursement | $42,752.00 | | | | $485,715.56 |
| | | | 03/18/80 to | | | |
| | | | 04/02/80 | Eagle materials provided | $7,672.70 | $478,042.86 |
| | | | | Lycoming materials provided | $64,214.85 | $413,828.51 |
| | | | | Rental space provided | $250.00 | $413,578.51 |
| | | | | Payments on guarantees to suppliers | $11,586.00 | $401,992.51 |
| | | | | Insurance invoices paid | $5,331.00 | $396,661.51 |
| | | | | Payments to nonguaranteed suppliers | $265.15 | $396,396.36 |
| | | | | Wire transfers-Bellanca loans | $67,000.00 | $329,396.36 |
| 04/02/80 | Address-O-Graph payment | $60.00 | | | | $329,456.36 |
| | | | 04/03/80 to | | | |
| | | | 04/25/80 | Eagle materials provided | $524.73 | $328,931.63 |
| | | | | Payments on guarantees to suppliers | $799.93 | $328,131.70 |
| | | | | Insurance invoices paid | $194.85 | $327,996.85 |
| | | | | Wire transfer-Bellanca loan | $43,873.56 | $284,063.29 |
| | | | | Employee expense payments | $664.18 | $283,399.11 |
| | | | | Nonguaranteed prof. services payments | $2,819.38 | $281,079.73 |
| 04/25/80 | Transfer of B-146 & A-01 proceeds | $134,611.82 | | | | $415,691.55 |
| 04/25/80 | Lycoming reimbursement | $26,624.00 | | | | $442,315.55 |
| | | | 04/26/80 to | | | |
| | | | 05/15/80 | Payments on guarantees to suppliers | $16,423.37 | $425,892.18 |
| | | | | Rental space provided | $250.00 | $425,642.18 |
| 05/15/80 | Eagle reimbursement | $1,825.68 | | | | $427,467.86 |
| 05/15/80 | Eagle reimbursement | $1,296.32 | | | | $428,764.18 |
| 05/19/80 | Address-O-Graph payment | $120.00 | | | | $428,884.18 |
| 05/22/80 | Eagle reimbursement | $2,520.29 | | | | $431,404.47 |
| | | | 05/23/80 to | | | |
| | | | 07/24/80 | Guaranteed prof. services payments | $9,204.73 | $422,199.74 |
| | | | | Payments to nonguaranteed suppliers | $10,077.60 | $412,122.14 |
| | | | | Rental space provided | $500.00 | $411,622.14 |
| | | | | Utilities invoices paid | $22.26 | $411,599.88 |
| | | | | Insurance invoices paid | $589.50 | $411,010.38 |

412

APPENDIX F
NEW VALUE SETOFFS FOR
PREFERENTIAL TRANSFERS TO AVIATION

| Preferential Transfers to Aviation | | | New Value Advanced by Aviation | | | Preference After Setoff |
|---|---|---|---|---|---|---|
| Date of Transfer | Description of Transfer | Transfer Amount | Date of Advance | Description of Advance | Amount Advanced | |
| 05/30/80 | Miscellaneous reimbursements | $7,412.69 | | | | $7,412.69 |
| | | | 06/03/80 | Salary and expense payment | $1,230.77 | $6,181.92 |
| 06/04/80 | Eagle materials reimbursements | $1,760.94 | | | | $7,942.86 |
| | | | 06/12/80 | Salary and expense payment | $835.60 | $7,107.26 |
| | | | 06/12/80 | Salary and expense payment | $2,019.20 | $5,088.06 |
| | | | 06/12/80 | Salary and expense payment | $1,230.77 | $3,857.29 |
| | | | 06/15/80 | Alexandria rental space provided | $1,680.00 | $2,177.29 |
| | | | 06/27/80 | Salary and expense payment | $835.60 | $1,341.69 |
| | | | 07/03/80 | Salary and expense payment | $1,230.77 | $110.92 |
| | | | 07/03/80 | Salary and expense payment | $2,019.20 | $0.00 |
| | | | 07/11/80 | Salary and expense payment | $835.60 | $0.00 |
| | | | 07/11/80 | Salary and expense payment | $2,019.20 | $0.00 |
| | | | 07/15/80 | Alexandria rental space provided | $1,680.00 | $0.00 |
| 07/16/80 | Address-O-Graph payment | $5.62 | | | | $5.62 |
| | | | 07/18/80 | Salary and expense payment | $1,230.77 | $0.00 |